1

2

3

4

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                   **SOUTHERN DISTRICT OF CALIFORNIA**

10                                              04CV1971- MMA(WMc); 04cv2290-
                                                04CV1973- MMA (WMc);        MMA
11   IN RE: REMEC INCORPORATED                  CASE NO. 04-CV-1948-MMA (AJB)    (WM
     SECURITIES LITIGATION
12                                              **ORDER RULING ON PENDING**
                                                **MOTIONS;**
13
                                                [Doc. Nos. 173, 194, 263, 308, 310, 336]
14
     This Document Relates to all Actions.      **DISMISSING CASE WITH**
15                                              **PREJUDICE**

16

17        Currently pending before the Court are four summary judgment motions and several

18   evidentiary motions in these consolidated securities fraud cases against Defendants

19   REMEC, Inc., Ronald E. Ragland, and Winston E. Hickman. In sum, for the reasons stated

20   below, and because the Court finds that Defendants are entitled to summary judgment on

21   the element of scienter, judgment shall be entered in favor of Defendants and the case shall

22   be dismissed with prejudice.[1]

23   / / /

24   / / /

25   / / /

26   / / /

27   _____

28   [1]All pending motions are resolved herein, including the summary judgment motions
     concerning false and misleading statements, reliance, internal controls, and loss causation, as
     well as the evidentiary motions.

- 1 -                                04cv1948

# I.     BACKGROUND

## A.     Basic Facts

Defendant REMEC, Inc. ("REMEC") designed and manufactured "high frequency subsystems used in the transmission of voice, video and data traffic over wireless communications networks and in space and defense electronics applications." FAC[2] ¶ 2. This action concerns REMEC's Commercial segment (also known as the Wireless Systems division).[3] Defendant Ronald Ragland, an engineer, founded REMEC in 1983 and served as its Chief Executive Officer ("CEO") and Chairman of the Board of Directors until February 2004. Ragland Decl. ¶¶ 3-4. In November 2003, REMEC purchased Paradigm Wireless Systems, Inc., and hired that company's Chief Financial Officer ("CFO") Winston Hickman to serve in that same position at REMEC. Hickman Decl. ¶ 4; Ragland Decl. ¶ 11.

Plaintiffs accuse REMEC of materially overstating its financial results by failing to recognize millions of dollars in losses related to goodwill impairment. *See e.g.*, FAC ¶¶ 3-6, 139-225. Although the heart of Plaintiffs' case concerns impaired goodwill, Plaintiffs allege REMEC engaged in other deceptive accounting practices such as inflating revenue by overstating the value of excess, obsolete inventory and by failing to disclose significant internal control deficiencies. *See e.g.*, FAC ¶¶ 8, 11, & 14.[4]

The FAC contains two causes of action. REMEC, Ragland, and Hickman are named in the first cause of action for securities fraud pursuant to § 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934. Plaintiffs' second claim alleges control person liability

---

[2]The Fourth Amended Complaint ("FAC") is the operative pleading.

[3]REMEC reorganized its divisions over the years. REMEC had been divided into four segments. Williams Decl. Ex. 28 at 10; *id.* Ex. 56 at 10-11 (Form 10-K at 4-5). In 2002, REMEC streamlined its organization into the Commercial Wireless segment involved in this lawsuit, and the separate Defense and Space Segment. The Court will indicate when it is using consolidated financial numbers. In all other instances, the Court cites only the financial figures of the Commercial Wireless segment.

[4]Plaintiffs abandoned two allegations regarding the improper practice of selling and booking revenue for known, non-functional products and "pulling-in" orders from the future to meet current quotas. Pls.' Opp. to Falsity MSJ at 24, n.57. Plaintiffs previously alleged these accounting practices in FAC ¶ 11(c) & (d). *See also* FAC ¶ 8.

1   against Ragland and Hickman under § 20 of the Securities Exchange Act of 1934.

2       The Court certified a class of plaintiffs who purchased or otherwise acquired

3   REMEC securities between September 8, 2003 and September 8, 2004.  Fed. R. Civ. P.

4   23(a) & (b)(3); Order Granting Pls.' Mo. for Class Certification.  [Doc. No. 103.]

5          **B.**    **<u>Defining Goodwill Impairment Testing</u>**

6       Plaintiffs' case primarily involves an accounting method to test the value of

7   goodwill, which is calculated and reported on a company's financial statement.  Goodwill

8   is an intangible asset that reflects the "excess of the cost of an acquired entity over the net

9   of the amounts assigned to assets acquired and liabilities assumed."  Williams Decl. Ex. 1

10  at 105.[5]  In other words, goodwill, though it is an intangible asset, must be measured.  If the

11  value of the goodwill is "impaired," the company must deduct or "write off" that value on

12  the balance sheet.  When the value is positive, the company records goodwill as an asset.

13  Williams Decl. Ex. 2 at 42 (FY02 Form 10-K at F-8 reports purchases of Solitra and Pacific

14  Microwave Corp. and subsequent $17.7 million write-off associated with Pacific).

15       Goodwill is customarily acquired when an existing company purchases another

16  company.  With each acquisition, goodwill is recorded on the company's financial

17  statement.  In this case, Plaintiffs allege that REMEC pursued an aggressive strategy of

18  buying companies and recording inflated goodwill values in a scheme to mask the true

19  financial condition.  *See e.g.*, FAC ¶ 87.  Under Ragland's command, part of REMEC's

20  business strategy was to expand by buying other specialized technology companies that

21  would complement REMEC's product offerings.  Williams Decl. Ex. 2 at 8-9 (FY02 Form

22

23       [5]Defendants submitted a later version of the Financial Accounting Standards Board
Statement of Financial Accounting Standards No. 142: Goodwill and Other Intangible Assets
24  (" FAS 142"), which reflects amendments made after the initial standard was adopted.
Brownlie Decl. Ex. C (2008).  For example, ¶ 24 was deleted from the original version in 2006.
25  *Id.* at 25.  The parties dispute whether ¶ 24 *or* Appendix B sets forth the controlling standard.
Pls.' Opp. Br. at 5; Regan Decl. ¶ 2 (Appendix B contains background information and is not
26  authoritative); Defs.' Reply Br. at 2.  For purposes of ruling on the summary judgment
motions, the Court uses the standard in effect at the time REMEC conducted its tests.  The
27  Court rejects Plaintiffs' argument that "shockingly" Defendants ""admitted" violating FAS 142
because "the Company ignored ¶ 24."  Pls.' Opp. Br. on Falsity at 4-5.
28      Plaintiffs' original exhibit of FAS 142 was illegible, and was replaced in a "Notice of
Errata."  For simplicity, the Court cites Plaintiffs' exhibit as if it had been filed with Williams'
initial declaration. [Doc. No. 286.]

           

10-K at 6-7 describes strategy to pursue acquisitions); Williams Decl. Ex. 56 at 10 (FY03 Form 10-K).[6]  Beginning in 1999, REMEC's Commercial unit acquired several companies. REMEC  recorded the acquired goodwill as an asset on its financial statements in most of those transactions.[7]  For example, in November 2003, during the class period, REMEC bought Paradigm Wireless (Hickman's former employer) and recorded $17 million on its financial statement as goodwill, or 81% of the $21 million purchase price. *See* Pls.' Opp. Br., Attachment 3; Fraser Decl. Ex. 4 at 1 (Hinkle mem. dated 2/19/04).  Plaintiffs calculate that REMEC recorded goodwill totaling $55.9 million from the Commercial Wireless's four main acquisitions (or 64% of the $87 million purchase prices). *See* Pls.' Scienter Opp. Br., Attachment 3.

As mentioned, companies must test the value of goodwill using generally accepted accounting procedures ("GAAP").  The Financial Accounting Standard ("FAS") Board changed the rules governing the valuation of intangible assets in 2002.  Under the prior rule, companies accounted for goodwill by amortizing the value over a period of years as a long-term asset.  Brownlie Decl. Ex. D (FAS 121).  The prior rule instructed companies to account for and disclose impaired goodwill "whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recovered." *Id.* at 84.

The statement of FAS 142 eliminated the prior method of amortizing goodwill.

---

[6]REMEC's fiscal year ends on the last day of January, and its quarters end on the last day of April, July, October, and January.  The Court uses the abbreviations employed by the parties, such as "FY04."

[7]REMEC acquired several companies before the class period commenced.  Plaintiffs use the pre-class purchases to show the extent to which REMEC used goodwill to overstate its financial situation and give the false impression that the acquisition strategy was working. FAC ¶ 85 (at beginning of class period, REMEC's Commercial segment carried $44.1 million of goodwill, which represented 13% of total assets); *id.* ¶¶ 100, 139.  Plaintiffs highlight the following pre-class acquisitions: (1) October 2001, acquired ADC Mersum Ov (a/k/a "Solitra") for $56 million and recorded goodwill of $26 million; (2) November 2001, purchased CWH WEIHUA Shanghai Telecommunications Ltd. (a/k/a "China") for $2.7 million and recorded $2 million of goodwill; (3) December 2002, Spectrian acquired but no goodwill was recorded; (4) June 2003, bought Himark Telecom Group for $12.1 million and recorded goodwill of $9.9 million.  Katsell Reply Decl. Ex. 3 at 50 (Feb. 5, 2004 Hinkle mem.) (EY000695); *see* Williams Decl. Ex. 2 (FY02 Form 10-K at 6-7 describes other acquisitions).
REMEC also acquired Nanowave, but it was merged into the Defense segment which is not involved in this litigation.

Williams Decl. Ex. 1.  Instead, FAS 142 uses a two-step test to identify potential goodwill impairment and to measure the amount of loss.  *Id.* at 12 (¶ 18).  The first step compares the fair value of a reporting unit with its carrying value.  *Id.* at 12-14 (¶¶ 19 & 23-25).  If the fair value exceeds the carrying amount, goodwill is not impaired and the second step is not required.  *Id.* at 12 (¶ 19).  If the carrying amount exceeds its fair value, the second step is performed to measure the amount of impairment loss.  *Id.*  The second step "compares the implied fair value of reporting unit goodwill with the carrying amount of that goodwill."  *Id.* at 13 (¶ 20).

The accounting method to value goodwill involves predictions of future results and other uncertain variables.  The language of FAS 142 states that it measures a "reasonable estimate of the value of goodwill."  Williams Decl. Ex. 1 at 12 & 108 (¶ 18 n.13).  "Unlike many other assets that are tested for impairment, goodwill does not have a set of cash flows uniquely associated with it.  Instead, the cash flows associated with acquired goodwill usually are intermingled with those associated with internally generated goodwill and other assets because entities generally enter into business combinations to reduce costs and achieve synergies, which entails integrating the acquired entity with the acquiring entity."  *Id.* at 50 (App. B84); *id.* at 54 (App. B96 & B97); *id.* at 61-62 (App. B127) ("a goodwill impairment test by its very nature will include some level of imprecision").  As the definition states, goodwill measures amorphous concepts like the "synergy" created by merging two companies.  Goodwill is measured in large part on predictions, such as predictions of future sales and estimates of the cost savings that will be achieved by combining two entities (*e.g.*, reductions in duplicative labor and facilities).

The prediction of gross profit margin is central to Plaintiffs' suit against REMEC.  These types of business judgments should not be invalidated merely because, in hindsight, they proved wrong.

FAS 142 also changed the timing of goodwill testing.  It required companies to test the value of goodwill every fiscal year.  In addition to the annual test, certain conditions "that would more likely than not reduce the fair value" of an acquisition could trigger a

1    requirement to perform an interim test.  *Id.* at 15 ¶ 28.

2           REMEC implemented the new FAS 142 rule in early 2002 and first reported its

3    compliance after its FY03 ended on January 31, 2003.  *See* Williams Decl. Ex. 2 at 28;

4    Katsell Supp. Decl. Ex A at 12 & 16.[8]  The first test conducted under the new rule is called

5    the transitional test.  REMEC's transitional test applied "as of" the beginning of REMEC's

6    fiscal year, and the company had six months to complete it.  Williams Decl. Ex. 1 at 23 (¶

7    55).  The annual test must be conducted the "same time every year," *id.* at 14 (¶ 26), and

8    REMEC elected to measure goodwill impairment "as of" the last business day of

9    December.

10          In its Securities and Exchange Commission ("SEC") filings, REMEC told investors

11   that it tested goodwill and found no impairment.  *See e.g.*, Williams Decl. Ex. 56 at 33

12   (FY03 Form 10-K at 27) ("We did not recognize any goodwill impairment as a result of

13   performing this annual test.").  Plaintiffs dispute the accuracy of those statements.

14   Plaintiffs allege Defendants falsely assured the market it used assumptions that were

15   "consistent with the plans and estimates that we use to manage the underlying business" to

16   calculate its goodwill.  FAC ¶¶ 5 & 151.  Plaintiffs further allege that REMEC used

17   unreasonable assumptions to test the goodwill and should have conducted interim goodwill

18   impairment tests.  FAC ¶¶ 9-10.  Of particular importance to Plaintiffs' case, REMEC

19   assumed, for purposes of its annual impairment analyses in FY03 and FY04, that its gross

20   profits in future years would range from a low of 24% to a high of 38%.  Williams Decl.

21

---

22          [8]Defendants submitted several declarations by attorney Noah Katsell in connection with
       the various motions.  The Court distinguishes between five of them as follows:  (1) "Katsell
23     Scienter Decl." for the exhibits accompanying the reply brief to Defendants' *scienter* motion
       [Doc. No. 253-2]; (2) "Katsell MSJ Decl." refers to the exhibits attached to Defendants'
24     motion for summary judgment on falsity [Doc. No. 308-3]; (3) "Katsell Reply Decl." refers
       to the exhibits attached to Defendants' reply brief on that same motion [Doc. No. 339-4]; (4)
25     "Katsell Opp. Decl." refers to the exhibits accompanying Defendants' opposition to the
       Plaintiffs' motion on false and misleading statements [Doc. No. 259-2]; and (5) "Katsell Supp.
26     Decl." refers to the supplemental briefs that the Court allowed the parties to file regarding the
       February 2002 transitional test [Doc. No. 317-2].
27          The parties provided duplicates of several exhibits because of the factual overlap of the
       issues.  To simplify the quantity of exhibits, the Court has in some instances cited an exhibit
28     attached to a declaration filed with the scienter motion when the same document is also
       attached to another declaration filed in support of another motion.

1    Ex. 56 at 33 (FY03 Form 10-K at 27); *id.* Ex. 5 at 25 (draft FY04 Form 10-K at 22).[9]

2    Plaintiffs emphasize that REMEC's actual performance had been much worse:  7.1% in

3    FY02, 10.2% in FY03, and 12.3% in FY04.  In short, Plaintiffs accuse REMEC of using

4    numbers that crossed the line from optimism to manipulation.

5         In reviewing the accounting claims at issue in this lawsuit, the Court bears in mind

6    that measuring goodwill entails the exercise of professional judgment.  *See e.g.*, Katsell

7    MSJ Decl. Ex. E (Minstein Dep. at 27); Regan Rebuttal Report at 12-15; Katsell Decl. to

8    Mot. to Strike Ex. 2 at 8, 14, & 17 (hereinafter "Holder Rebuttal Report").  Professional

9    judgment is involved in accounting for goodwill in general because it is an intangible asset

10   and specifically because it depends upon predictions of future results.  *See e.g.*, Williams

11   Decl. Ex. 1 at 6 (the two-step process "begins with an estimation of the fair value of a

12   reporting unit"); *id.* (¶ 18 n.13) ("The fair value of goodwill can be measured only as a

13   residual and cannot be measured directly."); *id.* at 13 (¶ 23) (defining fair value as the

14   amount for which willing parties could buy or sell the asset); *id.* at 67 (App. B153)

15   (allowing "latitude" to measure fair value).

16         "Accountants have long recognized that 'generally accepted accounting principles'

17   are far from being a canonical set of rules that will ensure identical accounting treatment of

18   identical transactions.  'Generally accepted accounting principles,' rather, tolerate a range

19   of 'reasonable' treatments, leaving the choice among alternatives to management."  *Thor*

20   *Power Tool Co. v. C.I.R.*, 439 U.S. 522, 544 (1979); *In re Cirrus Logic Sec. Litig.*, 946 F.

21   Supp. 1446, 1457 (N.D. Cal. 1996).

22         FAS 142 also gives management discretion to make reasonable estimates in the

23   _____

24   [9]Plaintiffs submitted a document that appears to the Court to be a *draft* of REMEC's
     FY04 Form 10-K because it contains data from the FY03 Form 10-K, has bracketed text in

25   bold face that indicates a work in progress, and is not signed.  Williams Decl. Ex. 5 (R232786
     to 232854, *e.g.*, R232799 (referring to 34% revenue figure from "fiscal year ended January 31,

26   2003," "**[disease]** " & 232853); *accord* Fraser Decl. Ex. 23.  The Court discovered the problem
     when it compared the warning language that Defendants quoted from the paragraph entitled

27   "We may encounter difficulties in effectively integrating acquired businesses."  *Compare*
     Brownlie Ex.  F at 157 (FY03 Form-10K) *with* Williams Decl. Ex. 5 at 14 (FY03) *and*

28   Williams Ex. 56 at 20 (same paragraph as FY03).  Defendants did not provide a complete copy
     of the Form 10-K.  *Id.*; Katsell MSJ Decl. Ex. Q.  The Court therefore cites Plaintiffs' Exhibit
     5 as "draft FY04 Form 10-K."

totality of circumstances.  *See e.g.,* Williams Decl. Ex. 1 ("some consideration should be given to industry trends.").  This is not to say that goodwill is wholly subjective.  Companies are permitted to select an appropriate valuation method, and REMEC selected the discounted cash flow method.  *Id.* at 67 (App. B150-52).  "[W]hen cash flows are used to estimate fair value, those cash flows should be consistent with the most recent budgets and plans approved by management."  *Id.* (App. B152).  FAS 142 also requires that "cash flow estimates shall be based on reasonable and supportable assumptions."  *Id.* at 14 (FAS ¶ 24); *id.* at 95 (App. E ¶ 41a).

With these principles in mind, the Court turns to the pending motions.

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Plaintiffs bear the burden of proving these elements:  (1) a material (2) misrepresentation of fact; (3) scienter; (4) connection with the purchase or sale of a security; (5) reliance (also known as transaction causation); (6) loss causation; and (7) economic loss.  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005); *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996).  Courts may analyze falsity and scienter together, even though they are separate elements, because they generally depend upon the same set of facts.  *See In re Daou Systems, Inc. Sec. Litig.*, 411 F.3d 1006, 1015 (9th Cir. 2005).

Plaintiffs must come forward with "specific facts showing that there is a genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Celotex*, 477 U.S. at 325.

The Court must construe the evidence and draw justifiable inferences in favor of the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

"Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587. "This rule does not require that there be no factual dispute.  '[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.'"  *Hanon*, 975 F.2d at (quoting *Anderson*, 477 U.S. at 247-48).  "Where material factual disputes exist, the court must allow a jury to resolve the factual disputes." *Provenz*, 102 F.3d at 1483.

### III.    CROSS MOTIONS FOR SUMMARY JUDGMENT ON FALSE OR MISLEADING STATEMENTS

The parties filed cross motions to determine whether or not certain statements were false or misleading as a matter of law.

In a securities fraud case, "[l]iability depend[s] on the plaintiffs' success in demonstrating that one of the statements made by the company was actually false or misleading."  *In re Convergent Tech. Sec. Litig.*, 948 F.2d 507, 512 (9th Cir. 1991).  "Thus, to prevail, the plaintiffs must demonstrate that a particular statement, when read in light of all the information then available to the market, or a failure to disclose particular information, conveyed a false or misleading impression."  *Id.*; 15 U.S.C. § 78a ("to make any untrue statement of material fact or to omit to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading").

"The fact that an allegedly fraudulent statement and a later statement are *different* does not necessarily" establish falsity because the statement must be evaluated at the time it was made and not by hindsight.  *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1549 (9th Cir. 1993) (pre-Private Securities Litigation Reform Act of 1995) ("PSLRA").  The Ninth Circuit cautioned that the application of "flexible accounting concepts . . . do not always (or perhaps ever) yield a single correct figure."  *Id.*  In order to create a triable issue of fact on falsity, Plaintiffs must demonstrate more than a "difference between two permissible

1  judgments, but rather [must present facts explaining that the statement is] the result of a

2  falsehood." *Id.*

3  **A.**    **Plaintiffs' Accounting Expert Witnesses' Opinions are Admissible under**

4  ***Daubert***

5  Plaintiffs rely on expert testimony from two CPAs as evidence that REMEC's

6  goodwill impairment tests were manipulated by using unrealistic assumptions.  Defendants

7  move to exclude the expert opinions of Andrew G. Minstein and D. Paul Regan.  Fed. R.

8  Evid. 702.  Defendants argue that Minstein and Regan did not use a reliable methodology

9  in forming their opinions, but simply substituted their own subjective judgments.

10  In *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993), the Supreme

11  Court directed trial judges to exercise their "gatekeeping responsibility" to ensure that

12  expert testimony be "not only relevant, but reliable."  The Supreme Court gave examples of

13  factors to determine reliability, but its list is not exclusive because the test is flexible to fit

14  the subject matter.  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141, 150, 153

15  (1999).  "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district

16  court to admit opinion evidence which is connected to existing data only by the ipse dixit of

17  the expert."  *G.E., Inc. v. Joiner*, 522 U.S. 136, 146 (1997).  The proponent of the witness

18  bears the burden of establishing an expert's qualifications, reliability, and helpfulness.

19  Having reviewed the expert reports and declarations, the Court overrules

20  Defendants' objections because their arguments bear on the weight of the evidence.

21  **1.**    **Minstein Expert Report**

22  Defendants complain that Minstein's analysis is conclusory.  Defs.' Mot. to Strike

23  at 3-4 ("Minstein simply substitutes his judgment for that of REMEC's, and concludes that

24  REMEC was wrong."); *Daubert*, 509 U.S. at 590 (expert's opinion cannot be based upon

25  subjective belief or unsupported speculation).  The Court overrules the objections as they

26  pertain to the FY03 and FY04 annual impairment tests, but sustains the objections to his

27  conclusory opinions as to whether REMEC should have performed interim tests.

28  **a)**    **FY03 and FY04 Goodwill Impairment Tests**

1    The Court finds that Minstein's expert opinions are sufficiently reliable to be

2    admissible evidence because his declaration elucidates the basis of his conclusions.  His

3    expert report supports Plaintiffs' claims that REMEC made false and misleading statements

4    that its goodwill was not impaired in its Form 10-K for FY03 and FY04.[10]

5         Minstein concludes that REMEC's analysis of goodwill impairment was conducted

6    in violation of GAAP in both FY03 and FY04.  *See e.g.*, Minstein Decl. ¶¶ 24(b), 26-29, &

7    31-33.  Minstein opines that the assumptions REMEC used to project gross profit margins

8    and operating expenses as a percentage of revenue were inappropriate and indefensible.

9    Minstein bases his opinion on factors such as REMEC's low performance in recent years,

10   continuing pressure from competitors, the slow progress of moving manufacturing

11   operations from Finland to China, and poor selection of guideline companies.  Minstein

12   Report at 4-10 & 17-21.  Minstein notes that these conditions existed both when REMEC

13   reported goodwill and when it took the writeoff.  Minstein Decl. ¶ 6.  He points to facts that

14   support his conclusion, such as the small margins in the FY03 and FY04 tests, the small

15   percentage of the calculated fair value in contrast to the carrying value, and the impact that

16   small changes had on REMEC's continued losses.  *Id.* ¶ 24(b).

17        Minstein also explains how he chose the assumptions he used in his computer

18   model.  Minstein uses actual data from Andrew Corporation – one of the guideline

19

_____

20        [10]Minstein submitted his expert report in the form of a declaration, which the Court cites
     as "Minstein Report," [Doc. No. 284-2], to distinguish it from the separate declaration he
21   submitted to oppose the Defendants' motion, which the Court cites as "Minstein Decl." [Doc.
     No. 330.]
22        The Court acknowledges that Defendants justifiably criticized Minstein's original
     report.  His explanation of his methodology and assumptions were concise, but bordered on
23   being conclusory.  The declaration he prepared to respond to the Defendants' specific
     complaints, however, provides the necessary illumination for the Court to conclude that his
24   opinion is admissible.  For instance, Defendants criticized Minstein's failure to make a clear
     statement that a reasonable accountant would not have made the same decisions and his failure
25   to review the depositions before preparing his report.  Minstein responded to and resolved
     those two matters in his Declaration.  Minstein Decl. ¶ 18 ("In my opinion, any competent
26   valuation analyst conducting unbiased analysis of the data available to me would conclude that
     there was an indication of impairment of the goodwill at the end of FY 2003"); *id.* ¶ 45 ("I
27   prepared the Minstein report for submission on December 29, 2008.  At that time a substantial
     amount of deposition testimony was unavailable to me, and a number of depositions had not
28   yet been taken. . . . After I prepared my report I reviewed all relevant deposition testimony.
     I found nothing in any deposition testimony that alters any opinions expressed in my report.").

companies that REMEC used.  *See e.g.*, Williams Decl. Ex. 12 at 8 (listing Andrew as guideline company).  Although Andrew consistently outperformed REMEC, Minstein states that he gave REMEC the benefit of doubt that it could achieve similar numbers. Minstein Decl. ¶¶ 19, 21(d), & 41(b), (c), & (e).  He applied an across-the-board 10% revenue growth rate in each of the last eight years of the projection based on "industry and company expectations."  Minstein Report at 19 & Ex. 18; Minstein Decl. ¶¶ 21(a) & 41(a). He explains how he arrived at a gross profit margin of 30% after allowing for a 15% margin in the first year.  Minstein Report at 19 & Ex. 19; Minstein Decl. ¶¶ 21(b) & 41(b). He also contrasts the different gross profit margin assumptions that REMEC used in two tests in the same year.  Minstein Decl. ¶ 4.

In sum, the Court concludes Minstein explains the steps of his analysis and justifies the numbers he used; consequently, his expert opinion is admissible.

Defendants point to various weaknesses in Minstein's analysis.  These include such matters as (1) his professional judgment (*e.g.,* his assertion that "Powerwave is the better indicator of expected REMEC commercial performance," Minstein Report at 17; Minstein Decl. ¶ 5); (2) his interpretation of the governing accounting standard (*e.g.*, "In my opinion Defendants did not comply with requirements of FAS 142 because they . . . did not base their FY03 goodwill impairment assumptions on historical performance, which is the best available evidence because company budgets and forecasts historically were not achieved," Minstein Decl. ¶ 10(b); *id.* ¶ 27(b) (same for FY04); *id.* ¶ 10(e) (REMEC "improperly excluded the best comparison company"); (3) his heavy reliance on historical performance and the hindsight of actual performance as compared to predictions of future improvement (*e.g.*, *id.* ¶ 16(b)-(e)); *id.* ¶ 33(d) ("Actual performance for FY 04 was even worse than the forecasted amounts"); *id.* ¶¶ 36 & 38 (relying on historical performance of guideline company); and (4) the accuracy of certain factual assertions and calculations (*e.g.*, "forecast results were directed by management," Minstein Report at 20; REMEC's budgets "must be regarded as inherently unreliable," *id.* at 21; "REMEC's goodwill impairment test was based on unrealistic and unachievable budgets," Minstein Decl. ¶¶ 12 & 16(b)).

Defendants may explore these perceived deficiencies through cross examination. *Primaina v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) ("Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion.") (citing *Daubert*, 509 U.S. at 596)); *e.g.*, *Robinson v. Hartzell Propeller, Inc.*, 326 F. Supp. 2d 631, 649 (E.D. Pa. 2004) (determination of weight and sufficiency of expert evidence is "sole province of the jury").

For the present purpose of ruling on the summary judgment motion, the Court **OVERRULES** Defendants' laundry list of evidentiary objections to Minstein's report. Defs.' Evid. Obj. [Doc. No. 339-2].

**b)  Interim Tests**

The Court **SUSTAINS** Defendants' objection to Minstein's expert opinion on whether REMEC failed to conduct necessary interim tests between its annual tests. Minstein concludes that REMEC should have conducted interim tests for the quarters ending May 2, 2003 and October 31, 2003.  Minstein Report at 3, 15-17.

FAS 142 provides that "[g]oodwill of a reporting unit shall be tested for impairment between annual tests if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying amount."  Williams Decl. Ex. 1 (FAS 142 ¶ 28).  The standard gives examples of such events or circumstances, such as "a loss of key personnel."

The Court agrees with Defendants that Minstein does not explain his reasons and does not conduct any analysis under the standard – he simply jumps to conclusions. Minstein identifies the events that, in his opinion, triggered the duty to conduct an interim test.  For example, Minstein claims that the loss of key personnel, namely Morash as CFO in September 2003 and Ragland as CEO in February 2004, qualify as triggering events. Minstein Decl. ¶ 22-24 (interim); Minstein Report at 16.  What is lacking, however, is any analysis of the language in FAS 142 that states the event "*would more likely than not reduce the fair value of a reporting unit below its carrying amount*."  When asked about his analysis at his deposition, Minstein admitted that he had not performed an impairment test

1   to demonstrate that the identified events would have reduced the fair value of the

2   Commercial wireless segment below its carrying value.  Katsell MSJ Decl. Ex. E (Minstein

3   Dep. at 302-03).  As such, his opinion rests on his subjective belief or unsupported

4   speculation.  *Daubert*, 509 U.S. at 590.

5                           **c)  Scienter**

6         The Court agrees with Defendants that Minstein exceeded his role as an expert

7   witness on accounting when he gave his opinions about the Defendants' mental state.  The

8   Court discusses that issue in the scienter section below.

9                   **2.    Regan Rebuttal Report**

10        Plaintiffs offer Regan's expert report to rebut the report by Defendant's expert

11  William W. Holder.  Rogers Decl. Ex. 1 (Regan Decl. Ex. A.) (hereinafter "Regan Rebuttal

12  Report"). [Doc. No. 252.]

13        Defendants first contend the rebuttal report was untimely filed in relation to

14  Plaintiffs' opposition brief.  This procedural objection is overruled.  The pretrial schedule

15  was extended to allow the parties to exchange the rebuttal reports on February 3, 2009.

16  Plaintiffs submitted the report as soon as it was available on February 9, 2009.  The Court

17  observes that Defendants filed their expert's rebuttal report on the same day.  [Doc. No.

18  254.]  The Court prefers to resolve summary judgment motions on a complete record.

19        Next, Defendants argue Regan's report exceeds the scope of a proper rebuttal brief

20  because Regan conducted his own goodwill impairment analysis whereas Defendants'

21  expert Holder did not undertake that task.  The Court **OVERRULES** this objection because

22  Regan's analysis contradicts Holder's opinion on the same subject matter, specifically,

23  whether REMEC used assumptions, estimates, and forecasts to evaluate goodwill that

24  complied with GAAP.  *Compare* Regan Rebuttal Report at 17-26 *with* Holder Rebuttal

25  Report at 8-9 & 13-18.  Regan also addressed Holder's reliance on the Ernst & Young audit

26  work papers and the analysis by the successor Certified Public Accountant ("CPA").  *Id.*

27        Defendants' substantive argument is that Regan ignored the relevant legal standard

28  and completely failed to explain or justify how or why the assumptions he made are more

1  appropriate than the assumptions REMEC used to value goodwill.

2      The Court **OVERRULES** the objection because the allegations are belied by the

3  report itself.  Regan explains precisely why he believes REMEC used inappropriate

4  assumptions and then supports his reasons for selecting alternative inputs.  *See e.g.*, Regan

5  Rebuttal Report at 17-25.  As the Ninth Circuit observed on remand from the Supreme

6  Court, "the test of *Daubert* is not the correctness of the expert's conclusions but the

7  soundness of his methodology."  *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311,

8  1318 (9th Cir. 1995).  Defendants may make use of the traditional methods of testing the

9  weight of an expert's opinion by vigorous cross examination and presentation of contrary

10  evidence.  *Daubert*, 509 U.S. at 596.

11      For the present purpose of ruling on the summary judgment motion, the Court

12  **OVERRULES** Defendants' laundry list of evidentiary objections to Regan's report.  Defs.'

13  Evid. Obj. [Doc. No. 339].

14          **B.        Statements Before and During Class Period**

15      The cross motions for summary judgment involve these statements:   (1) REMEC

16  performed a goodwill impairment test in February 2002; (2) REMEC's goodwill for FY03

17  was not impaired (particularly the gross profit margin assumptions); (3) REMEC would

18  soon return to profitability; (4) Ragland "retired" as CEO; (5) the "China Ramp" was "on

19  plan"; and (6) other accounting practices and financial performance.

20      A corporate officer who, on behalf of corporation, signs the financial statement

21  "makes" a statement for potential liability under the federal securities laws.  *Howard v.*

22  *Everex Sys. Inc.*, 228 F.3d 1057, 1061-62 (9th Cir. 2000).  In this case, Ragland was CEO

23  at the start of the class period, but he left REMEC in the middle of it.  Hickman was not

24  employed by REMEC at the start of the class period, but remained through the end of it.

25  Because the two executives had different terms, it is important to pay attention to the date

26  of the statements contained in the SEC filings.

27  / / /

28  / / /

1   **1.      Factual Issues Remain on the Falsity of the Statement that**

2   **REMEC conducted a Transitional Goodwill Impairment Test as**

3   **of February 1, 2002**

4   Plaintiffs contend that Defendants falsely told investors that REMEC "performed its

5   transitional goodwill impairment test as of February 1, 2002."  Fraser Decl. Ex. 9 at 12 (Q3

6   04 Form 10-Q filed Dec. 13, 2003) ("REMEC did not recognize any goodwill impairment

7   as a result of performing this transitional test."); *accord* Williams Decl. Ex. 56 at 33 (FY03

8   Form 10-K at 27) (R887571) (same, pre-class statement).  They seek summary adjudication

9   on this issue.  Pls.' MSJ Br. at 17-20.

10  Defendants counter that the company did perform that transitional test, which was

11  the first test conducted under the new standard in FAS 142, but cannot locate the actual

12  document.  Plaintiffs argue that the fact that REMEC cannot produce, when ordered to do

13  so, the 2002 test demonstrates that it does not exist.  *See* Order Granting in part and

14  Denying in part Pls.' Mot. Compel Production of Docs. and Interrog. Resp. [# 193]; Order

15  Granting Mot. to Compel Dep. Answers. [# 270].[11]

16  After Plaintiffs' motion was fully briefed, the Court permitted Defendants to file a

17  supplemental brief because they located documents reflecting that the transitional test had

18  been performed.  Defendants now rely on circumstantial evidence from their accountant to

19  show that the test was conducted.

20  The Court concludes that Plaintiffs are not entitled to a partial summary judgment

21  that REMEC did not conduct its transitional test in February 2002.  Defendants submitted

22  evidence that REMEC's independent auditor reviewed that initial test during its audit in

23  April 2003.  Katsell Supp. Decl. Ex. A (Ernst & Young Audit Results).[12]  The auditor's

24  

25  [11]This is not a situation in which a party would be sanctioned for misconduct in failing
to preserve or produce evidence, for example, by drawing an adverse inference that relevant
26  evidence was wrongfully suppressed.  Fed. R. Civ. P. 37(b); *Von Brimer v. Whirlpool Corp.*,
536 F.2d 838, 844 (9th Cir. 1976).
27  

28  [12]Ernst & Young prepared the Audit Report for the Audit Committee.  The CPA
specifically reviewed the implementation of the new accounting standard FAS 142.  Ernst &
(continued...)

1   statement that it "reviewed" the initial test "performed by the Company" on the

2   Commercial segment which used the "discounted cash flow analysis" for both segments "as

3   of February 1, 2002" is circumstantial evidence that REMEC did conduct the transitional

4   impairment test as stated in its Form 10-K.  *Id.* at 12 (R1928030).  Ernst & Young reviewed

5   Arthur Andersen's valuation of Solitra, including the fair value of goodwill, as a part of the

6   audit.  *Id.* (noting its review of the Oct. 2001 Solitra analysis); Furukawa Surreply Decl.

7   Ex. A (Arthur Andersen Valuation Analysis of Solitra, dated Oct. 2001).   Nonetheless,

8   REMEC has not produced the document and none of REMEC's witnesses definitively

9   testified to personal knowledge that the test was performed.  Furukawa Decl. Ex. B (Hinkle

10  Dep. at 243-44) ("I don't recall any analysis."); Furukawa Surreply Decl. Ex. B at 51 & 55

11  (Sackett Dep. at 124 & 151) (General Counsel does not know of any supporting

12  documents); Fraser Decl. Ex. 11 (Morash Dep. at 36) (doesn't believe separate transitional

13  test done) & Ex. 30 (Gibbs Dep. at 14-15) ("I do not know if that was done"); *but see*

14  Katsell MSJ Decl. Ex. G (Gray Dep. at 12) ("I spearheaded" the transitional test with

15  assistance from outside consultant).  Consequently, there is a triable issue on this disputed

16  fact.

17       In their supplemental brief, Defendants further argue that REMEC *properly* tested

18  the goodwill by relying on third-party valuations of recent acquisitions.  Defendants argue

19  that the accounting standards permit this approach because the acquired entities constituted

20  a "significant portion" of the Commercial Wireless segment.  Defs.' Supp. Opp. Br. at 2-3;

21  Williams Decl. Ex. 1 (FAS 142, App. B ¶ 155); Furukawa Surreply Decl. Ex. B at 52-55

22  (Sackett Dep. at 125-29).  Plaintiffs objected to the new issue, but responded in their own

23  supplemental brief by disputing whether the transitional test, as reported in the

24  corroborating documents, complied with the accounting standard to value the "reporting

25

26       [12](...continued)
         Young summarized its procedure as follows:  "We reviewed the Company's initial and annual
27       impairment tests performed by the Company during fiscal 2003 in accordance with FAS 142.
         A discounted cash flow analysis (Step I) was performed for both the Commercial and Defense
28       business segments as of February 1, 2002 and December 27, 2002."  Katsell Supp. Decl. Ex.
         A at 12.

1   unit as a whole." Williams Decl. Ex. 1 (FAS 142 ¶ 23). Plaintiffs contend that REMEC

2   improperly substituted an analysis of one acquisition (Solitra) by an outside accounting

3   firm instead of conducting a complete test of the Commercial segment's goodwill.

4           The Court declines to address this new issue – whether the transitional test,

5   assuming it exists, complied with FAS 142 – because it was not part of either party's

6   original motion for summary judgment. *See Martinez v. Ylst*, 951 F.2d 1153, 1156-57 (9th

7   Cir. 1991) (declining to review issue not raised in opening brief, but raised for the first time

8   in a reply brief); *Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 738 (9th Cir. 1986)

9   (declining to consider summary judgment issue that was not "specifically and distinctly

10  argued" in initial brief). The Court granted leave to file supplemental briefs on the issue of

11  the existence of the transitional test based upon Defendants' inability to locate documents

12  reflecting that test. [Doc. Nos. 311, 313, 316.] The Court did not grant leave for the parties

13  to advance a new legal theory about the transitional test.

### 2.      FYO3 Goodwill Impairment Test

15          The next statement concerns the first annual test of goodwill that REMEC conducted

16  under the new FAS 142 accounting standard.

17          One introductory caveat is appropriate. REMEC filed its Form 10-K in April 2003

18  *before* the class period commenced in September of that year. Statements made *before* the

19  class period can be relevant evidence on this issue of <u>scienter</u> because "they may provide

20  insight into what the defendant knew during the class period." *DeMarco v. DepoTech*

21  *Corp.*, 149 F. Supp. 2d 1212, 1223 n.6 (S.D. Cal. 2001), *aff'd*, 32 Fed. Appx. 260 (9th Cir.

22  2002); *accord In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) (pre-class

23  data relevant to confirm what a defendant should have known at start of class period); *In re*

24  *Merck & Co. Sec. Litig.*, 432 F.3d 261, 271-72 (3d Cir. 2005) (adopting Second Circuit's

25  analysis in *Scholastic* that statements from outside the class period may be relevant

26  evidence for purpose of drawing an inference about defendant's knowledge). A defendant

27  may be held liable, however, only for the statements made during the class period.

28  *DeMarco*, 149 F. Supp. 2d at 1223 n.6 (citing *In re IBM Corp. Sec. Litig.*, 163 F.3d 102,

1   107 (2d Cir. 1998)).  Here, the class period dictates that liability may be based only upon

2   statements made by Defendants between September 8, 2003 and September 8, 2004.

3   However, the Court considers whether the pre-class period statements are false or

4   misleading on the issue of <u>falsity</u> because it bears on whether Defendants acted with

5   <u>scienter</u> during the class period.  The Court analyzes the scienter element below.

6        The Form 10-K included the following language on the valuation of REMEC's

7   goodwill for the fiscal year that ended on January 31, 2003.

8        The required goodwill impairment test was performed as of December
     27, 2002.  Our impairment review process is based on a discounted future
9    cash flow approach that uses our estimates of revenue for the reporting units,
     driven by assumed market growth rates and assumed market segment share,
10   and estimated costs as well as appropriate discount rates.  <u>These estimates are
     consistent with the plans and estimates that we use to manage the underlying
11   business.</u>  The estimates we used assume that we will gain market segment
     share in the future and the Commercial segment will experience recovery and
12   a return to growth and profitability from the current trends.  We may incur
     charges for goodwill impairment in the future, if the products fail to gain
13   expected market acceptance or if we fail to achieve our assumed revenue
     growth rates or assumed gross margins.  <u>In performing the fiscal 2003 annual
14   test for the Commercial segment, we assumed</u> sales growth rates ranging
     from 5%-15%; <u>gross profit margins ranging from 30%-38% (excluding
15   depreciation);</u> an income tax rate of 18% and a discount rate of 20%. . . .  We
     did not recognize any goodwill impairment as a result of performing this
16   annual test.

17   Williams Decl. Ex. 56  at 33 (Form 10-K at 27) (emphasis added).

18        Plaintiffs allege that REMEC falsely stated that its goodwill was not impaired for

19   FY03 (measured "as of" Dec. 27, 2002).  They argue that REMEC used inflated and

20   unreasonable gross profit margins to perform that test.  Specifically, they seek summary

21   adjudication that REMEC falsely stated that the gross profit margin "estimates are

22   consistent with the plans and estimates we use to manage the underlying businesses."  *Id.*;

23   Pls.' MSJ Br. at 14-17 n.17.[13]

24        In contrast to the narrow question that Plaintiffs raise, Defendants raise a broader

25   issue.  In their competing motion, Defendants move for summary adjudication that there is

26   ───────────────

27        [13]The FAC contains similar allegations about the assumptions (gross profit margins
     ranging from 24% to 29% excluding depreciation) REMEC used to conduct its goodwill
     impairment analysis for FY04.  The FAC highlights the same "consistent" statement in the
28   Form 10-K for FY04.  FAC ¶ 52.  Plaintiffs have not moved for summary adjudication on the
     falsity of that statement.

1  no evidence that the company's goodwill impairment analysis for FY03 was improper,

2  misleading, or fraudulent.

3        **(a)       A Jury Must Decide Whether REMEC's FY03 Assumptions**

4                **of Future Gross Profit Margins of 30% to 38% were**

5                **"Consistent" with its Business Plan**

6        In conducting its FY03 goodwill impairment test, REMEC assumed gross profit

7  margins of 30% for FY04, 35% for FY05, and 38% for the next seven years.  Williams

8  Decl. Ex. 56  at 33 (Form 10-K at 27); Katsell Opp. Decl. Ex. J at 298.[14]

9        Plaintiffs argue that REMEC's internal forecast of its expected gross profit was

10 much less – only 21.7% for FY03.  This figure comes from a budget dated February 4,

11 2003.  Fraser Decl. Ex. 24 at 2 (R000172).  Plaintiffs use the figure from FY03 because

12 REMEC said the FY04 forecast was based on the "current budget."  Katsell Opp. Decl. Ex.

13 J at 299 (EY-004847) ("Fy 2004 based on current budget.").  Plaintiffs argue that the public

14 statement was false at the time it was made because the assumption that REMEC would

15 achieve a 30% gross profit margin in FY04 was inconsistent with the forecast REMEC was

16 using to manage the business (that is, the current budget of FY03 used 21.7%).  REMEC, in

17 a subsequent Form 10-K, acknowledged that even "a 1% - 2% change" in the gross profit

18 margin of the Commercial segment could have a "significant impact" on the outcome of the

19 impairment test.  Williams Decl. Ex. 5 at 25 (draft FY04 Form 10-K at 22); Hickman Decl.

20 ¶ 13.  The much higher estimate is not "consistent" with the actual 21.7% rate used

21 privately to run the Commercial segment.

22        In opposition, Defendants' witnesses explained that the figure in the budget includes

23 _____

24        [14]Ernst & Young produced this document.  Defendants state that the exhibit contains the
   audit work papers for the FY03 (ended January 31, 2003).  Katsell Opp. Decl. ¶12; *accord*
25 Katsell MSJ Decl. ¶ 10.  Kristen Janis, a Senior Manager at Ernst & Young, initialed the
   document on "3/12/03."  Katsell Opp. Decl. Ex. J (EY-004846); *see* Katsell Scienter Decl. Ex.
26 G (Krutop testifies she initials documents after she reviews them).  The document reports the
   *actual* results for FY01, FY02, and FY03.  *See* Katsell Scienter Decl. Ex. A at 7 (Morash Dep.
27 at 73).  Thus, the header incorrectly states the analysis is "as of December 27, <u>2003</u>" since the
   correct "as of" date was December 27, <u>2002</u> for the fiscal year ended on January 31, 2003.
28 This mistake is also confirmed by virtue of the fact that REMEC conducted its FY04 test "as
   of" December <u>26</u>, 2003.  *Compare* Williams Decl. Ex. 5 at 25 (*draft* FY04 Form 10-K) *with*
   *id.* Ex. 56 at 33 (FY03 Form 10-K states REMEC performed test "as of December <u>27</u>, 2002).

depreciation; by contrast, the goodwill impairment analysis excludes depreciation.  Katsell MSJ Decl. Ex. L at 283-84 (Hinkle Dep. at 158-59); Katsell Opp. Decl. Ex. N at 405-06 (Gray Dep. at 35-36); *see* Katsell Opp. Decl. Ex. J at 299 ("Gross margin excludes depreciation").  Defendants argue that if the 5% depreciation figure is deducted from the 30% assumption for FY04, it shows that REMEC used consistent gross profit margins in its internal budget and its public statements about goodwill impairment test.

Plaintiffs challenge this logic.  Even taking into account a 5% difference for depreciation leaves a disparity of 4.3% in FY04.

As further evidence, Plaintiffs cite to the Internal Control and Fraud Considerations form that Ernst & Young completed to prepare for its audit of REMEC's FY03 books.  Plaintiffs' brief states that Ernst & Young "called the GPM assumptions 'aggressive and unrealistic'" as if the auditor specifically identified the gross profit margin assumptions in REMEC's goodwill impairment analysis.  Pls. MSJ Br. at 16.  This is a mischaracterization.  The memo actually states a concern with "[m]anagement's commitment to analysts, creditors, and other third parties to achieve aggressive or unrealistic forecasts."  Nonetheless, Ernst & Young's observation does state its general opinion that REMEC had used unrealistic forecasts.

Plaintiffs also cite a draft of a three-year strategic plan to support their motion.  Williams Decl. Ex. 10 at 1.  The plan forecasts gross margins for the Commercial segment of 25.9% for FY04, 28% for FY05, and 30% for FY06.  *Id.* at 63 (R001319).  Plaintiffs argue that these in-house assumptions are inconsistent with the higher gross profit margins announced to the investing public in the Form 10-K.

Defendants raise two objections to the admissibility of the August 2003 Three Year Strategic Plan exhibit that Plaintiffs submitted.  Williams Decl. Ex. 10.  First, Defendants argue the exhibit has not been authenticated.  The Court overrules this objection because it is clear that REMEC created the August draft and a proper foundation easily can be laid by a person with personal knowledge that the document is what it is purported to be.  *Hal Roach Studios v. Feiner & Co.*, 896 F.2d 1542, 1551 (9th Cir. 1990); *Burch v. Regents of*

*the Univ. of Calif.*, 433 F. Supp. 2d 1110, 1120 (E.D. Cal. 2006); *see* Katsell MSJ Decl. Ex. J at 269 (CFO Hickman states budgets were based upon "the 2003 strategic plan").  Indeed, Defendants submitted the September 2003 version of that same document.  Katsell Opp. Decl. ¶ 22 & Ex. T.  Second, Defendants argue the exhibit is irrelevant because REMEC did not use the August draft in its goodwill analysis, rather, it used a September 2003 version as the basis for the assumed revenue.  The Court overrules this objection because Plaintiffs offer the earlier draft as evidence of the information that was available to REMEC at the time it prepared its financial statements.  Fed. R. Evid. 402.

The Court's review of the record leads to the conclusion that Defendants have raised questions of fact that defeat Plaintiffs' motion as to the falsity of this pre-class period statement.  First, Defendants cite a budget for FY04, which began on February 1, 2003. Katsell Opp. Decl. Ex. K.  That budget, which is dated March 13, 2003, forecast a 25.12% gross profit margin for the Commercial segment.  *Id.* at 2 (R315180).  Adding back the 5% for depreciation makes the assumption 30.12%, which is the same as the 30% assumption that REMEC stated it would achieve in FY04.

Second, the budget had been prepared with estimates provided by the product line managers and then consolidated at the corporate level.  Defendants argue this "bottom up" approach protected the budget from manipulation by executives.

Third, Defendants point to testimony that the company used the information it had available and the results that it expected to achieve.  Katsell Reply Decl. Ex. 4 at 103-05 (Ernst & Young Partner Niki Krutop Dep.); Katsell Reply Decl. Ex. 7 at 182-84 (CFO Morash Dep.).

Fourth, Defendants cite evidence to explain the higher figures REMEC used for FY05 to FY10.  Morash defended using projections of 35% to 38% gross profit margins after FY04 because "[w]e thought things were going to continue to improve, and so, we add a modest improvement on top of that."  Katsell Opp. Decl. Ex. C at 245 (Morash Dep. at 110).  In particular, Morash believed that once the manufacturing operations were completely located in China, REMEC's costs would reduce from "$40 an hour to 40¢ an

hour." *Id.* "So, if that doesn't improve your gross margin, then I don't know what does." *Id.* Morash also testified that he discussed the assumptions with Ernst & Young during the audit, and the CPA approved them. Katsell Scienter Decl. Ex. A (Morash Dep. at 72).

Fifth, REMEC's independent auditor reviewed the FY03 goodwill impairment testing assumptions as part of its annual audit of the financial statements, and found they were "in line with management['']s forecasts and expectations of the relative segments' performance in subsequent years." Katsell Supp. Decl. at 12 (Audit Results, Report to the Audit Comm. of the Bd. of Directors) (dated Apr. 17, 2003). This included the gross profit margins used by the Commercial segment. "Based on the results of [Ernst & Young's] analyses, *no indicators of impairment were noted.*" *Id.* (emphasis added).

The Court concludes that a reasonable jury could accept Defendants' explanation and take the 5% depreciation into account to reconcile the different figures in the current budget and the goodwill impairment test. There is certainly room for the parties to argue whether these numbers fall within the definition of the word "consistent." Because a jury could find that REMEC used gross profit margin figures that were the same as its internal projections, Plaintiffs are not entitled to summary adjudication on the falsity of the challenged statement.

One further observation: Plaintiffs criticize the use of a budget dated March 13, 2003 to evaluate a goodwill impairment test "as of" December 27, 2002. Plaintiffs argue that the Defendants' evidence is irrelevant because the document was "dated 2½ months ***after*** the date as of which REMEC publicly reported it conducted the test" and "could not possibly be a document used to run the business at the time the test was performed." Pls. Reply Br. at 7 (emphasis in original). Plaintiffs appear to believe that the "as of" date is the date on which the goodwill impairment test was "performed." They also argue that documents prepared closer in time to December 27 are more reliable than those created later. For example, Plaintiffs argue that the version of the budget printed on February 3, 2003 is better evidence than a version prepared in March 2003. *Id.* at 8 ("While Plaintiffs' evidence is dated approximately one month after the date the test was conducted "as of," it

was the budget nearest in time to the testing that Plaintiffs could find in Defendants' production.").

This is inaccurate.  The "as of" date is selected by a company to measure goodwill; the company uses the same date in every annual test.  REMEC selected the last business day of December for its annual test.  Although REMEC's goodwill was valued "as of" December 27, 2002, the impairment test itself is performed over many weeks.  *See generally* Williams Decl. Ex. 1 at 81-82 (FAS 142, App. B ¶¶ B142, B204 & B210 (discussing amount of work involved in impairment testing and allowing six months for companies to complete initial test under new method).  The test can rely on information available during that time period.[15]  During that same time period, REMEC would have been closing its fiscal year end books to prepare its SEC filings and Ernst & Young would have been conducting its annual audit of REMEC's financial statements.

By necessity, a test is conducted "as of" a date selected by the company even though the books for that period have not yet been closed and the budget for the new year has not yet been finalized.  Katsell Reply Decl. Ex. 4 (Krutop Dep. at 103-04) ("the period that is selected is not the period that all the information has to be available . . . if you do it, say as of December 27, . . . your books for that period, by definition, wouldn't be closed, nor would you have a budget from that period forward as of that date").  As Defendants point out, REMEC created a "working build" document and then revised the budget several times thereafter.  Williams Decl. Ex. 51 at 2 (R000172) (same as Fraser Decl. Ex. 24); Defs.' Opp. Br. at 3 n.6.  The early versions, including the one dated February 3, 2003, were subject to modification.  Katsell Opp. Decl. Ex. C at 245-46 (Morash Dep. at 110-11) (referring to R012945, "it was a preliminary budget" that was "printed" on Feb. 4, 2003, but "[t]here might have been modifications to it after that, . . .  it's not final.").  More importantly, FAS 142 provides that companies should use "the most recent budget" to estimate cash flows.  Williams Decl. Ex. 1 (FAS App.B ¶ B152).

---

[15]The parties did not point the Court to the exact date REMEC completed its FY03 impairment test.  The only certainty is that it was finalized before REMEC released the results to the public on April 30, 2003 in its Form 10-K.  Williams Decl. Ex. 56 at 1.

1    Moreover, a goodwill impairment test necessarily refers to estimates, forecasts, and

2 projections of future events.  It is natural to expect these figures would be modified and

3 refined as the company solidified its strategy for the coming years.

4    Plaintiffs' complaint that the March 13, 2003 budget was created "one day after

5 E&Y *signed off* on the impairment analysis" also fails.  Pls.' Reply Br. at 7 (emphasis is

6 original); Williams Decl. Ex. 44 (Ernst & Young initialed "3/12/03").  The budget was

7 available to REMEC during the time it was analyzing the value of its goodwill.  To the

8 extent that Defendants rely on Ernst & Young's approval of the assumptions, the original

9 memorandum was dated January 30, 2003; was written by Kristen Janis, Senior Manager at

10 Ernst & Young; and disclosed that REMEC assumed a 38% gross margin rate for the

11 commercial segment.  Williams Decl. Ex. 44 at 1.

12    The Court further notes that Plaintiffs also rely on documents created after the "as

13 of" date of December 27, 2003 to support their own motion.  Plaintiffs cite three documents

14 that were created well after REMEC announced the goodwill impairment test for FY03.

15 First, they rely on the "Internal Control and Fraud Considerations" form that Ernst &

16 Young prepared in connection with its annual audit in the subsequent year (FY04).  Pls.'

17 MSJ Br. at 16 (citing Fraser Decl. Ex. 23, which is same as Williams Decl. Ex. 26 (EYE-

18 008934)).  The form is not dated but the footer contains the date "08/03."  Second,

19 Plaintiffs rely on a version of the three-year strategic plan, dated August 2003.  *Id.* at 17 &

20 n.19 (citing Fraser Decl. Ex 25, which is same as Williams Decl. Ex. 10 (R001266)).

21 Third, Plaintiffs cite a three-year forecast created in August 2003.  *Id.* (citing Fraser Decl.

22 Ex. 26.

23          **(b)      A Jury Must Decide Whether REMEC's Goodwill**

24                **Impairment Analyses were False or Misleading**

25    Defendants move for summary adjudication in their favor as to Plaintiffs' goodwill

26 claims.  Their motion covers Plaintiffs' allegations about the annual goodwill impairment

27 tests for both FY03 and FY04, as well as allegations that REMEC should have conducted

28 interim tests on the Commercial Wireless division.  Defs.' MSJ Br. at 6-16.  Defendants

argue that Plaintiffs have not presented evidence sufficient to support a verdict in their favor on the element of falsity. *Celotex*, 477 U.S. at 323 (when moving party is defendant on an element that plaintiff must prove); *Apple Computer*, 886 F.2d 1113. The Court **DENIES** the motion.

Defendants' motion is based entirely on their argument that Plaintiffs' experts' reports are unreliable and are therefore inadmissible under *Daubert*. Defs.' Br. at 10-12 (FY03), 13-14 (interim), & 15-16 (FY04). The Court, however, has concluded that the expert opinions are admissible in so far as they pertain to the annual impairment tests. Consequently, there are competing expert opinions as to whether REMEC's valuation of goodwill violated GAAP. *Compare* Minstein Report at 18 ("The projected gross margins exceeded what REMEC had historically achieved or would reasonably be expected to achieve."), *id.* at 13 & Ex. 13 (calculating a goodwill impairment charge of $133.9 million for FY03), *id.* at 19 & Ex. 19 (using 25% gross margin – a number in line with REMEC's internal information but still optimistic about future growth – resulted in a $69.8 million goodwill impairment for FY04); *accord* Minstein Decl. ¶¶ 9-11 (FY03) & 26-33 (FY04) *and* Regan Rebuttal Report at 17-19, 21 (FY03), & 22-25 (FY04) *with* Holder Report at 18 ("the methodology employed by REMEC in its related impairment analyses appears reasonable"). *Provenz*, 102 F.3d at 1490 ("As a general rule, summary judgment is inappropriate where an expert's testimony supports the non-moving party's case.") (citations omitted). To the extent that Defendants point to evidence in the record that supports REMEC's analysis, these present questions of fact.[16] Whether REMEC's FY03 and FY04 goodwill impairment tests violated GAAP is, therefore, a jury question.

### (c)   Plaintiffs' Claim on Interim Testing Fails as a Matter of Law

---

[16]For example, as to the FY03 test, Defendants note that REMEC acquired Paradigm in the middle of the class period, which added $17.56 million worth of goodwill to its balance sheet. Defendants further stress that REMEC expressly warned investors that the 30% to 38% gross margins were uncertain predictions. Williams Ex. 56 at 33. Defendants also rely on the testimony of their accounting expert. Holder Report at 18 (concluding REMEC's goodwill impairment analyses were reasonable).

1    Defendants also move for summary judgment on Plaintiffs' related claim that

2    REMEC's failure to conduct interim tests violated GAAP.  Plaintiffs contend REMEC

3    falsely stated, both before and during the class period, that there were no impairment

4    indicators.  *See e.g.*, Brownlie Decl. Ex. H (2Q04 Form 10-Q at 19) ("Through August 1,

5    2003, there have been no such indicators.").  Plaintiffs' only evidence on this issue was

6    Minstein's expert testimony.  The Court has stricken the relevant portions of Minstein's

7    testimony because he offers unsupported and unreliable conclusions.  Without that

8    evidence, Plaintiffs have not created a genuine issue of fact as to whether certain events

9    triggered REMEC's obligation to conduct interim evaluations of goodwill.  As such, the

10   Court **GRANTS** Defendants' motion as to that issue.

11           **B.      Ragland's Optimistic Statements about Future**

12           Plaintiffs contend that Ragland misled the market by making overly optimistic

13   statements in December 2003.[17]  Pls.' MSJ Br. at 6-13; Pls.' Reply Br. at 4 n.3.  Defendants

14   filed a cross motion on the December statements and they seek partial summary judgment

15   that similar statements in September were not misleading as a matter of law.  Defs.' MSJ

16   Br. at 17-19.

17           "Projections and general expressions of optimism may be actionable under the

18   federal securities laws."  *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1113 (9th Cir.

19   1989) (pre-PSLRA).  "In this circuit, a projection or statement of belief may be actionable

20   to the extent that one of the three implied factual assertions is inaccurate:  '(1) that the

21   statement is genuinely believed, (2) that there is a reasonable basis for that belief, and (3)

22   that the speaker is not aware of any undisclosed facts tending the seriously undermine the

23   accuracy of the statement.'"  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 501 (9th Cir.

24   1992) (quoting *Apple Computer*, 886 F.2d at 1113)); *accord Virginia Bankshares, Inc. v.*

25   *Sandberg*, 501 U.S. 1083, 1093-94 (1991) (statement of belief may be actionable if speaker

26   _____

27          [17]Plaintiffs appear to suggest that Defendant Hickman, the CFO, may be responsible for
     the December statements, *e.g.*, Pls.' Br. at 7; however, the record shows that Defendant
     Ragland made the contested statements.

28          Hickman was not employed by REMEC at the time Ragland made his other optimistic
     forecast in September 2003.

knows the opinion has no reasonable basis in fact at the time it is expressed); *Marx v. Computer Sciences Corp.*, 507 F.2d 485, 489 (9th Cir. 1974) ("a forecast, essentially a prediction, may be regarded as a 'fact' within the meaning of" Rule 10b-5). "The fact that the prediction proves to be wrong in hindsight does not render the statement untrue when made." *In re Verifone Sec. Litig.*, 11 F.3d 865, 871 (9th Cir. 1993) (citing *Marx*, 507 F.2d at 489-90). The Ninth Circuit has held that misleading opinions (as compared to statements of fact) must be "both objectively and subjectively false or misleading." *Rudke v. Capitol Bancorp, Ltd.*, 551 F.3d 1156, 1162 (9th Cir. 2009).

"[A]s opposed to simple representations of historic fact," an optimistic prediction of future growth, profit, or success "presents more subjective issues." *Apple Computer*, 886 F.2d at 1113; *G & M, Inc. v. Newbern*, 488 F.2d 742, 745-46 (9th Cir. 1973) ("Under the securities law a reasoned and justified statement of opinion, one with a sound factual or historical basis, is not actionable. Here, however, considering the gross disparity between prediction and fact . . . , we have no difficulty finding this 'prediction' to be actionable."). In certain circumstances, a generalized, run-of-the-mill assertion of corporate optimism amounts to "mere puffery" that cannot be the basis of a securities fraud lawsuit. *In re Impac Mortgage Holdings, Inc. Sec. Litig.*, 554 F. Supp. 2d 1083, 1096 (C.D. Cal. 2008) (citing *Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 352 F.3d 367, 379 (9th Cir. 2003)); *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1168 (C.D. Cal. 2007). Courts often analyze the materiality of such statements because no reasonable investor would rely on a company's subjective expression of optimism for the future. *See e.g.*, *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 868-69 (N.D. Cal. 2004); *Verifone*, 11 F.3d at 1114. Here, however, the parties have not moved for summary judgment on the materiality element, but instead analyze whether the statements are false or misleading. Pls. MSJ Br. at 1-2, 7-9 (Sept. statement); Defs.' MSJ Br. at 3-5 & 16-19 (Sept. & Dec. statements); *but see* Defs.' MSJ Br. at 17 (mentioning materiality in passing).

### 1.   September 2003 Statements

REMEC issued a press release on September 8, 2003 to announce the results of its

second quarter of FY04.  Williams Decl. Ex. 24.  REMEC reported the hard financial data,

including net sales, net loss, and gross profit.  The last paragraph quotes Ragland in his role

as CEO as follows:

> Continued improvement in sales and gross margins, as well as reduction in operating expenses and critical competitive wins, supports our confidence in REMEC's game plan to exit FY'04 with sustainable growth and profitability.  In addition to continued strong market share gains, we believe that the OEM and service provider customers are again spending on wireless infrastructure.  Our Defense and Space Group continues to perform at record levels, while we continue to improve the performance of our Commercial Group.  The acquisition of Himark expands our ability to serve the China marketplace and provides important momentum and competitive advantage in achieving our goal of a near term return to profitability and a strong second half performance.

*Id.*[18]

Defendants argue that these statements are the type of soft information predicting

the future that are not actionable as a matter of law.  Plaintiffs rely on their expert's opinion

that Ragland's projections were flatly contradicted by other, non-disclosed information.

A close look at Ragland's statement shows that part of it concerned the *entire*

company.  When Ragland spoke in general terms of factors that supported "confidence" in

the "game plan" to achieve profitability by the end of the fiscal year on January 31, 2004,

he was predicting the *consolidated* results for both segments of the company.  *Id.*

Defendants point to the record to show that shortly before Ragland made that public

---

[18]Plaintiffs quote language stating that REMEC "said it will return to profit in the period ending in January as sales rise."  Pls. Opp. Br. at 10 & n.27.  That language is found in an article in a Bloomberg publication.  FAC ¶ 34.  The statement was drafted by the third-party analyst and cannot be attributed to the Defendants without evidence that REMEC "placed their imprimatur" on the projection.  *Cirrus*, 946 F. Supp. at 1466 (exception exists when company involved itself in preparation of third-party analysis).  The Bloomberg article goes on to attribute a statement to David Morash, the CFO at the time, that REMEC "may break even in the third quarter ending in October."  FAC ¶ 34.  Morash's statement, even assuming that the reporter accurately transcribed the telephone interview, cannot be used to show Ragland's state of mind.  *Id.*; *In re Gupta Corp. Sec. Litig.*, 900 F. Supp. 1217, 1237 (N.D. Cal. 1994) ("Analysts might quote corporate spokespersons out of context or inaccurately interpret remarks made by corporate insiders.").

Plaintiffs mischaracterize a headline in another Bloomberg article as being an affirmative statement of fact.  Williams Decl. Ex. 29 (Sept. 8, 2003).  The reporter wrote that statement, thus, it cannot be attributed to the Defendants.  *Cirrus Logic*, 946 F. Supp. at 1466.  In any event, the Bloomberg article stated that REMEC "*expects* to return to profitability in the 'near term.'"  Williams Decl. Ex. 29 (emphasis added).

prediction, REMEC internally forecast that its consolidated operations would earn a profit in the third and fourth quarters. Williams Decl. Ex. 7 at 65 (R001426) (forecasting $1.7 and $1.6 million net income in third and fourth quarters, respectively, for entire company); Katsell Opp. Decl. Ex. C at 247 (Morash Dep. at 219) (the entire company "was expecting a small profit" in third quarter); Fraser Decl. Ex. 11 (Morash Dep. at 215-17). Plaintiffs' expert criticizes Ragland's statements because he did not disclose that REMEC's internal forecast for the *operating* income (as compared to net income) predicted consolidated losses of $2.2 million and $700,000, respectively. Minstein Report at 23; Minstein Decl. at 23. Plaintiffs' expert opines that Ragland's predictions were misleading because REMEC had large operating losses and the forecast of net income was "only possible with substantial income from non-recurring items unrelated to operations," Minstein Decl. at 24, ¶¶ 42, 43, & 44(b), namely, a $2 million gain from an executed trade of foreign exchange. Williams Decl. Ex. 7 at 56 (R001417).

The last part of Ragland's statement concerns the Commercial Wireless Segment. Ragland stated that the performance of that separate segment had been improving in comparison to prior quarters. He identified the acquisition of Himark as a factor that supported his optimism that REMEC would be "achieving our goal of a near term return to profitability." Williams Decl. Ex. 24. Plaintiffs' expert notes that this prediction of profit is contradicted by the internal forecast of large net losses in both the third and fourth quarters for the Commercial segment. Minstein Decl. at 23, ¶ 44(a) & (b)(i); Williams Decl. Ex. 7 at 66 (R001427) (forecasting $4.9 and $3.5 million losses in third and fourth quarters).[19]

The Court **DENIES** Defendants' motion as to the September 2003 statements. Although Ragland was predicting uncertain, future results, the record contains financial forecasts that cast doubt on his optimism. The interpretation of the financial forecasts may be open to debate, but Plaintiffs present evidence that REMEC had internally forecast large

---

[19]The expert also points to REMEC's actual performance. *Id.* The Court disregards this evidence which depends wholly on hindsight.

losses just three days before Ragland predicted the company would show a profit at the end

of FY04.  Given the amount of the Commercial segment's actual net losses in the first and

second quarters, $9.2 and $7.7 million, and its projected losses of $4.9 and $3.5 million for

the third and fourth quarter, Plaintiffs raise a triable issue of fact as to whether Ragland's

projections ignored facts that seriously undermined his September 2003 statements.

*Hanon*, 976 F.2d at 501-03; *Marx*, 507 F.2d at 490.  The *consolidated* financial situation

was no better, as even the forecast of $1.7 and $1.6 million net profit would not wipe out

the $7.1 and $3.6 million losses from the two prior quarters.

### 2.    December 2003 Statements

REMEC announced its third quarter results on December 8, 2003.  Ragland

predicted that REMEC would make a profit soon.  In the press release, Ragland said, "we

believe we are on track to achieve profitability in the near term."  Williams Decl. Ex. 30 at

3 (R2601287).  In the conference call that same day, Ragland stated, "we are quite

convinced that we're still steadily in the growth mode."  Williams Decl. Ex. 31 at

R2601287.  Ragland described his expectations as being "quite upbeat."  *Id.* at R2601286;

*id.* at R2601290 ("I happen to be pretty damn optimistic about the way the marketplace

looks.").  After Ragland commented on some of the positive indications and his confidence

in the development, management, and sales teams at REMEC, he then said, "[o]ur goal is to

breakeven for the quarter."  *Id.* at R2601287; *id.* at R2601292 (setting goal for gross margin

in coming year).

The parties dispute whether Ragland falsely described REMEC's financial situation

in the press release and earnings conference call.[20]  Plaintiffs contend that when Ragland

announced on December 8, 2003 that REMEC would soon return to profitability, the

company faced extreme pricing pressures and REMEC's internal projections contradicted

any belief of profit by the end of FY04.  Pls.' MSJ Br. at 7.  In their cross motion,

Defendants argue that "[w]ith two months to go in the quarter and the internal forecast

---

[20]The Court overrules Defendants' objection to the admissibility of the transcript of the
conference call because the document could be easily authenticated.  Fraser Decl. Ex. 1; *Hal
Roach*, 896 F.2d at 1551.

being so close to breakeven, these numbers do not show that a breakeven fourth quarter was impossible to achieve." Defs. MSJ Br. at 18.

Like his predictions in September 2003, Ragland's December statements are optimistic statements that usually are not actionable as securities fraud. *Copper Mountain*, 311 F. Supp. 2d at 879 (rejecting statements that business was "strong," "solid," and "on track to meet revenue and earnings expectations"). Plaintiffs rely on the exception to that general rule. They argue that Ragland knew his positive, public statements were inaccurate at the time he made them. Pls. MSJ Br. at 7-13; *see* Pls.' Opp. Br. at 21-23.

As support, Plaintiffs rely on the presentation at a Board of Directors meeting on December 5, 2003 when REMEC forecasted a net loss of $600,000 for the fourth quarter and estimated a net loss of $15.4 million for FY04. Williams Decl. Ex. 8 at 33 (R001619). That presentation also informed Ragland that the expected savings from the "China ramp" had not yet come to fruition because of delays in getting out of Finland. Indeed, the delay was costing REMEC $3 to 5 million each quarter. Fraser Decl. Ex. 2 at 70 (R001656). Second, the presentation reported that "[c]ontinuing industry pricing pressure will keep underlying Gross Profit margins" low while "material costs remain high." Williams Decl. Ex. 8 at 20 (R001606 year to date challenges); *id.* at 28 (R001614 fourth quarter forecast). Given this information, Plaintiffs contend that Ragland's positive statements three days later were misleading.[21]

In addition, Plaintiffs note that REMEC did not have a track record of meeting its forecasts. For example, at the September 2003 Board of Directors meeting, REMEC had predicted it would earn a profit in the third quarter. Williams Decl. Ex. 8 at 33 (R001426). That goal was not met. Instead of earning a $1.7 million profit, REMEC suffered a net loss of $4.1 million that quarter. *Compare* Williams Decl. Ex. 7 at 65 (R001426) (Sept. 5, 2003 forecast for Q3) *with* Williams Decl. Ex. 8 at 33 (Q3 actual result). Plaintiffs argue that

---

[21]Plaintiffs also point to an email sent to Ragland on December 17, 2003. Pls.' Mo. at 10 (citing Fraser Decl. Ex. 14). Because Ragland received the preliminary income statement for November 2003 *after* he made the statement that Plaintiffs contend was false, this document is not probative of Ragland's knowledge on December 8, 2003.

1   because the actual result was a loss twice as large as the early forecast, Ragland must have

2   known his prediction for the fourth quarter was equally doomed to fail.

3           Plaintiffs also note that others with the same information doubted that REMEC

4   would quickly return to profitability.[22]   First, Plaintiffs rely on Hickman's testimony that he

5   "would not have said that" REMEC's goal was to breakeven in the fourth quarter.   Fraser

6   Decl. Ex. 10 (Hickman Dep. at 123).   Second, a member of the Board of Directors had been

7   concerned with REMEC's "lack of profitability and sales growth" throughout his tenure.

8   Fraser Decl. Ex. 12 (Hughes Dep. at 85-86).   Third, Plaintiffs state that Ernst & Young did

9   not believe REMEC would achieve the goal of profitability given its consistent losses in the

10  first three quarters of FY04.   The basis of this inference is that Ragland's statement that

11  REMEC would return to profitability caused the auditor to be on the lookout for overstating

12  revenues when it conducted the annual audit.

13          Defendants argue the internal forecast did not seriously undermine Ragland's

14  optimism for improvement during the two remaining months of the fourth quarter because

15  it was a small number.   It was not impossible that REMEC would eliminate the projected

16  loss of $600,000 and breakeven.   They minimize the significance of REMEC's past

17  performance.   In the recent past, REMEC's actual results showed increased sales in the

18  first, second, and third quarters as well as a declining net loss.   Williams Decl. Ex. 8 at 33

19  (R001619) (sales increased from $81 to  $86 to $104 million in the three prior quarters,

20  while the net loss of $7.1 million in the first quarter was reduced to a $4.1 million loss in

21  the third).   Defendants further argue Ragland genuinely believed REMEC's forecasts were

22  reasonable.   Prior to the third quarter, the company had expected to earn a "small profit."

23  Katsell Opp. Decl. Ex. C at 247 (Morash Dep. at 219) (CFO, at that time, testified REMEC

24  forecast a little better than break even).   REMEC's budget for FY04 projected net income

25  of $2.2 million.   D's Opp. p. 1.   Finally, Defendants argue the company had a plan to

26  increase gross profit margins over the near term in order to meet the target.   Katsell Opp.

27

28          [22]Plaintiffs cite to Morash's deposition as further support; but saying "I don't remember" is not evidence.   Pls. Br. at 8-9 (citing Fraser Decl. Ex. 11)

Decl. Ex. D (Pat Gray's Global Operations FY05 Budget) [Doc. No. 259-2].

On this record, the Court concludes that triable issues of fact exist and **DENIES** the cross motions as to the falsity of the December 2003 projection.  *Hanon*, 976 F.2d at 501-03; *Marx*, 507 F.2d at 490.

### C.   <u>Statement of Ragland's Reason for Leaving REMEC</u>

On February 10, 2004, REMEC issued a press release stating that "Ronald E. Ragland, 62, has announced his *retirement* from REMEC, Inc."  Fraser Decl. Ex. 31 (emphasis added).

Plaintiffs move for summary judgment that the announcement that Ragland "retired" was false.  They argue the record is clear that Ragland was forced out of the company for poor performance, therefore, REMEC's public statement portraying his departure solely as a personal decision to retire was misleading.

"To be actionable under the securities laws, an omission must be misleading; in other words it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists."  *Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).  The Court agrees that Plaintiffs have presented evidence to satisfy that standard.

Plaintiffs have shown the statement was false because the actual circumstances under which Ragland left REMEC cannot be characterized as "retirement."  First, the minutes of the January 30, 2004 meeting of the independent Board of Directors states:

> After an extensive discussion of the financial condition of the Company and management's inability to satisfactorily improve the financial performance of the business, upon motion duly made, seconded and unanimously carried it was decided that Ronald E. Ragland was to be removed immediately as Chief Executive Officer of the Company.  Messrs. Shaner and Nash were appointed to offer Mr. Ragland the opportunity to retire and to negotiate an appropriate transition agreement with Mr. Ragland.

Fraser Decl. Ex. 6.  Second, three Directors testified in their depositions that Ragland was asked to resign because of his poor performance.  *Id.* Ex. 12 at 4 (Harold Hughes Dep. at 215); *Id.* Ex. 15 at 3 (Thomas Waechter Dep. at 52); *Id.* Ex. 30 at 4 (William Gibbs Dep. at 216-17).  Ragland confirmed in his deposition that the Board used the "art form" of being

04cv1948

"encouraged to retire."  *Id.* Ex. 7 at 3 (Ragland Dep. at 132-33) ("The board of directors

asked me to retire from REMEC.").  The press release did not disclose that Ragland "was

to be removed immediately" and as a result he agreed to accept the Board's offer to retire.

*Id.* Ex. 30 at 5 (William Gibbs Dep. at 219-20) (Board decided to give Ragland opportunity

to retire to avoid any wrongful termination litigation, and "[a]fter some negotiation, he took

the agreement."); *GlenFed*, 42 F.3d at 1551 (statement "even if literally true" can be

misleading).

   Another piece of incriminating evidence is that REMEC drafted a script to answer

questions regarding Ragland's departure:

> **Why did Ron Ragland step down? Was Ragland forced to resign? Was**
> **Ragland's retirement a direct result of the poor financial results?**
> After founding REMEC in 1983 and leading the company for over 20 years,
> Ron Ragland took the personal decision that at the age of 62, he wanted to
> finally retire.
>
> **Did Ron's resignation come as a surprise?**
> There was no surprise or spur of the minute decision.  The board was fully
> aware of Ron's intentions and before leaving, he had agreed to assist the
> company, at its request.
>
> **Did the board try to prevent Ron from retiring?**
> Retirement is a completely personal decision and therefore the board
> completely respected Ron's wishes.

Fraser Decl. Ex. 32 at 1.

   Plaintiffs' evidence shows that REMEC portrayed a "façade that Ragland was

leaving the company of his own volition."  Pls.' Br. at 23.  In fact, Ragland described the

experience as feeling "like my beloved mother had just told me I was a bastard."  Fraser

Decl. Ex. 7 (Ragland Dep. at 133).

   Defendants oppose the motion on the ground that the omission was not material,

however, materiality is a separate element distinct from falsity.  Defs.' Opp. Br. at 11-12;

*TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449-50 (1976) ("there must be a

substantial likelihood that the disclosure of the omitted fact would have been viewed by the

reasonable investor as having significantly altered the 'total mix' of information made

available") (footnote omitted); *accord Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988).

1    Defendants also argue REMEC followed a standard business practice not to reveal

2    that Ragland retired only because he had been asked to retire.  *E.g.*, Katsell Opp. Decl. Ex.

3    S at 501 (Horn Dep. at 267) ("When people retire, it is not the practice – I've never seen

4    any announcement saying, 'Mr. X has retired because he was asked to retire.'  This is not

5    the way things are done in business.").  That such omissions are common however does not

6    immunize them from being misleading.

7        The Court concludes that Plaintiffs' evidence demonstrates the absence of a genuine

8    issue of fact as to the misleading nature of the statement in the February 10, 2004 press

9    release that Ragland retired.  *Celotex*, 477 U.S. at 323.

10        **D.    Statement that "China Ramp" was On Schedule**

11        REMEC manufactured its wireless products and components worldwide, but

12    decided to close its Finland operations and build new manufacturing plants in China.  *See*

13    Williams Decl. Ex. 56 at 10 (10-K at 4).  The goal was to reduce costs.  This project was

14    called the "China ramp."  On December 8, 2003, REMEC issued a press release that quoted

15    Ragland as saying that "our China ramp is proceeding on plan."  Fraser Decl. Ex. 13 at 3.

16    The parties filed cross motions as to whether this statement is false or misleading.

17        Defendants argue that the statement that the relocation of REMEC's manufacturing

18    to China was "on plan" is not actionable as a matter of law.  Defs.' Br. at 16-17.

19    Defendants argue the statement constitutes an amorphous, soft forecast of optimism.  *In re*

20    *Dot Hill Sys. Corp. Sec. Litig.*, 594 F. Supp. 2d 1150, 1158 (S.D. Cal. 2008) (rejecting

21    statement that integration of technology was "on schedule and continuing smoothly" and

22    "already a success"); *Copper Mountain*, 311 F. Supp. 2d at 880 (characterization of

23    business as "on track" to report earnings was "inactionable puffery").

24        The Court does not agree with Defendants' characterization of the statement as

25    forward-looking; instead, the statement describes a current business condition.  *In re Secure*

26    *Computing Corp. Sec. Litig.*, 120 F. Supp. 2d 810, 818 (N.D. Cal. 2000); *see Copper*

27    *Mountain*, 311 F. Supp. 2d at 880 ("To the extent that such statements rested upon a

28    characterization of the present state of the company, such statements are not properly

considered forward-looking.").  The Court also rejects Defendants' argument that the statement is mere puffery.  Ragland's statement does not subjectively evaluate the quality of the plan.  Rather, his statement asserts that the plan to transition manufacturing from Finland to China is proceeding according to the established schedule.  *Wet Seal*, 518 F. Supp. 2d at 1168 (contrasting statements that can be objectively verified from those lacking a standard against which "a reasonable investor could expect them to be pegged") (citations omitted).

In their motion, Plaintiffs seek partial summary judgment that the statement was false because, at the time it was made, Ragland knew the project was suffering costly delays.  Pls. Br. at 2.  Specifically, three days before REMEC made its public statement, the Board of Directors learned that one challenge REMEC had faced in the third quarter was that the "China ramp too slow, costing $3 - $5M/Quarter."  Fraser Decl. Ex. 2 at 70 (R001656) (Dec. 5, 2003 presentation).  Plaintiffs note that this was not new information. When the Board of Directors held its June 2003 meeting, the China ramp was "3 months behind original plan."  Fraser Decl. Ex. 3 at 14 (R001087).  Similarly, at the September 5, 2003 Board of Directors meeting, REMEC reported that "[s]lower than planned phase-down of Finland manufacturing causing $2.5M/qtr budget overrun."  Fraser Decl. Ex. 8 at 13 (R001374) (noting delay in setting up supply chain of "China manufacturing ramp").

One executive testified that the three or four months of delay "was not [an] insignificant amount of time."  Fraser Decl. Ex. 15 at 4 (Thomas Waechter, Chief Operating Officer, Dep. at 82).  Plaintiffs emphasize that REMEC depended upon the transition out of Finland and into China to achieve considerable cost savings that would overcome the pricing pressures facing the wireless industry.  *Id.* (Dep. at 84) ("with the pricing pressures we had and the importance of getting to lower cost products, yes, [the delay] was significant"); Fraser Decl. Ex. 18 (Jon Opalski Dep. at 207) (a transition to lower cost manufacturing "was the only idea that was going to make our company profitable").

One industry analyst concurred and concluded that the "eventual transition of the

company's Finland-based manufacturing to China . . . should enable the company to show gross margin improvement in its next fiscal year."  Fraser Decl. Ex. 17 at 1.  The analyst reported that, as of September 2003, REMEC was incurring $2.5 million per quarter of costs by operating duplicate manufacturing facilities in Finland and China.  Those costs were expected to increase in the third quarter, and then to decrease upon a complete transition to China.  *Id.* at 1-2.

Defendants contend that Ragland's December 8, 2003 statement is consistent with the internal reports and therefore is not misleading.  H. Clark Hickock, Vice President of Global Operations, testified that the statement was accurate when it was made during the fourth quarter.  Katsell MSJ Decl. Ex. K at 276 (Hickock Dep. at 118).  Plaintiffs point to the weakness of Hickock's assertion, however, since he based his opinion on REMEC's press release, rather than personal knowledge of how the company had been performing. Furukawa Reply Decl. Ex. A (Hickock Dep. at 119).

Defendants also rely on Ragland's deposition testimony that "China was performing the plan and the ramp was too slow.  They're not mutually exclusive. . . . [W]e were not getting out of Europe as fast as we liked.  So we were performing the plan, but we'd like to be performing a lot faster."  Katsell MSJ Decl. Ex. V (Ragland Dep. at 209).

The Court **DENIES** Plaintiffs' motion to find the statement – "our China ramp is proceeding on plan" – false as a matter of law.  Whether the statement is misleading given the available inside information depends upon the credibility and weight afforded Ragland's explanation.  *Brody*, 280 F.3d at 1006; *Provenz*, 102 F.3d at 1483 (jury resolves fact disputes).

### E.   "Other" Accounting Practices and Historic Financial Performance

Plaintiffs allege that REMEC's financial reports were false and misleading because, aside from the valuation of goodwill, the company artificially inflated its reported earnings by reducing its inventory reserves in the second and third quarters of FY04.  FAC ¶ 8 ("manipulating inventory reserves to artificially improve profits").  Defendants move for summary adjudication of this allegation because Plaintiffs have failed to present any

1   evidence to substantiate it.

2          The Court agrees.  Plaintiffs oppose the motion with attorney argument but without

3   any evidentiary support.  Pls.' Opp. Br. at 18 & 23-24.  They cite one page of a two-

4   hundred page document without any testimony to explain how it relates to their fraud

5   theory.  Fraser Decl. Ex. MM (US Amps as of 10/31/03).  Plaintiffs offer no evidence to

6   defend allegations in the complaint that REMEC over-valued inventory or sold "zero

7   value" inventory.  FAC ¶ 11(a) & (b).  Further, Plaintiffs also fail to cite even a "scintilla"

8   of evidence that supports their allegation that REMEC falsely stated its historic results

9   regarding sales and revenue.  FAC ¶¶ 3 & 8.  Accordingly, to the extent that the Plaintiffs

10  allege REMEC committed other types of accounting fraud, the Court **GRANTS**

11  Defendants' motion for summary adjudication.  *Matsushita*, 475 U.S. at 587; *Celotex*, 477

12  U.S. at 325 (When moving party is the defendant, plaintiff may not "resist a properly made

13  motion by reference only to its pleadings.")

14  **IV.    SCIENTER**

15         Defendants seek summary judgment on the scienter element of the first cause of

16  action which alleges a violation of § 10(b).[23]  15 U.S.C. § 78(j); SAC ¶¶ 382-92.

17         In order to prevail at trial on a § 10(b) claim, a plaintiff must establish that each

18  defendant made the allegedly false or misleading statements with scienter.  *Kaplan v. Rose*,

19  49 F.3d 1363, 1378 (9th Cir. 1995); *see also Howard*, 228 F.3d at 1064 (PSLRA did not

20  alter substantive requirement for scienter on a summary judgment motion).

21         "Generally, scienter should *not* be resolved by summary judgment."  *Provenz*, 102

22  F.3d at 1489.  The court must deny a defendant's motion for summary judgment on intent

23  "unless *all* reasonable inferences that could be drawn from the evidence defeat the

24  plaintiff's claims."  *Id.* (quoting *Vaughn v. Teledyne, Inc.*, 628 F.2d 1214, 1220 (9th Cir.

25  1980) (emphasis added)).  A plaintiff opposing summary judgment "must present

26  significant probative evidence" of scienter.  *Id.*  "Thus, summary judgment on the scienter

27  ───────────────

28         [23]Defendants filed this motion in September 2008, when the parties were still engaged
    in discovery.  The Court continued the motion until the parties completed discovery.  [Doc.
    No.  187.]

issue is appropriate *only* where there is no rational basis in the record for concluding that any of the challenged statements was made with the requisite scienter." *Id.* (quotations and citations omitted).

"To establish scienter, plaintiffs must show that defendants had 'a mental state embracing an intent to deceive, manipulate, or defraud.'" *Id.* (quoting *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1424 (9th Cir. 1994) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193-94 n.12 (1976)). Negligence, even if inexcusable, is not sufficient. *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569 (9th Cir. 1990) (citations and quotations omitted). "Plaintiffs can 'establish scienter by proving either actual knowledge or recklessness.'" *Id.* (quotation omitted). The Ninth Circuit defines recklessness "as a form of intentional or knowing misconduct" and, at a minimum, requires a showing of conscious or "deliberate recklessness ." *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 976-77 (9th Cir. 1999).

"'[T]he proof of scienter in fraud cases is often a matter of inference from circumstantial evidence.'" *In re Software Toolworks, Inc.*, 50 F.3d 615, 627 (9th Cir. 1994) (quoting *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 n.30 (1982)). "However, '[t]he mere publication of inaccurate accounting figures, or a failure to follow [Generally Accepted Accounting Principles] GAAP, without more, does not establish scienter.'" *Id.* (quoting *Worlds of Wonder*, 35 F.3d at 1426)). GAAP "tolerates a range of reasonable treatments, leaving the choice among alternatives to management." *Cirrus*, 946 F. Supp. at 1457.

Before applying the summary judgment standard, the Court makes an initial observation. Counsel for Plaintiffs are skilled litigators, and they have ably and zealously argued their interpretation of the facts at hand. Plaintiffs' opposition brief is written such that one might readily accept their conclusion that "Ragland and Hickman were directly involved and knew the goodwill test assumptions were false and misleading." Pls.' Opp. Br. at 14 (heading). In resolving the pending motions, however, the Court must separate rhetoric from evidence. The Court repeatedly examined the evidence underlying the

generous characterizations in Plaintiffs' briefs and found faint, if any, support.

At the pleading stage, the Court held that Plaintiffs alleged sufficient facts to create a strong inference of scienter in large part because the FAC quoted several Confidential Witnesses stating that Ragland and Hickman were directly involved in critical events and had personal knowledge of key facts. *Compare* Order Granting Mo. to Dismiss [SAC] at 16-17 *with* Order Denying Mo. to Dismiss FAC at 6 (citing FAC ¶¶ 99-126). None of those allegations are supported by the proof presented. After a taxing and thorough discovery process, Plaintiffs did not submit a deposition or declaration from a single Confidential Witness to substantiate the FAC's allegations regarding the executives' knowledge or personal involvement. *See e.g.*, FAC ¶¶ 128 & 136 (alleging Ragland "issued his directives" to reduce manufacturing costs "in a futile attempt to improve gross profit margins"); *id.* ¶¶ 102 (alleging "Hickman personally adjusted this forecast"), 112-13, 117, & 134-35 (alleging Hickman was "definitely involved" and "intensely debated" gross profit margins with independent auditors).

The Court is mindful that "credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge when he is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255. This is particularly important for the intent element. While ordinarily the issue of scienter presents a triable issue of fact, this case proves the exception. "Rule 56 must be construed with due regard not only for the rights of the persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis." *Celotex*, 477 U.S. at 327. A jury trial is unnecessary when attorney argument is not supported by the facts that were produced during an extensive and exhaustive discovery process. *Anderson*, 477 U.S. at 256-57 (courts may resolve intent in summary judgment motions when "the plaintiff has had a full opportunity to conduct discovery" and no rational jury would return a verdict in its favor); *Celotex*, 477 U.S. at 327 ("Summary judgment procedure is properly

1    regarded not a disfavored procedural shortcut, but rather as an integral part of the Federal

2    Rules as a whole, which are designed to 'secure the just, speedy and inexpensive

3    determination of every action.'").

4         Despite their impressive stack of exhibits (the 81 consolidated exhibits on the

5    scienter and reliance motions exceed 3,000 pages [Doc. Nos. 286-98]), Plaintiffs have not

6    produced evidence sufficient to raise a question of fact of an intent to deceive. *Anderson*,

7    477 U.S. at  255 ("[T]he plaintiff, to survive the defendant's motion, need only present

8    evidence from which a jury might return a verdict in its favor.").  Defendants correctly state

9    that "all of the evidence shows the opposite – good faith conduct on the part of defendants

10   – and that there is no plausible inference to be drawn that Defendants did anything with

11   scienter."  Defs. MSJ Br. at 1.  Defendants marshaled substantial, if not overwhelming

12   evidence, that Defendants acted in good faith.  *Worlds of Wonder*, 35 F.3d at 1425

13   (defendants "conclusively rebutted" plaintiffs' "speculative inferences" of fraud).

14        This case involves a complicated accounting analysis that is infused with the

15   exercise of professional judgment.  All of the experts in this case agree that professional

16   judgment is applied throughout goodwill impairment testing.  Katsell MSJ Decl. Ex. E

17   (Minstein Dep. at 27, 29, 37, 52, 226, 234-35, & 269).  Professional judgment is exercised

18   when predicting future results, for example, assessing the company's plans and whether its

19   goals are achievable.  *Id.* (Minstein Dep. at 235 & 258).  Goodwill impairment analysis

20   does not produce an absolute, black-or-white, definitive result.  *In re Acterna Corp. Sec.*

21   *Litig.*, 378 F. Supp. 2d 561, 583 (D. Maryland 2005).  Plaintiffs have shown their experts

22   reached different conclusions than Defendants about the value of REMEC's goodwill; but

23   they have not shown that the difference is the result of fraudulent conduct.  *GlenFed*, 42

24   F.3d at 1549 ("flexible accounting concepts" rarely "yield a single correct figure" and

25   different results may reflect "two permissible judgments" rather than a falsehood); *Acterna*,

26   378 F. Supp. 2d at 583.

27        At best, Plaintiffs produce evidence of corporate mismanagement.  *Sante Fe Indus.,*

28   *Inc. v. Green*, 430 U.S. 462, 473-79 (1977) (§ 10(b) does not regulate internal corporate

mismanagement, when not accomplished through deception); *Impac Mortgage*, 554 F. Supp. 2d at 1094 (management team's poor judgment or even incompetence are not actionable as deceit under federal securities law); *In re ICN Pharm., Inc. Sec. Litig.*, 299 F. Supp. 2d 1055, 1065 (C.D. Cal. 2004) ("delinquent write-down of the impaired assets, without anything more, does not state a claim of securities fraud, stating at best a bad business decision"). "[T]here is no rational basis in the record for concluding that any of the challenged statements was made with the requisite scienter" to establish securities fraud. *Provenz*, 102 F.3d at 1489 (quotation omitted).

### A.  Individual Defendant Ronald E. Ragland

Defendant Ragland seeks summary judgment on scienter and submits a sworn declaration to demonstrate the absence of evidence to support Plaintiffs' claim against him. "As CEO of REMEC, I did not make any decisions and did not participate in the making of any decisions regarding . . . goodwill, goodwill impairment, interim impairment testing or any other accounting matters." Ragland Decl. ¶ 5. Ragland relied on the accounting department to make those decisions. *Id.* "While I was certainly apprised of significant accounting decisions, they were not mine to make and I never overruled or changed any accounting decisions made by our accounting department, CFO, or Audit Committee." *Id.* He states that he had a good faith belief that the financial statements were true and in compliance with GAAP; he did not make any statement about REMEC with the intent to deceive; and he relied on the staff accountants as well as outside auditors to prepare accurate financial reports. Decl. Ragland ¶¶ 6-10.

Plaintiffs' opposition brief asserts that Ragland was "directly involved" in accounting matters, "reviewed the assumptions used," and "knew the goodwill test assumptions were false and misleading." Pls.' Opp. Br. at 14-15. The Court read each document Plaintiffs cite to support their broad allegations. The Court carefully examined the record and found that most of Plaintiffs' allegations lack substance. *Anderson*, 477 U.S. at 256-57 (summary judgment can be granted on state of mind; discredited testimony is not normally sufficient basis to draw contrary conclusion).

1    As to the very weak inference that can be drawn from certain evidence, Defendants

2    have rebutted it with substantial evidence that Ragland lacked the intent to defraud

3    investors, including a lack of motive and opportunity. *Vucinich v. Paine, Webber, Jackson*

4    *& Curtis, Inc.*, 739 F.2d 1434, 1436 (9th Cir. 1984) ("A plaintiff, however, must offer more

5    than conclusory allegations, and if the defendant presents affidavits or other evidence

6    establishing a lack of scienter, the plaintiff must come forward with some affirmative

7    showing.").

8    **1.    Ragland's Statements**

9    Plaintiffs identify several statements, that may or may not be false, that are

10   attributable to Ragland.  One was made before the class period began, *i.e.*, the statement

11   that REMEC's goodwill was not impaired for FY03.  During the class period, Plaintiffs

12   challenge whether REMEC conducted a transitional goodwill test in February 2002;

13   Ragland's prediction that REMEC would return to profitability; and his comment that the

14   China ramp was on plan.  Ragland left REMEC on February 10, 2004 – statements after

15   that date are not attributable to him.  Factual issues remain as to the misleading nature of

16   these statements.  In regard to the scienter element, the precise question is whether Ragland

17   knew or recklessly disregarded the alleged falsity at the time he made the challenged

18   statement.

19   Plaintiffs argue Ragland was aware REMEC could not meet the inflated

20   expectations, yet he knowingly continued to report misleading positive news.  They

21   contend that the egregious deficiencies in REMEC's accounting practices raise a genuine

22   issue of material fact with regard to the intent to deceive the public.  As support for this

23   theory, Plaintiffs make the following points.  Ragland discussed and reviewed the

24   assumptions used in the FY03 test and Plaintiffs' experts conclude that the goodwill

25   impairment analyses violated GAAP; Ernst & Young identified a potential risk of fraud in

26   Ragland's public statements about REMEC's return to profitability.

27   The sole document that connects Ragland in any concrete way to the FY03

28   impairment testing is an Ernst & Young memo, dated January 30, 2003, that discusses the

goodwill impairment test that REMEC was conducting at that time.  Williams Decl. Ex. 44.

Ernst & Young lists the assumptions that REMEC used to calculate the values, including a

gross margin rate of 38% for FY06 to FY10.  The memo states:  "We discussed each of the

above assumptions with the Company's management, including: CEO, Ron Ragland, CFO,

Dave Morash, and the Controller, Pat Gray."[24]  *Id.* at 2.

The memo does not, as Plaintiffs urge, demonstrate the Ragland "must have

known, or was reckless in disregarding, the fact that the GPM estimates used in the

impairment test were much higher than internal estimates 'used to run the business,'

contrary to what they told the public."  Pls. Opp. Br. at 15; *Kaplan*, 49 F.3d at 1379

(rejecting conclusory argument that statements were "so false" that individual defendant

"must have known" the statements were false).  Reading this memo in the light most

favorable to Plaintiffs, it simply states that the independent auditing firm "discussed" the

"assumptions" with Ragland.  Katsell Reply Decl. Ex. 5 at 113 (Gray Dep. at 55) ("the

auditors had access to our key management where they would speak with them as part of

the regular process of an audit"); *see Metzler*, 540 F.3d at 1068-69 (in motion to dismiss,

complaint failed to allege external auditor counseled manager that his proposal was

improper; rather, allegations pointed only to disagreement and questioning).  A general

discussion does not in itself indicate that Ragland was involved in selecting or

manipulating the assumptions used in the impairment test.  *Vantive*, 283 F.3d at 1087-88

(plaintiff needs at least one specific item of information conveyed that relates to alleged

fraud); *cf. Provenz*, 102 F.3d at 1491 (question of fact raised by defendant who was

"personally involved in and approved each decision" to make misleading statement);

*Software Tools*, 38 F.3d at 1089 (plaintiffs defeated summary judgment because defendants

participated in drafting false projections).

---

[24]Patrick Gray's deposition testimony that he "could not remember" if Ragland was
involved in goodwill impairment testing, "but based on the E&Y work paper, it says he was"
is not based on his personal knowledge and is not admissible as evidence.  When counsel
instructed Gray not to assume, Gray confirmed that he did "not recall whether Ron was
involved in this or not."  Katsell Reply Decl. Ex. 5 at 111 (Gray Dep. at 34).  Gray did not
recall discussing the assumptions with Ragland.  *Id.* at 113 (Gray Dep. at 55).

1    A related piece of evidence is Ragland's testimony that he reviewed the estimates,

2    assumptions, and financial statements.  Ragland Decl. ¶ 5.  Ragland states he "did not

3    prepare [the goodwill impairment testing] estimates and forecasts, but I did review them

4    and was familiar with them."  *Id.* ¶ 8.

5    Plaintiffs jump on Ragland's "admission" that he "reviewed" the relevant financial

6    documents as proof of his opportunity to manipulate the outcome.  In their motion on

7    REMEC's allegedly false and misleading statements concerning the FY03 goodwill

8    impairment test, Plaintiffs conclude that Ragland must have known that assuming gross

9    profit margins of 30% to 38% in future years was false.  Pls.' MSJ Falsity Br. p.16-17.

10   Plaintiffs speculate that Ragland told the market they were the same as those used to run

11   the business to "bolster" their legitimacy because he knew the market would be skeptical of

12   such high numbers.  *Id.*

13   The evidence does not support this sweeping allegation.  All of the evidence before

14   the Court shows that Ragland was not involved in the analysis of goodwill impairment.

15   In relation to the calculations of goodwill, which is the cornerstone of Plaintiffs'

16   fraud allegations, Ragland states that he "did not make any decisions" and "did not

17   participate" in any accounting matters.  Ragland Decl. ¶ 5.  As CEO, Ragland "was

18   certainly apprised of significant accounting decisions," but he never changed those

19   decisions.  *Id.*  The accounting department, CFO, and Audit Committee made the decisions

20   regarding goodwill impairment and Ragland relied in good faith on their competence and

21   expertise, as well as the outside auditors Ernst & Young.  *Id.* ¶¶ 5-7.

22   Plaintiffs rely on William Gibbs' deposition as evidence that Ragland was

23   "responsible for the impairment testing."  Pls.' Opp. Br. at 15.  Gibbs' actual testimony

24   does not support that characterization.  Gibbs, a member of the Board of Directors and its

25   Audit Committee, testified during his deposition as follows:

26        Q.  Do you know who is responsible for the oversight of the goodwill
          testing in determining an impairment existed?

27        A.  Ultimately, the CEO and then the CFO.

28        Q.  Do they share the responsibility?

A.  Well, the buck stops at the CEO.  He delegates it to the CFO, so it's the CFO's primary responsibility.

Q.  And is it your understanding the CFO makes a determination, but the CEO would review that determination?

[objection omitted]

A.  I don't know.

Q.  You said the CEO delegates it to the CFO so it's the CFO's primary responsibility; however, you said the ultimate responsibility was the CEO['s], correct?

A.  That doesn't mean he reviews everything.  The buck stops there.

Williams Decl. Ex. 37 at 3 (Gibbs Dep. at 150).

This testimony describes nothing more than a CEO's responsibility to oversee the business.  *See Vantive*, 283 F.3d at 1087-88.  It does not demonstrate Ragland's involvement in the goodwill testing during his tenure when that analysis was actually performed by other employees.  Ragland was not directly involved in goodwill impairment testing.  There is no evidence that Ragland circumvented the accounting department.

As noted, Plaintiffs have not produced a witness to testify to the truth of the aspersions recited in the complaint.  Instead, the witnesses who were deposed testified that Ragland was not involved in the impairment testing.  Patrick Gray, who served as Corporate Controller before taking a higher position, testified that he "spearheaded" the analysis and did "not recall whether Ron [Ragland] was involved" in the goodwill testing process or in creating the assumptions used in the test.  Katsell MSJ Decl. Ex. G at 216 & 220 (Gray Dep. at 12 & 18); Katsell Scienter Decl. Ex. D at 22-23 (Gray Dep. at 34).  Similarly, David Hinkle, who took over as REMEC's Corporate Controller when Gray was reassigned, testified that he was responsible for conducting the impairment testing.  Katsell Scienter Decl. Ex. C.  Hinkle did not recall any discussions with Ragland about the goodwill impairment analysis.[25]  *Id.* at 14 & 17 (Hinkle Dep. at 345 & 394).

---

[25]In January 2004, REMEC began the process of conducting its annual goodwill impairment testing for FY04.  Ragland was CEO at that time, but Hinkle does not recall having any discussions with "anyone" regarding the analysis, nor any instructions to achieve a

(continued...)

1        Nor is there any evidence that Ragland provided, let alone manipulated, the data that

2    was input into the goodwill impairment test.  REMEC's budgets were prepared by many

3    employees within the company, including product line managers.  Katsell MSJ Decl. Ex. G

4    at 223-24 (Gray Dep. at 24-25).  The budget "numbers weren't picked by any one person."

5    Katsell MSJ Decl. Ex. K at 275 (Hickock Dep. at 82) ("I didn't provide any of the inputs.  I

6    did approve the final product, but these numbers that you're looking at on this piece of

7    paper are the results of a very detailed, bottoms-up, add-all-that-together-and-you-get-this

8    results.").  Hinkle would then compile the information for a consolidated budget.  *Id.* Ex. L

9    at 280-82 (Hinkle Dep. at 18-19, 48).  The Court agrees with Defendants that a reasonable

10   inference from the "bottoms-up" procedure is that management did not have the

11   opportunity to falsify the budget numbers used to evaluate goodwill.

12       Moreover, Plaintiffs' rank speculation is wholly discredited by Ragland's sworn

13   declaration.  He states his subjective belief that "the estimates used in the goodwill

14   impairment testing were based on and, in fact, were the same as the estimates and forecasts

15   that management used to run REMEC's business."  Ragland Decl. ¶ 8.  Ragland understood

16   the "forecasts for earnings, profitability and margins exceeded our actual performance at

17   that time" but he explains the specific reasons behind the optimism.  *Id.*  These include the

18   fact that REMEC's sales and revenues had been increasing; that the transfer of

19   manufacturing to Costa Rica, the Philippines, and China would be successful; and the

20   industry was poised for a resurgence, both in national and international markets, in the

21   products that REMEC manufactured.  *Id.*

22       Plaintiffs rely on their expert, Minstein, as support that the goodwill impairment test

23   

24   [25](...continued)
conclusion that goodwill was not impaired.  Katsell Scienter Decl. Ex. C at 17.  In February, the process continued and Hinkle discussed goodwill impairment with Ernst & Young early

25   that month.  *See* Brownlie Decl. Ex. K at 176 (EY-000695) (Feb. 5 memo from Hinkle to Ernst & Young regarding goodwill testing for FY04).  Ragland left REMEC on February 10, 2004.

26   Williams Decl. Ex. 42.  To the extent that Hinkle testified that Ragland had already left the company by the time 2004 goodwill impairment tests were done, he appears to refer to the

27   *completed* analysis.  The evidence is clear that Ragland departed in the midst of REMEC's testing but before the company finalized its valuation, which it released in April 2004.  Katsell

28   Scienter Decl. Ex. C at 17.  Nonetheless, Hinkle's testimony does not show, as Plaintiffs' allege, that Ragland "was responsible" for goodwill impairment testing.  Pls. Opp. Br. at 15.

conducted during Ragland's tenure was so flawed that the magnitude of the accounting errors creates an inference that the report was deliberately manipulated to defraud investors.  Minstein opines that REMEC's assumptions for the Commercial segment were flawed, unsupported, and unrealistic.  REMEC assumed 30% to 38% gross profit margins for the FY03 impairment test at a time when its internal forecast was 21.7% and its recent actual performance for FY02 was approximately 7%.[26]

The Court agrees with Defendants that Minstein's testimony at times crosses into impropriety when he offers his opinions as to Defendants' mental state.  *Elsayed Mukhtar v. Cal. State Univ.*, 299 F.3d 1053, 1066 n.10 (9th Cir. 2002), *amended by* 319 F.3d 1073 (9th Cir. 2003); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 546-47 (S.D.N.Y. 2004) (expert opinions on intent or motives of corporations not admissible).  Examples of Minstein's conclusions regarding the intent of Defendants include, among others, (1) "REMEC willfully and knowingly used unrealistic assumptions in order to avoid recognizing an impairment loss." Minstein Report at 20; *e.g., id.* (REMEC "intentionally" omitted Powerwave as a guideline company; selected other companies "with a goal of manipulating data to achieve a desired result"; and "[w]hen REMEC wanted to write off goodwill in July of 2004, they used much more reasonable assumptions"); (2) REMEC acted "recklessly" (*e.g.*, Minstein Decl. ¶ 7 ("the company recklessly failed to conduct" the transitional test); (3) "Clearly management's intent in doing the numerous goodwill impairment tests was not to achieve a sensitivity analysis." Minstein Decl. ¶ 35; *id.* ¶ 35(d) "the tests were conducted with the goal of achieving a desired numerical result").  Nevertheless, Minstein points to the large difference between the gross profit margin actually achieved and the one forecast for the upcoming year.  His opinion creates a question of fact about the misleading nature of the conclusion that REMEC's goodwill was not impaired in FY03.  Plaintiffs argue one can infer from the vast disparity that Ragland must have known the number was inflated.

---

[26]Minstein states that REMEC's actual FY02 performance was 7.1%.  Minstein Report at 6.  Defendants cite a document prepared in 2003 reporting the Commercial segment's actual gross margin results were 6%.  Katsell Reply Decl. Ex. 2 at 19.

This argument fails for three reasons.  First, Plaintiffs' assertion, like that in the *Kaplan* case, is that the "statements are so false that defendants must have known they were false and must have intended to mislead the public." *Kaplan*, 49 F.3d at 1379.  In that case, as here, the "argument does not suffice to rebut the declaration[] of good faith made by the defendant[]." *Id.*  Ragland stated in his sworn declaration that he believed in good faith that the financial statements were true and complied with GAAP.  *Id.*  Ragland is an electrical engineer with bachelors and masters degrees in that field, and has no accounting education.  Decl. Ragland ¶ 3.  Plaintiffs presented no evidence to discredit Ragland's sworn statement that he relied in good faith on inside and outside professionals to produce accurate financial reports.  *Id.* ¶¶ 5-7 & 9.

Second, at best, Plaintiffs' inference – that Ragland must have known the gross margin assumption was too high – leads to a conclusion that there was a violation of GAAP.  "[E]ven deliberate GAAP violations do not by themselves establish scienter." *Wet Seal*, 518 F. Supp. 2d at 1163; *In re U.S. Aggregates, Inc. Sec. Litig.*, 235 F. Supp. 2d 1063, 1073 (N.D. Cal. 2002).  Plaintiffs' expert opinions about the <u>falsity</u> of the statement do not defeat Ragland's motion for summary judgment as to <u>scienter</u> because a deliberate violation of accounting procedures, by itself, is not sufficient to create an inference that the CEO, who was not involved in selecting the data, acted with an intent to defraud investors.  "Plaintiffs have failed to provide detailed evidence of the contemporaneous decision-making behind the alleged accounting errors that would combine to show the required scienter." *ICN Pharm.,* 299 F. Supp. 2d at 1065 (goodwill impairment).

Furthermore, the evidence shows Ragland was fired for poor performance.  Williams Decl. Ex. 41 at 2, 4 (Audit Committee member Harold Hughes recalls discussing Ragland's performance at every Directors meeting; the reviews were "negative"; and Ragland was fired because "his strategic vision was not working effectively").  While Plaintiffs may have shown mismanagement, they have not presented evidence on which a jury could find that Ragland was acting with the scienter that is necessary to impose personal liability for securities fraud.  *Sante Fe*, 430 U.S. at 473-79 (corporate

mismanagement does not create a § 10(b) claim); *Impac Mortgage*, 554 F. Supp. 2d at 1094

(absent evidence of deceit, poor judgment and incompetence are not actionable).

Plaintiffs offer a second piece of circumstantial evidence that could give rise to an

inference that Ragland acted with the intent to defraud.  Plaintiffs rely heavily on

comments by Ernst & Young in its "Internal Control and Fraud Considerations" form.

Williams Decl. Ex. 26.[27]  Plaintiffs point to the audit team's observations about risk factors

relating to material misstatements or fraudulent financial reporting.  "The team determined

that the biggest risk of fraud was with improper revenue recognition, due to the pressure by

executive management to return to profitability in the current year." *Id.* at 19.  The team

also noted "[e]xcessive interest by management in maintaining or increasing the entity's

stock price or earnings trend.  Management's commitment to analysts, creditors, and other

third parties to achieve aggressive or unrealistic forecasts.  Domineering management

behavior by the Company's CEO." *Id.* at 24.  Though the memo does not name Ragland, it

is clear that the comments relate to him.  *See* Williams Ex. 45 at 2 ("as a result of the

CEO's resignation our initial consideration of the risk of understatement of expenses in

order to attain profitability was no longer deemed to be a key risk"); *accord id.* Ex. 33 at 2.

Plaintiffs argue this form raises an inference that Ragland, who had a "domineering"

management style and an "excessive interest" in the share price, had a motive to manipulate

the financial reports to vindicate his public statements.  Pls.' Opp. Br. at 15; Williams Decl.

Ex. 26 at 7, 19, & 24.

Any negative inference created by Ernst & Young's concern is largely negated by

Ernst & Young's explanation of the function of the form and Defendants' affirmative

evidence to the contrary.  The planning document does <u>not</u> conclude that anyone at

REMEC committed fraud; rather, it simply alerts the audit team to certain issues to ensure a

complete and effective audit.  Katsell Opp. Decl. Ex. M (Krutop Dep. at 274); *id.* Ex. L

---

[27]The form is not dated.  It indicates that it was prepared in connection with the audit to be performed for REMEC's FY04, which ended on January 31, 2004.  The audit team completed its initial risk assessment in November 2003.  Williams Decl. Ex. 33 at 2.  The document refers to events "subsequent to our initial planning and risk assessments,"including Ragland's departure in February 2004.

(Janis Dep. at 404).  Ernst & Young prepares the standard form before it conducts an audit so that each member of the team is alert to potential fraud issues in the client's financial papers.  *Id.* at 1. The purpose of the form is to help Ernst & Young decide "the nature, timing, and extent of our audit procedures."  *Id.*  The form further states:  "We expect one or more fraud risks will be identified for most engagements.  In addition, there is a presumption that we will identify one or more fraud risks relating to revenue recognition."  *Id.* at 6.

Patrick Gray, the Controller at the time, explicitly denied that Ragland pressured the business units to forecast certain figures.  Katsell Scienter Decl. Ex. D at 20 (Gray Dep. at 30) ("I believe there were targets and goals mutually – mutually developed.  But that to my knowledge, there was no undue pressure related to the business units to meet a certain number that year."); *id.* at 21 (Dep. at 31) (same as to gross margin projections).

Plaintiffs do not present any evidence to show Ragland had reason to believe that REMEC had not conducted the transitional goodwill impairment test in February 2002.  *ICN Pharm.,* 299 F. Supp. 2d at 1065 ("Plaintiffs have failed to provide detailed evidence of the contemporaneous decision-making behind the alleged accounting errors that would combine to show the required scienter.").

Plaintiffs also rely on Ragland's prediction that REMEC soon would return to profitability.  As discussed above, factual issues exist as to whether Ragland's optimistic statements in September and December 2003 were false.  In evaluating the scienter element, the question is whether Ragland's optimism was grounded on an objectively reasonable basis and a genuine personal belief.  *Rudke*, 551 F.3d at 1162 (misleading opinion or projection must be both subjectively and objectively misleading).

Plaintiffs rely on Hickman's testimony that he "would not have said that" REMEC's goal was to breakeven in the fourth quarter as circumstantial evidence that Ragland made the statement with deceptive intent.  The rest of Hickman's testimony, however, defeats any such inference.  Hickman's complete statement was "but I wasn't the CEO either."  Fraser Decl. Ex. 10 (Hickman Dep. at 123).  Hickman explained that his job as CFO

1   dictated that he take positions that other executives would consider "too conservative," and

2   he denied having any "real conflicts" about Ragland's performance.  *Id.*

3        Aside from Hickman's view that the glass was half-empty, Plaintiffs have not

4   presented evidence that Ragland knowingly misled investors; rather, the evidence shows

5   Ragland genuinely believed the company would prosper.  Williams Decl. Ex. 30 at

6   R2601290 ("I happen to be pretty damn optimistic about the way the marketplace looks.").

7   Ragland focused on the positive signs of growth.  Ragland Decl. ¶ 8; *see, e.g.*, Williams

8   Decl. Ex. 7 (Sept. 2003 BOD presentation showed REMEC's *consolidated* rate losses had

9   slowed over three quarters, and forecasts for third and fourth quarters predicted profits and

10  earnings per share).  Similarly, Ragland articulated his reason for believing that the

11  relocation of manufacturing facilities from Finland to China was "on plan" but needed to

12  go faster.

13        **2.    Defendants Produce Affirmative Evidence that Conclusively**

14             **Negates any Inference that Ragland Acted with Scienter**

15        Even if Plaintiffs presented evidence that could give rise to an inference in their

16  favor, Defendants have rebutted that inference with affirmative evidence of good faith.

17        Plaintiffs' speculation that Ragland knew the company's goodwill was impaired in

18  FY03 is negated by Ernst & Young's opinion that the assumptions were reasonable.

19  Acting as REMEC's outside auditor, Ernst & Young reviewed the goodwill analyses for

20  FY03, and expressly concurred in the conclusion that goodwill was not impaired.  *See e.g.*,

21  Katsell Reply Decl. Ex. 2 (FY03 audit work papers).[28]  The partner, Niki Krutop, and the

22  senior manager, Kristen Janis, of the audit team testified that they "evaluated" goodwill and

23  concluded REMEC "had come to a reasonable conclusion that goodwill had not been

24  impaired as of the fiscal year ended 2003."  Katsell MSJ Decl. Ex. O; *id.* Ex. T (Janis Dep.

25  at 226, 418-28) (describing audit of assumptions and goodwill test); Katsell Reply Decl.

26  Ex. 4 at 96 (Krutop Dep. at 96) (explaining her analysis of was REMEC's projected gross

27

28        [28]Plaintiffs attached a Summary Review Memorandum for 2003, but it concerned only
the Finland subsidiary.  Williams Decl. Ex. 53.

margins were "reasonable").  Ernst & Young evaluated the 38% figure and did not advise

REMEC to change it.  "While gross margins historically have been approximately 25%

management represents that the historical gross margins include only 30-50% capacity and

the model assumes 80-100% capacity.  Gross margins for the Commercial segment in the

fourth quarter 2003 were 17%, however as of the fourth quarter management represents

that the volume levels had just begun to pick up and were still operating at less than 50%

capacity.  We noted that gross margins for the fiscal year ended 1998 were approximately

30% and was prior to the establishment of off-shore manufacturing facilities which are also

expected to provide significant savings."  Williams Decl. Ex. 44 at 2.  The independent

auditor's approval of REMEC's annual goodwill impairment testing undercuts any claim

by Plaintiffs that Ragland knew or should have known the assumptions were false.  *Cirrus

Logic*, 946 F. Supp. at 1465 (Even if Plaintiffs raised an issue of material fact that company

violated GAAP, the review and approval by auditor "would have negated any inference of

scienter.").

Moreover, as Defendants correctly argue, the level of transparency also serves to

negate an inference that Ragland had a scheme to defraud investors.  Defendants showed

that Ernst & Young had full access to conduct a thorough, professional, and independent

audit while Ragland was CEO.  *Worlds of Wonder*, 35 F.3d at 1425-26 (evidence that

defendant's accountant had full knowledge of facts rebutted scienter); *Cirrus Logic*, 946 F.

Supp. at 1463 ( "This conduct tends to negate an inference of scienter.").

In addition, Ernst & Young reviewed REMEC's third quarter financial report, which

ended in October 2003.  Katsell Reply Decl. Ex. 12 ("we performed analytical review

procedures" of matters including gross margins).  It considered whether any indicators of

impairment had arisen since the year end so as to require a cash flow analysis/detailed

assessment of impairment."  *Id.* at 206 (mem. at 3).  REMEC's management determined

that goodwill was not impaired and the CPA firm made an informed decision not to object.

*Id.* at 209 (mem. at 6) ("Based on our review, we are not aware of any material

modifications that should be made to the condensed consolidated financial statements for

them to be in conformity with generally accepted accounting procedures."); *accord id.* Ex. 11 (same, first quarter ended May 2, 2003).

Defendants correctly note that Ragland did not sell any stock during the class period. Decl. Ragland ¶ 13.  This fact dispels an inference of scienter.  *Worlds of Wonder*, 35 F.3d at 1425 ("minimal sales of stock also negates an inference of scienter" in summary judgment motion) (citing *Apple Computer*, 886 F.2d at 1117-18); *Acterna*, 378 F. Supp. 2d at 576-77 (same, no sales).

Finally, the company released other negative information and cautioned investors of the risks of predictions.  For example, the Form 10-Q for the second quarter of FY04 again warned investors that "[s]ignificant judgments required to estimate the fair value of reporting units include estimating future cash flows, determining appropriate discount rates and other assumptions.  Changes in these estimates and assumptions could materially affect the determination of fair value and/or goodwill impairment for each reporting unit." Brownlie Decl. Ex. H.  The company disclosed negative information during the class period.  REMEC took a $17,695,000 write off in the fourth quarter of FY02 in relation to the goodwill recorded from the acquisition of Pacific Microwave Corporation.  Williams Decl. Ex. 2 at 42 (FY02 Form 10-K at F-8); *e.g.*, Brownlie Decl. Ex. L (Feb. 10, 2004 press release entitled "REMEC Announces Preliminary 4th Quarter Results Below Expectations"); Ex. M (Mar. 24, 2004 press release announces $34.7 million net losses for 4th quarter).  As Ragland states in his declaration, "it makes no sense to me why anyone would take the write-offs we took in [the fourth] quarter while concealing other write-offs that REMEC would have to disclose later.  I see no benefit from the conduct that the plaintiffs claim occurred."  Ragland Decl. ¶ 12;  *see Acterna*, 378 F. Supp. 2d at 576-77 (if a motive to commit fraud is relevant to scienter, then a lack of motive undermines any such finding).

### 3.   Plaintiffs' Other Contentions are Unsupported Conclusions

Plaintiffs press other arguments to support their case against Ragland; however, each fails due to lack of evidence.

1    Plaintiffs assert that "Ragland, as CEO, was responsible for overseeing the integrity

2  of the financials and certifying to the SEC and the public that they were accurate and

3  complete." Pls.' Opp. Br. at 14.  This merely states the obvious that Ragland performed the

4  duties of a CEO.  A corporate officer's job title does not prove that he was personally

5  involved with the alleged fraud.  *Metzler Inv. GHMB v. Corinthian Colleges, Inc.*, 540 F.3d

6  1049, 1068-69 (9th Cir. 2008); *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1087-88 (9th

7  Cir. 2002) (awareness of day-to-day workings does not establish scienter); *accord In re*

8  *Marsh & McLennan Co., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 483 (S.D.N.Y. 2006)

9  (organizational role of defendant does not establish his knowledge of facts constituting

10  misconduct).

11    Plaintiffs further contend that Ragland falsely told investors that REMEC had an

12  adequate system of internal controls to ensure accurate financial reports.[29]  *See e.g.*, FAC ¶¶

13  36-37, 47, 73(f), 74(m).  They contend that this misstatement is probative of Ragland's

14  state of mind.  Order Grant. Mot. to Dismiss at 10, n.2 [Doc. No. 34]; *In re Atlas Air*

15

----

16    [29]The Court rejects Defendants' argument that Plaintiffs are attempting to plead a
separate cause of action concerning internal controls under the Sarbanes-Oxley Act.  Defs.'
17  MSJ Scienter Br. at 21-25.  That statute requires the principal corporate officer to evaluate the
effectiveness of internal controls.  15 U.S.C. § 7241 (§ 302(a)).  The allegations that
18  Defendants made false statements about the effectiveness of REMEC's internal controls are
offered as evidence that Defendants acted with scienter regarding Plaintiffs' § 10(b) claim.
19  Accordingly, the Court denies that part of Defendants' motion that purports to seek summary
judgment on the internal control "claims." [Doc. No. 173.]
20    The Court also rejects Defendants' contention that the FAC did not give sufficient
notice of certain allegedly false statements.  *See e.g.*, Defs.' MSJ Falsity Br. at 6 n.3 & 17;
21  Defs.' Opp. False and Misleading Br. at 6-7; *see* FAC ¶¶ 36-38, 47, 51, 59, 73(f), 74(m).
Plaintiffs have not changed the legal theory.  Plaintiffs simply submit evidence obtained in
22  discovery to support their securities fraud claims.  *See Kaplan*, 49 F.3d at 1368-69 (statements
appearing in complaint are properly before district court in summary judgment motion);
23  *William Inglis & Sons Baking Co. v. ITT Cont'l Baking Co., Inc.*, 668 F.2d 1014, 1052-54 (9th
Cir. 1982) (district court has discretion to treat pleading as amended to conform to facts in
24  affidavits on summary judgment motion, especially when issues were explored during
discovery).
25    Nor have Plaintiffs "avoided" the heightened pleading standards of the PSLRA by
presenting evidence that was produced during discovery.  Once a plaintiff states a securities
26  fraud cause of action under the heightened pleading standard, the case is like any other law
suit.  The parties conduct discovery, and in the course of reviewing internal documents and
27  taking depositions of employees, plaintiffs may uncover additional facts of direct misconduct
or circumstantial evidence that corroborates their theory.  When these *facts* are presented with
28  a summary judgment motion, the question is whether the facts are admissible and relevant.
Here, Plaintiffs included facts in their opposition brief that were fully explored in discovery
and that relate to the same course of conduct alleged in their pleading.

04cv1948

1    *Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489 & n.7 (S.D.N.Y. 2004); *In*

2    *re Hamilton Bancorp Inc.*, 194 F. Supp. 2d 1353, 1359 (S.D. Fla. 2002).

3        The challenged statement is contained in a quarterly financial report that REMEC

4    filed with the SEC during Ragland's tenure as CEO.  Williams Decl. Ex. 28 (Form 10-Q,

5    filed Dec. 2003).[30]   The report is accompanied by a Certification, in which Ragland states

6    that he has reviewed the form, and that, based on his knowledge, it does not contain false

7    statements or misleading omissions.  *Id.* at 25 ¶¶ 1-3 (R768868).  Ragland states that he is

8    "responsible for establishing and maintaining disclosure controls and resources" that ensure

9    he is informed of material information.  *Id.* ¶ 4.  Ragland states that he evaluated the

10   effectiveness of those controls and presented his conclusion in the body of the SEC filing.

11   Turning back to that section of the Form 10-K, Ragland concluded that the internal controls

12   were "effective, in that they provide reasonable assurance that information required to be

13   disclosed" is timely reported.  *Id.* at 22 (R768865).  The Certification concludes with a

14   statement that Ragland disclosed to the independent auditor and the Board's Audit

15   Committee "[a]ll significant deficiencies and material weaknesses in the design or

16   operation of internal control over financial reporting which are reasonably likely to

17   adversely affect [REMEC's] ability to record, process, summarize and report financial

18   data" and any fraud.  *Id.* at 25 ¶ 5.

19        Plaintiffs contend that Ragland knew that the internal control procedures were

20   flawed because a few months earlier Ernst & Young told REMEC that it had observed

21   "certain weaknesses involving internal control" when it had conducted its annual audit.

22   Williams Ex. 63 (Mar. 14, 2003 memo).  Ernst & Young was primarily concerned that

23   REMEC did not have enough trained accounting staff to prepare timely reports, but it

24   described six "areas where sufficient expertise, oversight or process controls were not

25

26       [30]The FAC alleges that other SEC filings contain similar language, *e.g.*, FAC ¶ 36;
27   however, the parties submitted only a few of the reports as exhibits to this motion.   Williams
Decl. Ex. 56 at 39 & 74 (R887577 & R887612) (pre-class Form 10-K for FY03); *but see*
Williams Decl. Ex. 2 at 55 (FY02 Form 10-K contains simple signature line that Ragland "duly
28   caused" the report to be filed but does not contain a Certification page).  The Court considers
the evidence submitted.  Fed. R. Civ. P. 56.

         04cv1948

employed, resulting in adjustments made subsequent to the initial close." *Id.* Ernst & Young recommended that REMEC hire and supervise more personnel in the accounting and finance departments; establish a closing calender; improve communications with foreign locations; and use a computer system to identify obsolete inventory and reserves rather than rely on subjective analysis. *Id.* The memo reports that the auditors consulted with management and that the company had hired new staff, increased review and oversight, re-evaluated its internal control processes, and instituted an internal audit function. *Id.*

The Court finds that Ragland's Certification that REMEC's internal controls were "effective" is <u>not</u> evidence that Ragland had an intent to deceive. *Cf. Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1003-04 (9th Cir. 2009) (unless Plaintiffs first prove language is false, boilerplate language in required Sarbanes-Oxley Certification "add[s] nothing substantial to the scienter calculus"). Plaintiffs' suggested inference is unreasonable for two reasons.

First, the Ernst & Young memorandum, dated March 2003, contains the management's response to the concerns the independent auditor uncovered in the annual audit which shows the weakness had been discussed at some earlier date. The memo describes the remedial actions REMEC took to eliminate the problems identified by the auditor. Thus, the Ernst & Young March 2003 memo does not prove that REMEC's internal controls were not effective at the time, several months later, when Ragland filed the report with the SEC in December 2003. *See also* Katsell Supp. Decl. Ex. A at 7 (Ernst & Young's audit report for FY03, dated Apr. 17, 2003) ("We noted no material deficiencies").

Second, there is no evidence that REMEC did not respond effectively to the auditors' concerns. Rather, the memo itself confirms that a past problem had been addressed. The memo that Ernst & Young submitted a year later, after completing the FY04 audit, confirms that conclusion. None of the concerns raised in the March 2003 memo were mentioned in the March 2004 memo. Williams Decl. Ex. 64 (listing concerns

1   with derivatives, foreign currency translation, payroll issues, other review processes, and

2   computer security); *accord* Katsell Supp. Decl. Ex. A at 7 (Ernst & Young Audit Report

3   dated April 17, 2003) ("We noted no material deficiencies" in internal controls, but

4   recommended two improvements to increase efficiency of cash disbursements and bank

5   reconciliations).

6         Similarly, evidence that a member of the Board of Directors perceived weaknesses

7   in internal controls while Ragland was in charge bears on mismanagement.  Williams Decl.

8   Ex. 66 at 7 (evaluating internal control environment as "still ineffective"), 12, 18, 24, 28.[31]

9   It does not support an inference of securities fraud in the context of this litigation.

10  *GlenFed*, 11 F.3d at 848-49.  Weak internal controls are an issue of corporate

11  mismanagement or negligence, not federal securities fraud.  *Id.,* 11 F.3d at 848-49.[32]

12        Plaintiffs do not provide any evidence to support their claim that Ragland

13  "participated in numerous Audit Committee meetings."  Pls.' Opp. Br. at 15.  Plaintiffs did

14  not produce evidence such as the minutes of the Audit Committee meetings that show

15  Ragland participated in any discussion concerning goodwill testing.  Instead, Plaintiffs cite

16  to the Audit Committee's Charter.  Williams Decl. Ex. 46.  That document outlines the

17  responsibilities of the three directors on the Audit Committee.  *Id.*  It is not probative of

18  Ragland's role in the alleged accounting fraud.

19        Plaintiffs argue that REMEC's purchase of Himark is indicative of Ragland's

20  scienter.  Plaintiffs note that Ragland was dating the owner of Himark, Shu-Yi Lin, at the

21

22  [31]Plaintiffs state that Chairman of the Board Andre R. Horn completed this 28-page questionnaire.  Pls.' Opp. Br. at 25 n.114.  Plaintiffs have not provided any support for that assertion; however, it appears that "Andre" is written on the first page.  *Id.* Ex. 66 at 1.  The

23  questionnaire appears to be have been printed in July 2003 and given the footer "aec7/8/2003" and was thus completed *before* Hickman joined REMEC.  *Id.*

24  The Court could not locate the separate questionnaire that Plaintiffs attribute to Director Howard E. Hughes, Jr., nor the page with a quotation that the control environment did not rate

25  a "passing grade."  Pls.' Opp. Br. at 25 n.114 (citing REM 0008439).  The Court notes that Hughes joined REMEC's Board in September 2003 and served on the Audit Committee.  *See*

26  Williams Decl. Ex. 5 at 28 & 30.

27  [32]The *GlenFed* decision pre-dates the PSLRA, which enacted "formidable" pleading standards.  *Metzler*, 540 F.3d at 1055.  Nonetheless, the decision makes the valid observation

28  that allegations of "faulty management practices" fail to satisfy the general Rule 9(b) standard to plead fraud with particularly.  *GlenFed*, 11 F.3d at 848-49.

1  time REMEC acquired the company for $12.1 million.  Pls.' Opp. Br. at 12 (describing

2  "deception," "secret affair," "impropriety").  The couple later married.  Williams Decl. Ex.

3  38 (Bernard Lirola Dep. at 106).  After Ragland left REMEC, the Board of Directors

4  decided to sell Himark back to her, but REMEC lost approximately $3 million on the

5  transaction.  *Id.* (Dep. at 108).

6         The Court agrees with Defendants that Plaintiffs have not presented evidence of any

7  misconduct as to that transaction.  Attorney argument is not admissible evidence, and the

8  available evidence negates the inference that Plaintiffs attempt to draw.  Lirola testified that

9  he had "no reason to believe" that Ragland's personal relationship influenced REMEC's

10  decision to buy Himark.  *Id.* (Dep. at 107).  In addition, the fact that a member of the Board

11  of Directors contacted an attorney for advice is not evidence that the transaction was

12  deceptive, particularly when the conclusion of that independent investigation confirmed

13  there was nothing to disclose.  Williams Decl. Ex. 37 at 6 (Gibbs Dep. at 227-29); *id.* Ex.

14  34 at 129 (minutes show two attorneys advised Board of findings); *but see id.* Ex. 41 at 2-4

15  (Director Harold Hughes believed the relationship created a conflict of interest problem,

16  but noted the independent investigation found "nothing untowards").

17         Ernst & Young concurred.  Ernst & Young conducted an independent review of the

18  Himark acquisition and concluded that the purchase price had not been inflated, but was

19  consistent with comparable transactions.  Williams Decl. Ex. 45 at 2.  Ernst & Young

20  concluded that the conditions of the sale had not affected REMEC's financial statements

21  and REMEC was not required to make any disclosures.  *Id.*

22         Though the FAC casts aspersions at the motivation for acquiring Himark and its

23  value, Plaintiffs have not produced evidence to support the allegation.  *See e.g.*, FAC ¶¶

24  189, 192, 196.

25         The Court must construe all reasonable inferences in Plaintiffs favor.  By the same

26  token, Defendants should not endure an expensive trial when no reasonable jury could

27  conclude that Plaintiffs have proven their case.  The Court concludes that Plaintiffs have

28  not offered  "concrete evidence from which a jury might return a verdict in his favor" – it is

1  not sufficient to merely assert "the jury might, and legally could, disbelieve the defendant's

2  denial of [deceitful intent]." *Anderson*, 477 U.S. at 255; *Matsushita*, 475 U.S. at 587

3  ("Where the record taken as whole could not lead a rational trier of fact to find for the non-

4  moving party, there is no 'genuine issue for trial.'").

5        Even assuming Plaintiffs' experts are right that REMEC's goodwill was impaired,

6  their opinions about the <u>falsity</u> of the statement do not defeat Ragland's <u>scienter</u> summary

7  judgment.  A deliberate violation of accounting procedures, by itself, is not sufficient to

8  create an inference that the CEO, who was not involved in selecting the data, acted with an

9  intent to defraud investors. *Wet Seal*, 518 F. Supp. 2d at 1163 ("even deliberate GAAP

10  violations do not by themselves establish scienter"); *U.S. Aggregates*, 235 F. Supp. 2d at

11  1073.  This is particularly true when the experts' opinion of falsity is grounded on

12  professional judgment concerning the application of GAAP; the test involves projections of

13  future events; and REMEC's auditor approved the analysis.  Plaintiffs' attempt to bridge

14  the gap from deliberate accounting violations to fraud is conclusively defeated by the rest

15  of the record.  When the evidence "clearly rebuts any inference of bad faith," a plaintiff's

16  expert's contrary opinion is "insufficient to defeat summary judgment" on scienter. *Worlds*

17  *of Wonder*, 35 F.3d at 1425-26 ("failure to follow GAAP, without more, does not establish

18  scienter"); *Software*, 50 F.3d at 627; *Cirrus Logic*, 946 F. Supp. at 1457 ("GAAP is not a

19  set of rules ensuring identical treatment of identical transactions; rather, it tolerates a range

20  of reasonable treatments, leaving the choice among alternatives to management.")

21  (collecting cases).

22        In conclusion, Plaintiffs have not presented sufficient evidence to survive Ragland's

23  motion for summary judgment as to scienter. *Celotex*, 477 U.S. at 323 ("A complete failure

24  of proof concerning an essential element of the nonmoving party's case necessarily renders

25  all other facts immaterial.").  Plaintiffs have not rebutted Ragland's declaration that he

26  acted in good faith. *Kaplan*, 49 F.3d at 1378-79 (granting summary judgment on

27  defendant's affidavit when plaintiff failed to set forth specific facts showing a genuine

28  issue for trial).  Accordingly, the Court **GRANTS** Defendant Ronald E. Ragland's motion

1    for summary judgment on scienter and dismisses him from the first cause of action.

2                    **B.      Individual Defendant Winston E. Hickman**

3          Hickman, the other executive named in this class action, moves for summary

4    judgment on the ground there is no evidence that he acted with scienter.  Hickman

5    submitted a sworn declaration in support of his motion.

6          Hickman joined REMEC as CFO on November 14, 2003, when REMEC was in the

7    midst of preparing FY04 reports as well as budgets and forecasts for FY05.  Hickman Decl.

8    ¶ 4 & 7.  He has an MBA in finance, but relied on accountants for "technical accounting

9    expertise."  *Id.* ¶ 5.  Hickman states he had a good faith belief that the challenged

10   statements were true; he did not make any statement with the intent to deceive; and he

11   relied on the staff accountants as well as outside auditors to prepare accurate financial

12   reports.  *Id.* ¶¶ 4-21.

13         Hickman's job responsibilities as CFO bring him closer to REMEC's financial

14   reports; however, the Court finds that Plaintiffs have not produced sufficient evidence of

15   scienter to survive his summary judgment motion.  Plaintiffs' assertion that Hickman was

16   "directly involved and knew the goodwill test assumptions were false and misleading" is

17   not supported by the evidence.  Plaintiffs rely on exaggerated characterizations to argue

18   Hickman intended to deceive the investing public.[33]  The record contains no such evidence.

19   The Court agrees with Defendants that Hickman did not have an opportunity to manipulate

20   the goodwill impairment tests.  That task was performed by other employees, Hickman did

21   not direct the manner in which the test was performed or its outcome, and the outside

22   auditor approved the analysis.

23                    **1.      Hickman's Involvement in FY04 Impairment Testing**

24   _____

25         [33]For example, Plaintiffs' state in their brief that "Hickman also insured that he was
     constantly apprised of REMEC's financial status by hiring a direct reporter whose sole purpose
26   at REMEC was to constantly run financial projections."  Pls.' Opp. Br. at 14.  Plaintiffs cite
     deposition testimony that purportedly supports that claim.  It does not.  Tiernan Hussey
27   testified that his primary responsibilities were to "conduct the forecasting process"; analyze
     "cost studies, returns, financial return studies"; and provide "financial input into the business
28   decision-making process for the company."  Williams Decl. Ex. 43 at 3 (Dep. 14-18).
     Hussey's description of his job duties does not by any means indicate that Hickman acted with
     intent to defraud investors.

Plaintiffs first argue that internal emails that contain different scenarios demonstrate that Hickman intentionally manipulated the numbers to perform a "bogus" goodwill impairment test in FY04. Pls.' Opp. Br. at 4-5 ("Defendants used false, arbitrary inputs in the calculations to reach this foregone conclusion."); *id.* at 13 (Hickman "hand selected" assumptions to conceal goodwill impairment). Setting aside Plaintiffs' exaggerated conclusion about the extent of Hickman's involvement in the calculations, the evidence shows the following course of events.

On February 1, 2004, David Hinkle, Vice President and Corporate Controller, sent Hickman an email with the subject line "FAS 142 – Commercial all scenarios 1-19 vs.xls." Williams Decl. Ex. 16.[34] Hinkle attached three different versions of the valuation of the Commercial segment "as of" December 31, 2003. *Id.* at 2, 18, & 34. At the time these documents were prepared, REMEC had the actual numbers through October 31, 2003 and a fairly reliable estimate of results for Q4 of FY04. REMEC's actual FY gross profit margins had been 25% in 2001, 6% in 2002, 10% in 2003, and approximately 18 to 23% in 2004. *Id.* at 2. The three versions differ in their assumptions and forecasts of the figures for the future years.[35] One scenario would have resulted in a goodwill impairment of $8.4

_____

[34]Exhibit 16 is the only email sent to Defendant Hickman and thus the only document that reflects his personal knowledge. Plaintiffs cite to email exchanges between the accounting staff before and after the February 1, 2004 message to Hickman. Pls.' Opp. Br. at 5, n.13. The emails between Hinkle and others do not show any conduct by Hickman, the named Defendant. *See e.g.*, Williams Decl. Ex. 11 (Dec. 20, 2003 email from Trevor Renfield to Hinkle); Ex. 12 (Jan. 17, 2004 email from Renfield to his other email address); Ex. 13 (Jan. 19, 2004 email from Renfield to Hinkle); Ex. 14 (Jan. 20, 2004 email from Renfield to Hinkle); Ex. 15 (update of Jan. 20, 2004 email); Ex. 17 (Feb. 7, 2004 email from Jerry Nelson to Hinkle); Ex. 18 (Feb. 9, 2004 email from Nelson to Hinkle); Ex. 19 (Feb. 14, 2004 email from Hinkle to Kristen Janis at Ernst & Young, the outside auditor); Ex. 20 (Feb. 14, 2004 email from Hinkle to Patrick Gray, a member of the Board of Directors); Ex. 21 (Feb. 18, 2004 email from Hinkle to David Wilkinson, REMEC's tax director); & Ex. 22 (Wilkinson's revisions later that day to Hinkle).

[35]The first version forecasted gross profit margins of 31% in 2005, 32% in 2006, and 35% in 2007 (and thereafter to 2014). *Id.* at 2-3 & 8 (excluding depreciation). After deducting the Net Book Value from the Current Book Value, the first version reports a Present Value *over* $263.4 million. *Id.* at 5-6.
The second version forecasted profit margins of 24% in 2005, 22 to 24% in 2006, and 26% in 2007 (with steady increases of 1% in most of the years to come). *Id.* at 18-20 & 24 (excluding depreciation expense). By subtracting the Net Book Value from the Current Book

(continued...)

1   million, whereas the two other versions calculated no impairment by an excess of at least

2   $44.3 million and at most $263.4 million.

3        Ultimately, as noted above, in its final April 15, 2004 public filing, REMEC

4   assumed "sales growth rates ranging from 5%-40%; gross profit margins ranging from

5   24%-28% (excluding depreciation); an income tax rate ranging from 0%-23% and a

6   discount rate of 20%" for the Commercial segment.  Williams Decl. Ex. 5 at 25 (draft FY04

7   Form 10-K).  REMEC used numbers in its Form 10-K that were different from those in the

8   three scenarios that Hinkle sent Hickman in February.  *Compare* Ex. 5 (highest GPM of

9   28% & top income tax rate of 23%) *with* Ex. 16 (GPM could reach 31% & income tax rate

10   could reach 25%).

11        The Court finds that the emails (including those listed *supra* n. 32) are devoid of

12   evidence that Hickman directed that certain figures be used or manipulated the goodwill

13   impairment analysis in any way.  Instead, the emails confirm that Hinkle and the

14   accounting staff derived the assumptions, and then reported their conclusions to Hickman.

15   *See also* Williams Decl. Ex. 49 (later, in Mar. 2004, Hickman received information from

16   Ernst & Young on the need for an interim test and he forwarded that information to the

17   accounting employees who were responsible for conducting the analysis).

18        Any permissible inference that could be drawn from the existence of three different

19   scenarios is negated by undisputed evidence.  Hickman acted in a supervisory role by

20   reviewing the final result, but was not involved in selecting the data or dictating a specific

21   outcome.  Hickman testified that Controller David Hinkle prepared the annual goodwill

22

23

24

_____

25   [35](...continued)
Value, the second version reports a Present Value *under* $8.4 million.  *Id.* at 21-22.  This

26   calculation reflected impaired goodwill because it assumed lower gross margins.
    The third and final variation forecasted gross profits of 24% in 2005 (the same figure

27   used in the second version), 26 to 27% in 2006, and 28% in 2007 (with 1% increases every
year or two in the future).  *Id.* at 34-36 & 40 (excluding depreciation).  After deducting the Net

28   Book Value from the Current Book Value, the third version shows a Present Value *over* $44.3
million.  *Id.* at 37-38.

04cv1948

impairment test for FY04.[36]  Hickman Decl. ¶ 8; Williams Decl. Ex. 32 at 7 (Dep. at 148).
Hickman described his own involvement in the process as "reviewing" the completed
analysis.  Williams Decl. Ex. 32 at 6-7 (Dep. at 147-48).  Hickman testified that he recalls
seeing one scenario and that Hinkle performed the analysis with the assistance of others in
the accounting department.  Katsell MSJ Decl. Ex. J at 270 (Hickman Dep. at 170) ("I
don't recall different scenarios.  I recall one analysis."); Hickman Decl. ¶ 8.  He testified
that the company used an existing model that had been prepared by an outside accounting
firm.  Hickman Decl. ¶ 8.  As noted, Hickman testified that he believed the optimistic
estimates and forecasts were reasonable.  *Id.* ¶ 10.  He relied on the outside audit by Ernst
& Young to evaluate the methodology, estimates, and assumptions.  *Id.* ¶ 12.

The employees in REMEC's accounting department confirmed the accuracy of
Hickman's description of his role.  Hinkle testified that he "oversaw the analysis."  Katsell
MSJ Decl. Ex. S at 251 (Hinkle Dep. at 251); Katsell Reply Decl. Ex. 3 (attached to this
Feb. 19, 2004 Ernst & Young mem. is analysis Hinkle performed on Feb. 5, 2004, in which
he states his reasons for predicting future growth "despite the on-going financial
difficulties") (EY-000695 to 000698); *see also* Williams Decl. Ex. 19 (on Feb. 14, 2004,
Hinkle sent an email to Kristen Janis at Ernst & Young and attached a scenario of goodwill
impairment that assumed a gross margin of 21.8%).  Tiernan Hussey testified that the
accounting staff input the data into the model.  Katsell Reply Decl. Ex. 8 at 190 (Hussey
Dep. at 118) ("We populated the model with our most recent business projection.").

Furthermore, the independent CPA discerned no impropriety in multiple versions
because they were working on determining sensitivity to some of the variables.  Katsell
Scienter Decl. Ex. G (Krutop Dep. at 301-02).

Plaintiffs next assert, without supporting facts, that the lower level employees "were
no doubt doing his bidding when they constructed numerous goodwill impairment testing
scenarios for the FY04 test until a result of 'no impairment' was achieved."  Pls.' Opp. Br.

---

[36]The FY03 impairment testing was conducted, completed, and reported several months before Hickman began working at REMEC, thus, that pre-class statement in the FY03 Form 10-K is not relevant to his state of mind.  Williams Decl. Ex. 56 (filed Apr. 30, 2003).

at 15-16.

The actual testimony unambiguously defeats speculation that Hickman deliberately manipulated the data or outcome.  As mentioned, Hinkle, not Hickman, was primarily responsible for goodwill impairment testing.  Williams Decl. Ex. 52 (Hickman Dep. at 147-48) (Hickman reviewed the analysis after Hinkle completed it).  In his deposition, Hinkle repeatedly testified that he did not recall any discussions, whether general or specific, with Hickman about the goodwill impairment testing conducted for FY04.  Katsell Scienter Decl. Ex. C (Hinkle Dep. at 345-46 & 393-94).  Plaintiffs' counsel specifically asked Hinkle if Hickman (or anyone else at REMEC) had instructed him to conduct the impairment test in a manner that ensured a particular conclusion.  Hinkle again stated that he did not recall any discussions with Hickman about the goodwill impairment testing, "[b]ut I believe if he requested me to do an analysis – any analysis in any way that was not consistent with my own beliefs that I would have objected to."  *Id.* (Hinkle Dep. at 393 & 394 ("nor do I recall any instructions to achieve a certain result in performing the goodwill impairment analysis")).

In a similar vein, Plaintiffs argue that REMEC "intentionally omitted Powerwave" as a competitor for comparison for the FY03 test, but Hickman conveniently used that company when REMEC took the writeoff the following year.  Pls.' Opp. Br. at 13.  Plaintiffs cite their expert's speculation about Defendants' state of mind.  *Id.* n.46 (citing Minstein Report).  As discussed above, the relevant portion of Minstein's report is not evidence, it is an improper legal conclusion.  There is no evidence that Hickman had any input into the selection of guideline companies.

Plaintiffs rely on the actual results to show that reality did not confirm the optimistic assumptions.  The Court discounts the observation because it depends on hindsight.  *GlenFed,* 42 F.3d at 1549

## 2.    Independent Auditor Concurred in Test Result

Ernst & Young reviewed and evaluated the annual impairment tests that Hinkle's accounting team assembled and presented while Hickman was CFO, including the FY04

impairment test conducted during the class period.  Ernst & Young examined the methodology REMEC used to value goodwill for FY04.  Katsell Reply Decl. Ex. 3 (FY04 audit work papers).  The audit team approved the conclusion that REMEC's goodwill was not impaired in FY04.  Williams Decl. Ex. 33 at 8 (FY04 Summ. Rev. Mem.) ("The Company performed an impairment analysis on their intangible assets of year end.  We have reviewed the related analysis and concur with their analysis.") (emphasis added); Katsell Reply Decl. Ex. 3 at 49 (Partner Niki Krutop concurs in Senior Manager Kristen Janis' opinion that "goodwill does not appear to be impaired").  The independent auditor's approval of REMEC's goodwill impairment testing corroborates Defendants' view that the company accurately reported its financial situation.

Plaintiffs discount the value of Ernst & Young's audits on two grounds.[37]  First, Plaintiffs argue that Ernst &Young relied on information provided by senior management – the same individuals who allegedly carried out the fraudulent scheme to conceal the true financial picture.  As just discussed, the record does not support this criticism because Hinkle, and others in the accounting department, performed the analysis.

Further, Ernst & Young's audit work papers describe the specific actions taken to review the impairment test.  Katsell Reply Decl. Ex. 3 (FY04).  Among other steps, the outside auditor "reviewed supporting forecast analysis, compared analysis to prior year actuals, discussed the assumptions with the Company's management as well as product line managers who were responsible for the forecast estimates." *Id.* at 46 (Mem. at 1 ¶ (1)).  Ernst & Young examined the disparity between the actual gross margins for FY04 of 18% with the optimistic assumption of future gross margins ranging between 24% and 29%.  *Id.* at 47-48 (Mem. ¶ (2)).  Ernst & Young listed the factors that warranted an expectation that the gross margins would "improve significantly in fiscal 2005 compared to 2004." *Id.* Plaintiffs criticize one of those reasons (*i.e.*, REMEC's plan to move manufacturing from Finland to China), but Ernst &Young provided several other reasons for accepting the

---

[37]Plaintiffs' citation to the affirmative defense of "auditor reliance" is irrelevant.  Pls.' Opp. Br. at 23-24; Defs.' Reply Br. at 8 n.17.  Defendants use the evidence of Ernst & Young's role as evidence that Hickman did not act with an intent to defraud investors.

assumption. *Id.* In sum, the evidence demonstrates that Ernst & Young conducted an independent check and concurred in the conclusion that REMEC's goodwill was not impaired for FY04. *See* Hickman Decl. ¶ 12 ("I understood that based on its audit procedures, E&Y determined that the estimates and assumptions were appropriate and agreed that the Commercial Wireless Segment's goodwill was not impaired."); *Cirrus Logic*, 946 F. Supp. at 1463-65 (frank consultation with auditor about an accounting matter tends to negate inference of intent to deceive).

The other reason Plaintiffs discredit Ernst & Young's audit is that the firm resigned shortly after REMEC disclosed the goodwill writeoff. Plaintiffs suggest that Ernst & Young "questioned Defendants' conduct" and resigned because the auditor recognized "the potential for fraud." Pls.' Opp. Br. at 6.

The record does not support this speculation. There is no evidence to connect Ernst & Young's resignation as REMEC's outside auditor to any corporate misconduct. The evidence clearly shows that Ernst & Young did *not* resign on the ground that REMEC's financial statements contained "an adverse opinion or a disclaimer of opinion, or was qualified or modified as to uncertainty, audit scope, or accounting principles." 17 C.F.R. § 299.304, *cited in* Williams Decl. Ex. 67 at 2 (Form 8-K). REMEC did not issue a restatement. *Cf. Atlas Air*, 324 F. Supp. 2d at 488-89 ("When a company is forced to restate its previously issued financial statements, the mere fact that the company had to make a large correction is some evidence of scienter.").

As discussed above in connection with Ragland's motion, Plaintiffs' reliance on the Internal Control and Fraud Considerations form is misplaced. The evidence shows that Ernst & Young conducted its audit with those potential fraud considerations in mind and found no misstatements in REMEC's financial reports. Williams Decl. Ex. 33 at 8 (FY04 Summ. Rev. Mem.). Each member of the audit team signed the conclusion which stated: "It is my opinion that the scope of the audit was adequate and that the financial position of REMEC, Inc. at January 31, 2004, and the results of its operations and its cash flows for the year then ended, are in conformity with generally accepted accounting principles

applied on a consistent basis." *Id.* at 12-13.  Ernst & Young's resignation in these

circumstances cannot be used to infer Defendants made financial statements with an intent

to defraud.  *Zucco*, 552 F.3d at 1001-02.

Moreover, Ernst & Young's concerns about Ragland's management style did not

extend to Hickman.  Williams Decl. Ex. 26 at 6 ("this risk no longer exists").  Instead,

Ernst & Young was "impressed" with Hickman's "technical and leadership capabilities"

and concluded "our view is that the replacement of [former CFO David Morash] with

Winston [Hickman] has improved the financial, management and control environment."

Williams Decl. Ex. 45 at 1 (May 13, 2004 Supp. Mem. after FY04 audit).

Plaintiffs submit evidence that Hickman attended an Audit Committee meeting

when Ernst & Young discussed the audit results for FY04.  Williams Decl. Ex. 65 (Apr. 7,

2004).  One item on the agenda was a discussion of the review process for establishing and

monitoring inventory and receivable reserves, with an eye toward future compliance with

the heightened standards in the Sarbanes-Oxley Act.  Hickman also participated in a

private, executive session to discuss "finance organization and staff enhancement plan."

*Id.* at 3.  This evidence is not probative of Hickman's scienter.

As with Defendant Ragland, Plaintiffs allege that Hickman made inaccurate

statements that REMEC had adequate internal controls.  In April 2004, Hickman certified

that REMEC's Form 10-K for FY04 was accurate.  Williams Decl. Ex. 5 at 68 (draft FY04

Form 10-K Certification) (R232853).  Hickman stated he had evaluated the company's

disclosure controls and procedures, and concluded they were "effective."  *Id.* at 27 (draft

FY04 Form 10-K at 24, Item 9a) (R232812).  Plaintiffs argue that Hickman falsely told

investors that the internal controls were adequate, when in fact, Ernst & Young, the

independent auditor, informed Hickman of problems discovered in the annual audit.  *Id.* Ex.

64 (Mar. 19, 2004 memo).[38]

---

[38]The format of the March 19, 2004 Ernst & Young memo is the same as the 2003 memo described above in connection with Defendant Ragland, with two differences.  First, the auditor identified a longer list of concerns. Ernst & Young recommended that REMEC

(continued...)

1    Arguably, one could draw a rational inference from the nature of the problems listed

2    in the March 2004 memo that Hickman's public evaluation of the internal controls was

3    suspect; however, any such inference is expressly refuted by a May 2004 memo.  There,

4    Ernst & Young reconsidered its evaluation of entity level controls in light of Ragland's

5    departure as CEO in February 2004, as well as the termination of David Morash as CFO in

6    September 2003.[39]  Williams Decl. Ex. 45.  The May 2004 memo praises the changes in top

7    management as having improved REMEC's internal controls.  Importantly, Ernst & Young

8    concluded that REMEC's internal controls were "effective."  *Id.* at 6.  Therefore, the

9    independent auditor expressly validated the accuracy of Hickman's statement.

10    Plaintiffs next argue that REMEC concealed internal control violations during the

11    class period until it disclosed them on September 30, 2004.  Pls.' Opp. Br. at 25 (citing Ex.

12    67).  Once again, Plaintiffs' characterization of the record is flawed.  Plaintiffs cite the

13

14    _____

15        [38](...continued)
      improve its accounting of "forward contracts to hedge against foreign currency changes";
16    implement review processes of accounts payable to avoid duplicate payments, to record
      foreign currency translations, to approve credit limits, and to approve speculative sales orders;
17    and adopt procedures to verify various payroll issues.  *Id.* at 2-3.  Specific recommendations
      were made concerning transactions with the Finland, Philippines, and China locations,
18    including establishing controls to review foreign currency transactions and accounts and
      clearing certain intercompany accounts; to study whether it needed a procedure regarding
19    "transfer pricing risks"; and to train staff on procedures for recognizing revenue, issuing
      checks, balancing bank statements, expenses, and other issues specific to the foreign locations.
20    *Id.* at 3-5. The memo finds many areas where  REMEC could improve the security of its
      computer system. *Id.* at 5-9. Finally, Ernst & Young advised REMEC that it would need to
21    prepare for the probing review and verification process required by the new Sarbanes-Oxley
      Act. *Id.* at 9-10.
22        Second, the memo does not include a response from REMEC management.

23        [39]Ernst & Young stated that the newly hired CEO's "attitude, experience and fresh
      perspective have been a positive influence on the Company['s] overall control environment
24    during the year-end financial statement close process."  *Id.* at 2.  Robert Shaner "quickly
      analyzed the business and has taken many steps to restructure the Company's processes and
25    controls."  *Id.*  "[H]e wants the finance and accounting department to do the right thing."  *Id.*
      Later in the memo, Ernst & Young describes recent changes in corporate governance,
26    including adding two new members to the Audit Committee, reinstating the internal auditor
      to a full time position, and updating its Code of Conduct.  *Id.* at 3-4.  Ernst & Young
27    commented:  "We have considered these changes to be a significant improvement of the 'tone
      at the top' and have noted that these individuals have been a positive change in the control
28    environment during the year-end financial statement close process.  In addition, we have seen
      the Corporate Governance Committee of the Board of Directors to be a positive influence in
      the past few months."  *Id.* (italics omitted).

1  Form 8-K in which REMEC disclosed that Ernst & Young had resigned as the independent

2  auditor.  That document refers to the preliminary internal control issues discussed in Ernst

3  & Young's March 19, 2004 memo.  Williams Decl. Ex. 67 at 2.  As the Court discussed

4  above, although Ernst & Young flagged initial concerns in March 2004, upon further

5  evaluation, in May 2004, the auditor concluded that REMEC's internal controls issues had

6  been cured and did not constitute a "reportable event."[40]  *Id.* Exs. 64 (Mar. 19, 2004 memo)

7  & 45 (May 2004 memo).  The information does not create an inference of scienter.

8  ### 3.     Hickman Presented Undisputed Evidence of Good Faith

9      In addition to the auditor's approval of the goodwill impairment analysis,

10  Defendants produced other undisputed evidence of Hickman's lack of scienter.  "Insofar as

11  Hickman may have had a sliver of opportunity to commit the alleged fraud," there is no

12  evidence that he had any motive to do so.  Defs.' MSJ Br. at 2.

13      His overall conduct is inconsistent with a fraudulent intent.  *Apple Computer*, 886

14  F.2d at 1118 (any inference of bad faith "completely dispelled by the defendants' overall

15  pattern of conduct").  Hickman recognized that the analysis of the FY04 books "estimated

16  that the fair value of the Commercial Wireless Segment exceeded the goodwill associated

17  with it by only $16,216[,000]."  Hickman Decl. ¶ 11.  Given that narrow margin, REMEC

18  told the public that the goodwill impairment test of FY04 should be weighed with caution.

19  Hickman Decl. ¶ 13 ("because it was a close call, we wanted to make sure that the market

20  was informed of that result").  The Form 10-K included cautionary language.

21      Over the last several years we have acquired a number of companies.  Many of
   these businesses were small and have required considerable infrastructure

22  upgrade.  In addition, we have approximately $65.5 million of goodwill resulting
   from these acquisitions, which may become impaired should we experience a

23  major change in our business outlook due to the loss of a major customer, our
   products becoming technically obsolete or if we continue to experience

24  significant losses.

25  Brownlie Ex. F at 157 (FY03 Form 10-K at 11).

26      A variance in the discount rate or gross margin assumptions could have a
   significant impact on the amount of identified goodwill impairment.  For

27

28      [40]Federal regulations require the disclosure of a "reportable event" when a company
   announces a change in its independent auditor.  17 C.F.R. § 229.304(a)(1)(v) (Item 304).

- 71 -

04cv1948

1     example, a 1% - 2% change in either of these factors in our Commercial segment
2     analysis would have resulted in an indication of possible impairment that would
      have led us to further quantify the impairment and record a charge to write-down
3     these assets.

4  *Id.* at 158.

5        Further, Hickman discussed his concerns about potential impairment with the

6  outside auditor.  Hickman Decl. ¶ 14 ("E&Y advised that we closely watch for indicators

7  that an interim impairment analysis should be performed.") & 16 ("I consulted with E&Y

8  about whether REMEC should conduct an interim test" for the first quarter); *accord* Katsell

9  Scienter Decl. Ex. G (Krutop Dep. at 301-07) (Ernst & Young discussed indicators and

10  suggested disclosure).  He followed the independent advice about whether REMEC should

11  conduct an interim test (as opposed to waiting to conduct the annual test at the next FYE).

12  Williams Decl. Ex. 49 (March 17, 2004 emails between Ernst & Young and Hickman on

13  the need to conduct an interim test and listing the FAS 142 factors with examples; Hickman

14  forwarded the information to the appropriate employees (Hinkle and Hussey)).  On August

15  24, 2004, Ernst & Young advised Hickman that REMEC should conduct an interim

16  goodwill impairment test based on the Board of Directors' plan to sell the company.

17  Brownlie Decl. Ex. P.  REMEC conducted that interim test and reported the goodwill

18  impairment on September 8, 2004.  William Decl. Ex. 23.  Hickman's open communication

19  with the independent auditor dispels any notion that he manipulated the goodwill

20  impairment tests while he was CFO.  *Cirrus Logic*, 946 F. Supp. at 1463-65 (voluntarily

21  consulting with independent accountant, making full disclosure, and seeking guidance and

22  approval negates any inference that financial transaction was made with intent to defraud);

23  *ICN Pharm.,* 299 F. Supp. 2d at 1065.

24        Plaintiffs contend Hickman ignored actual operating losses, disregarded low profits,

25  and tried to conceal the actual numbers.  Pls.' Opp. Br. 14-16, nn.49 & 64.  Yet, Hickman

26  lacked a motive to delay disclosing adverse information about REMEC's financial

27  situation.  *See Acterna*, 378 F. Supp. 2d at 576-77 (if a motive to commit fraud is relevant

28  to scienter, then a lack of motive undermines any such finding).  Hickman testified that, if

he had been in a position to manipulate the outcome, he had a strong personal incentive to make Ragland – who left REMEC in February 2004 at the same time REMEC was conducting the goodwill analysis and preparing its FY04 Form 10-K – look ineffective by blaming him for any problem with the value of REMEC's acquisitions.  Hickman Decl. ¶ 14.  It would have behooved Hickman to show REMEC's goodwill was impaired at the end of FY04 because Ragland had been the architect of the business plan to buy specialized companies and the public would attribute the bad performance to Ragland's leadership.  Instead, REMEC reported the goodwill impairment *after* Ragland departed and at a time when the public could blame Hickman's leadership for the downturn.

Defendants make a valid observation that the two individual defendants worked at REMEC at different times.  Ragland was CEO at the time REMEC hired Hickman from a competitor on November 14, 2003.  Ragland and Hickman worked together for barely three months – until Ragland left on February 10, 2004.  The Court agrees with Defendants that the brief overlap of their tenures considerably weakens any inference that the two officers carried out a continuous scheme to conceal REMEC's true financial condition.  Defs. MSJ Br. at 2.

Hickman's lack of motive to commit securities fraud is also exhibited by the absence of any allegation of insider trading. *Worlds of Wonder*, 35 F.3d at 1425; *Acterna*, 378 F. Supp. 2d at 576-77.  Hickman did not sell any stock during the class period and therefore did not take advantage of an allegedly inflated stock price.  Hickman Decl. ¶ 21.

Finally, even assuming Plaintiffs could establish that Hickman violated GAAP regarding goodwill impairment, there is no evidence to establish he must have been aware of the violation or that he acted with an intent to deceive investors.  *U.S. Aggregates*, 235 F. Supp. 2d at 1073 (even an obvious failure to follow GAAP does not establish intentional or knowing misconduct).

A reasonable fact finder could not conclude on this record that Hickman acted with an intent to deceive or with recklessness.  Accordingly, the Court **GRANTS** Defendant Winston E. Hickman's motion and **DISMISSES** him from the first cause of action.

## C.   **Corporate Defendant REMEC**

The briefs focus on the Individual Defendants, but REMEC also asserts that there is no evidence the corporation acted with scienter.

"A corporate defendant's scienter is necessarily derived from its employees." *Marsh & McLennan*, 501 F. Supp. 2d at 481.[41]  In most cases, when there is no evidence that an individual acted with intent to commit securities fraud, the corporate entity is not liable. *Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 853 (2d Cir. 1981) (granting summary judgment to corporate defendant when record contained no evidence that any officer acted with scienter).

The Court concludes that this case falls within the general rule and finds no extraordinary circumstances to justify holding REMEC liable when the executives have been granted summary judgment on scienter.

The parties have completed discovery and the Court has analyzed all of the evidence presented in relation to individual Defendants Ragland and Hickman.  There is one exception.  The February 10, 2004 press release announcing Ragland's "retirement" was not attributed to either executive.  Fraser Decl. Ex. 31 at 2.[42]  The Court found this statement misleading as a matter of law.  It concerned a tangential issue to the core issue in this case about the proper valuation of goodwill; consequently, that statement is not

---

[41]By contrast, at the pleading stage, some courts recognize "collective scienter," and in certain circumstances, a plaintiff may be able to "plead the requisite scienter against a corporate defendant without successfully pleading scienter against a specifically named individual defendant." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 192 (2d Cir. 2008); *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 710 (7th Cir. 2008).  When a widespread institutional fraud cannot be connected to a particular senior executive, a complaint may contain sufficient allegations as to unnamed officers if the combined allegations permit a strong inference that the corporation acted with scienter. *Marsh*, 501 F. Supp. 2d at 481-82.  The Ninth Circuit has left open the possibility that a complaint may plead a securities fraud claim against the corporation without being able to name, at that early stage, the individuals who concocted the fraud. *Glazer Capital Mgmt. LP v. Magistri*, 549 F.3d 736, 743-45 (9th Cir. 2008) (discussing *Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424, 1436 (9th Cir. 1995) and decisions from Second and Seventh Circuits).

[42]Hickman is listed as the contact person on the press release.  It is not clear who drafted the Question and Answer script, which was apparently prepared for the interim CEO, Robert Shaner.  *See* Fraser Decl. Ex. 32 ("I have agreed to act as interim CEO.").  Hickman was not involved in the decision to terminate Ragland because he was not an independent member of the Board of Directors.  *See* Fraser Decl. Ex. 6 (listing independent members).

04cv1948

1   sufficient to create a triable issue of fact as to the corporation.

2       Accordingly, the Court **GRANTS** the scienter motion as to the corporation and

3   **DISMISSES** Defendant REMEC from the case.

4   **V.    CONTROL PERSON LIABILITY**

5       Plaintiffs' second cause of action against Individual Defendants Ragland and

6   Hickman is based upon § 20(a), which makes certain "controlling" individuals liable for

7   violations of § 10(b).  FAC ¶¶ 393-96.  Because Plaintiffs' cause of action alleging a

8   primary violation of § 10(b) fails on the merits, it necessarily follows that the control

9   person cause of action fails as well.  *See VeriFone,* 11 F.3d at 872 (on motion to dismiss).

10  Accordingly, Defendants Ragland and Hickman are **DISMISSED** from the second cause of

11  action.

12      The Court notes at this juncture that because Plaintiffs allege only two causes of

13  action, both of which fail as to the individual Defendants, the first of which fails as to all

14  Defendants, this case shall be dismissed in its entirety with prejudice and judgment entered

15  in Defendants' favor.  The Court nevertheless shall rule on all pending motions in this case

16  to be as thorough as possible and for the sake of completeness.

17  **VI.   RELIANCE**

18      Defendants move for summary adjudication on the element of reliance.[43]  The Court

19  
_____

20      [43]In certifying the class, the Court found that "the proposed class representatives and the
    class members benefit from a presumption that they indirectly relied on Defendants' alleged
21  misstatements by relying on the integrity of the stock price established by the market."  Order
    Granting Pls.' Mot. for Class Certification at 4 [Doc. No. 103]. At that stage of the
22  proceedings, Defendants argued that Sitton's and Hu's claims were atypical because they
    bought REMEC stock after it dropped in price based on a belief it was undervalued.  The Court
23  held that regardless of a "personal perception that the stock was at a bargain price, they are still
    alleging – as the class is – that (1) they relied on the integrity of the market at the time of their
24  purchase; (2) the stock was artificially inflated in the market by Defendants'
    misrepresentations and omissions; and (3) they suffered losses as a result." *Id.* at 5 (citing
25  *Blackie v. Barrack*, 524 F.2d 891, 907 (9th Cir. 1975) (a plaintiff's subjective reasons for
    purchasing stock are irrelevant because price reflects the material representations; plaintiffs
26  rely on integrity of market because they did not buy shares at a price they knew had been
    manipulated by misleading statements or omissions)).
27      When determining class certification, the district court does not resolve the merits, even
    though the factual and legal issues are related.  *Coopers & Lybrand v. Livesay*, 437 U.S. 463,
28  469 & n.12 (1978).  The reasoning of a court's decision to certify a class may be persuasive

                                                                              (continued...)

**DENIES** the motion because material factual disputes remain as to whether the class representative, Lowell Sitton, relied on the integrity of the market; therefore, the Defendants have not, as a matter of law, rebutted the fraud-on-the-market presumption.

Initially, the Court designated John Hu and Sitton as class representatives, but Hu is no longer serving in that capacity. Order Granting Mot. to Dismiss Pl. Hu [Doc. No. 342]. Consequently, the part of Defendants' summary judgment motion that challenges Hu's reliance on the integrity of the market is moot.

### A.   Sitton's Transactions in REMEC Stock

By February 2004, Sitton, who had been investing on his own for approximately ten years, had been watching REMEC as a possible investment in his retirement account for a few months. Trippitelli Decl. Ex. B at 249-55 (Sitton Dep. at 33-38). Sitton conducted research on Yahoo Finance and looked for stocks priced under $20 a share. *Id.*

On February 10, 2004, REMEC announced its financial results for the fourth quarter "will be lower than its break-even net income goal and advised that operating results will be under pressure through at least the first quarter of the Company's new fiscal year" and that Ragland, who had founded the company, retired as Chief Executive Officer. FAC ¶ 48. On February 11th, the stock dropped to $7.80 per share.

On February 12, 2004, Sitton purchased 5,700 shares of REMEC stock at $6.45 per share because "[t]he price dropped pretty significantly" and he hoped "to sell it on the rebound." Trippitelli Decl. Ex. B at 256 (Sitton Dep. at 39). Sitton thought "it looks like maybe it's a bargain today." *Id.* He believed at that moment that the market had undervalued REMEC. *Id.*

In September, Sitton read that REMEC had been sued. *Id.* at 246 (Dep. at 29); *id.* at 299-302 (Dep. at 83-85) (by Oct. 6, 2004, Sitton had read a complaint against REMEC).

Sitton sold all of his shares on December 8, 2004 at a loss. *Id.* at 283 & 287 (Dep. at 66 & 70) (sold at $6.25 per share).

---

[43](...continued)
when applied to a summary judgment motion. *Hanon*, 976 F.2d at 506 n.6.

1    That same day, however, "the price had dropped a little bit" and Sitton purchased

2    5,880 shares in an attempt "to recoup some of the losses that I had suffered." *Id.* at 286

3    (Dep. at 69).  He held those shares only a brief time, selling them on December 10, 2004.

4    *Id.* at 284 (Dep. at 67-68); *id.* at 287 (Dep. at 70) ("I got scared"; "I didn't know what the

5    stock was going to do. . . . [I]t didn't rebound up anywhere where I could recoup any of

6    my losses.  So I decided it's best to cut my losses and get out."); *see also id.* at 286 (Dep. at

7    69) (Sitton placed a third order, but cancelled it before it was executed).

8    **B.    Legal Standard**

9    Reliance is an element of a securities fraud action.  *Dura Pharms.,* 544 U.S. at 341

10   (also known as "transaction causation").  "Reliance provides the requisite causal

11   connection between a defendant's misrepresentation and a plaintiff's injury."  *Basic*, 485

12   U.S. at 243.

13   When a material public misrepresentation has distorted the price of stock on the

14   well-developed, open market, the fraud on the market theory creates a presumption of

15   reliance because proof of actual reliance would be impractical.  *Id.* at 243-44  In

16   recognition of the impersonal method of investing and the common sense "premise that the

17   market price of shares traded on well-developed markets reflects all publicly available

18   information," courts employ a presumption of reliance as a device to allocate the burden of

19   proof.  *Id.* at 244-49 (citing with approval the Ninth Circuit's 1975 decision in *Blackie*, 524

20   F.2d at 906); *Apple Computer*, 886 F.2d at 1113-14 ("Under the fraud on the market theory,

21   the plaintiff has the benefit of a presumption that he has indirectly relied on the alleged

22   misstatement, by relying on the integrity of stock price established by the market.").  A

23   plaintiff may invoke the presumption by proving that the defendant made material

24   misrepresentations, that the shares were traded on an efficient market, and that he traded

25   shares between the time the misrepresentations were made and the time the truth was

26   revealed.  *Basic*, 485 U.S. at 248 & n.27; *Blackie*, 524 F.2d at 906 ("Materiality

27   circumstantially establishes the reliance of some market traders and hence the inflation in

28   the stock price – when the purchase is made the causational chain between defendant's

conduct and plaintiff's loss is sufficiently established to make out a prima facie case.";
"proof of subjective reliance on particular misrepresentations is unnecessary to establish a
[Rule] 10b-5 claim for deception inflating the price of stock traded in the open market.").

When the presumption of reliance arises, the burden of proof then shifts to the
defendant.  A defendant can rebut the presumption in different ways, including disproving
the materiality of the alleged omissions or misrepresentations; establishing that the shares
were not traded in an "efficient" market; or with evidence that "severs the link between the
alleged misrepresentation and either the price received (or paid) by the plaintiff, or his
decision to trade at a fair market price."  *Basic*, 485 U.S. at 248-49; *Blackie*, 524 F.2d at
906; *In re Fortune Systems Sec. Litig.*, 680 F. Supp. 1360, 1372 (N.D. Cal. 1987).  This
motion is based on the latter method to rebut the presumption of reliance:  Defendants
argue that Sitton's conduct severed the link between REMEC's allegedly false statements
about the financial situation and Sitton's decision to continue buying stock after the
company announced the goodwill impairment write-off.

"[O]ne way to rebut the fraud-on-the-market theory is to show that the plaintiff
would have bought his stock at the same price had he known the information that was not
disclosed or misrepresented."  *Hanon*, 976 F.2d at 507 (citing *Basic*, 485 U.S. at 248-49);
*Blackie*, 524 F.2d at 906 (defendant can rebut presumption "by proving that an individual
plaintiff purchased despite knowledge of the falsity of a representation, or that he would
have, had he known of it.").

Courts have observed that defendants may find it difficult to rebut the fraud on the
market presumption, "as we doubt that a defendant would be able to prove in many
instances to a jury's satisfaction that a plaintiff was indifferent to a material fraud."
*Blackie*, 524 F.2d at 906 n.22 & 908 (common sense dictates "that a stock purchaser does
not ordinarily seek to purchase a loss in the form of artificially inflated stock"); *accord*
*Basic*, 485 U.S. at 246-47 ("it is hard to imagine that there ever is a buyer or seller who
does not rely on market integrity.  Who would knowingly roll the dice in a crooked crap
game?") (quotation omitted); *cf. id.* at 256-57 & n.7 (White, J., dissenting) (arguing that

1   presumption is virtually non-rebuttable).

2       **C.   Analysis**

3       Plaintiffs in this case rely on the fraud on the market theory.  FAC ¶¶ 379-80.

4   Defendants argue they have presented sufficient evidence to rebut the presumption as a

5   matter of law.  Defendants argue that Sitton admitted in his deposition that he did not invest

6   in REMEC in reliance on the integrity of the market price, but instead, purchased his shares

7   for the specific reason that he thought the market *undervalued* REMEC.  "This market

8   timing strategy is premised on the belief that the market *had failed to reflect the true value*

9   of REMEC's stock.  It is the polar opposite of purchasing stock in reliance on the integrity

10  of the market price."  Defs.' Mot. at 2 (emphasis added).  Defendants argue that Sitton is

11  like a "short seller," who decides for himself that the market price was not an accurate

12  valuation, or a "position trader," who "focuses on technical price movements rather than

13  price."  *See Zlotnick v. TIE Commc'ns & L.W.*, 836 F.2d 818, 823 (3d Cir. 1988) (in motion

14  to dismiss, court would not presume short-seller relied on integrity of market, but he could

15  plead actual reliance); *In re Safeguard Scientifics*, 216 F.R.D. 577, 582 (E.D. Pa. 2003) (in

16  class certification motion, declining to name class representative subject to unique defense

17  of no reliance because he increased his stock holdings even after public disclosure of the

18  alleged fraud).

19      Further, Defendants emphasize that Sitton purchased REMEC stock *after* the class

20  period ended, which shows he was trading solely on the movements of the price and not in

21  reliance on the integrity of the market.  *See Rolex Employees Ret. Trust v. Mentor Graphics*

22  *Corp.*, 136 F.R.D. 658, 664 (D. Or. 1991) (in class certification motion, evidence that

23  proposed representative continued to trade after end of class period sufficient to rebut

24  presumption, thus his claims were atypical compared to those of other class members).

25  Defendants argue they have rebutted the presumption and shown that Sitton cannot

26  establish direct reliance because he did not read or rely on any of REMEC's statements

27  before investing.

28      The Court does not accept Defendants' premise that because Sitton purchased stocks

that were out of favor, he did not rely on the <u>integrity</u> of the market.  Defendants rely on the Third Circuit's decision in *Zlotnick* as support for their logic.  In that case, the Third Circuit applied the test for reliance to a "short seller," that is, an investor who thinks the market price is too high and expects the share price to go down after his purchase.  *Zlotnick*, and other cases that follow its logic, are questionable authority because they pre-date the Supreme Court's decision in *Basic* to embrace the fraud-on-the-market presumption.  *E.g., In re Western Union Sec. Litig.*, 120 F.R.D. 629, 637 (D.N.J. 1988).  District courts have also restricted its reach because "[t]here is a fundamental difference between an investor's presumption that the market price will move and the fact that the price was tainted by fraud."  *See e.g., Moskowitz v. Lopp*, 128 F.R.D. 624, 630-31 (E.D. Pa. 1989) (citing *Zlotnick* but concluding in class certification motion that different motives of speculators, short sellers, etc., "should not defeat the fraud-on-the-market presumption absent convincing proof that price played *no* part whatsoever in the decision making.").

The Court concludes that a decision to invest may be based on the integrity of the market price, regardless of whether the particular investor thinks the current price is too high (like the short seller) or too low (like the typical investor as well as the bargain hunter).  The weight of authority recognizes that an investment strategy, such as averaging down or Sitton's hunt for bargains, does not rebut the fraud on the market presumption as a matter of law.  *See e.g., Seidman v. Am. Mobile Sys. Inc.*, 157 F.R.D. 354, 360-62 (E.D. Pa. 1994) ("contrarian" investor who knowingly bought out-of-favor stocks at a reduced price in anticipation of a turnaround in value nonetheless relied on integrity of market when he bought shares without knowledge of defendant's dishonesty); *Randle v. Spectran*, 129 F.R.D. 386, 390-91 (D. Mass. 1988) (citing *Basic*, court doubts defendant could rebut presumption by showing plaintiffs invested when they knew price was falling on theory that market mistakenly valued stock); *Katz v. Comdisco, Inc.*, 117 F.R.D. 403, 409 (N.D. Ill. 1987) (plaintiff who believed defendant's stock was "underpriced" was typical investor).

The *Malone* decision potently and clearly explains the problem with Defendants'

1   argument about Sitton's investment strategy.

> 2   Whenever an investor purchases a particular stock with the
> 3   expectation of realizing a profit in excess of the market's average
>     return on investment for securities with a comparable risk, the
> 4   investor is *per force* wagering that his individual assessment for
>     the future earning potential of that company is superior to the
> 5   assessment of the marketplace as a whole, presumably because he
>     believes he has superior information or judgment. Thus, virtually
> 6   every investment decision is entered on the belief that a particular
>     investment is undervalued by the market relative to comparable
> 7   investments. This does not mean that all investors motivated by
>     the desire to make an above average return on their investment are
> 8   not relying on the integrity of the marketplace. An investor may
>     hold the conviction that the marketplace has inaccurately
> 9   predicted the earning potential of a company, and yet still enter a
>     transaction relying, in part, on the assumption that the market has
> 10  not been artificially inflated or depressed by material, false
>     information disseminated by corporate insiders. In other words,
> 11  simply because an investor believes that the market price is an
>     inaccurate assessment of the value of a stock, does not necessarily
>     mean that the investor is not relying on the integrity of the market.

12

13   *Malone v. Microdyne Corp.*, 148 F.R.D. 153, 159 (E.D. Va. 1993) (footnote omitted).

14   In any event, the Court **DENIES** Defendants' motion because Sitton's deposition

15   testimony raises questions of fact regarding his reliance. Sitton testified that he "was

16   basically trying to buy securities and – and make some money on them." Trippitelli Decl.

17   Ex. B at 250 (Sitton Dep. at 33); *id.* at 253 (Dep. at 36) ("Like I think anyone else that is in

18   the stock market . . . [I] try to catch a rebound on the stock and try to show a profit on the

19   stock."). Sitton also testified he was affected by the fraud that allegedly occurred before he

20   bought shares in February 2004 because "the stock was already artificially inflated" by

21   REMEC's failure to properly account for goodwill. *Id.* at 360-62 (Dep. at 143-45); *id.* at

22   365 (Dep. at 148) ("It sounds to me like they had artificially inflated the price before [the

23   February 10, 2004 press release]"); *id.* at 241 (Dep. at 24) ("a lot of other investors out

24   there were misled on the financial situation of the company, as I was misled."). In addition,

25   Sitton testified that he "read some press releases, I'm sure" before investing in REMEC,

26   though he "could not be specific." *Id.* at 261 (Dep. at 44); *id.* at 310 (Dep. at 93) (Sitton

27   was aware he could obtain REMEC press releases on the website he used to research

28   companies). On this record, Defendants are not entitled to summary judgment as to

1   reliance.  *Hanon*, 976 F.2d at 506-08 (defendant not entitled to summary judgment on

2   reliance element when plaintiff testified he purchased shares to make money, despite other

3   evidence that he did not rely on market).

4          As to the fact that Sitton bought shares after REMEC's September 8, 2004 press

5   release, Defendants have not cited any Ninth Circuit authority, and other courts are divided

6   on the significance of such evidence.  In *Rosen v. Textron, Inc.*, 369 F. Supp. 2d 204, 208-

7   09 (D. R.I. 2005) (class certification motion), the district court disagreed with the logic of

8   decisions (including the *Safeguard Scientifics* case cited by Defendants) that held a

9   plaintiff's continued purchase of stock after the corrective disclosure meant it could not

10  have relied on the alleged misrepresentations.  Instead, the district court agreed with those

11  courts that held a plaintiff's purchase of stock after the class period ends "is essentially

12  irrelevant" to whether that plaintiff's purchases during the class period were premised on

13  misleading information.  *Id.*  As stated by another district judge, "[t]he fact that [plaintiff]

14  attempted to recoup her losses by continuing to purchase [defendant's] stock after the

15  disclosure of the alleged misrepresentations has no bearing on whether or not she relied on

16  the integrity of the market during the class period."  *In re Frontier Ins. Group, Inc. Sec.*

17  *Litig.*, 172 F.R.D. 31, 41 (E.D.N.Y. 1997) (in context of motion to certify class and select

18  named representatives); *accord In re Connetics Corp. Sec. Litig.*, 257 F.R.D. 572, 576-78

19  (N.D. Cal. 2009) (noting contrary authority, but concluding "the purchase of stock after a

20  partial disclosure is not a per-se bar to satisfying the typicality requirement" of class

21  certification motion and holding lead plaintiff entitled to presumption that it relied on

22  integrity of market); *Greenspan v. Brassler*, 78 F.R.D. 130, 131-32 (S.D.N.Y. 1978)

23  (denying defendant's early summary judgment motion, though plaintiffs' continued

24  purchase of stock "raises questions concerning the materiality to them of the market's

25  integrity and defendants' alleged misrepresentations," fact issues remained on reliance); *In*

26  *re Rent-Way Sec. Litig.*, 218 F.R.D. 101, 114 (W.D. Pa. 2003) (in class certification

27  motion, stock purchases after end of class period "are irrelevant to the instant litigation");

28  *Garfinkel v. Memory Metals, Inc.*, 695 F. Supp. 1397, 1404 (D. Conn. 1988) (in class

1    certification context, plaintiff who bought stock after defendant issued corrective press

2    release was not atypical because a subsequent purchase is common investment technique to

3    decrease average cost of investment).  Because a reasonable jury might accept Sitton's

4    explanation for buying REMEC stock in December, the question of his reliance is not

5    suitable for resolution by summary judgment.[44]

6        Even if Defendants establish that Sitton cannot recover because he continued to

7    purchase stock after reading a complaint alleging securities fraud, *the class* may still use

8    the presumption to establish reliance.  7 *Newberg on Class Actions*, § 22:61, p. 284-85 (4th

9    ed. 2002) (a rebuttal of reliance by a particular class member must necessarily be on an

10    individual basis because there can be no class presumption of non-reliance) (citing *Arthur*

11    *Young & Co. v. United States Dist. Ct.*, 549 F.2d 686, 693-95 & n.10 (9th Cir. 1977)); *see*

12    *Fortune Systems,* 680 F. Supp. at 1372 (denying judgment on pleadings, but noting

13    "Defendants may still come to trial and attack each plaintiff's *actual* reliance, or the actual

14    reliance of similar groups of plaintiffs.").  To that extent, Defendants' motion is more

15    properly characterized as an attack on Sitton's fitness to serve as the named representative

16    of the class.  *See supra* n.41.

17    **VII.  LOSS CAUSATION ELEMENT**

18        Defendants also move for summary judgment on the element of loss causation.

19    Plaintiffs must prove loss causation to establish their § 10(b)/Rule 10b-5 claim.  Defendants

20    argue that Plaintiffs cannot establish loss causation as to any of the misrepresentations or

21

22

23 _____

24      [44]The Court notes that Defendants have not argued that Sitton's December purchase followed his knowledge that REMEC had been sued for securities fraud.  This arguably shows

25    that with regard to his December purchase he knew or had reason to believe that REMEC had committed fraud.  *E.g.*, *Jones v. Intelli-Check, Inc.*, 274 F. Supp. 2d 615, 634 (D. N.J. 2003).

26    Nonetheless, the December purchase is outside the class period and thus Sitton could not recover damages in connection with that transaction.

27      In addition, Defendants could argue that Sitton's conduct demonstrates that the statement announcing the write-off was not material information, which is a separate element

28    of Plaintiffs' securities fraud claim.  *E.g., Greenspan,* 78 F.R.D. at 131-32 (plaintiffs' continued purchase of stock "raises questions concerning the materiality to them of the market's integrity and defendants' alleged misrepresentations").

04cv1948

1   omissions alleged in the FAC, excluding those relating to goodwill or internal controls.[45]

2   Plaintiffs allege that during the class period REMEC's stock price was artificially

3   inflated due to Defendants' alleged fraudulent activity. Plaintiffs allege that disclosures set

4   forth in REMEC press releases eventually revealed the company's true financial status, and

5   directly caused REMEC's stock price to decline thereby causing Plaintiffs' losses. Of these

6   disclosures, the September 8, 2004 announcement that the net loss for REMEC's second

7   quarter "included a goodwill impairment of $62.4 million" has been indicated by Plaintiffs

8   throughout this litigation to be the most significant. Defendants argue that the disclosures

9   made by the company in REMEC's September 8, 2004 press release do not relate to the

10  five categories of allegations contained in the FAC, excluding goodwill and internal

11  controls.[46,47]

12  **A.    Loss Causation**

13  In order to succeed on a private right of action brought pursuant to § 10(b) of the

14  Securities and Exchange Act, a plaintiff must prove, *inter alia*, "loss causation." *See*

15  *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 156-57 (2008);

16  *Dura*, 544 U.S. at 346-48. To meet this burden, a plaintiff must provide sufficient evidence

17  to show "a causal connection between the material misrepresentation and the loss." *Dura*,

18  544 U.S. at 342. Price inflation alone is insufficient; rather, a plaintiff must show that an

19  economic loss occurred after the truth behind the misrepresentation or omission became

20  known to the market. *Id.* at 346-47. Furthermore, the decline in stock price caused by the

21

22   [45] Defendants state that they do not concede that Plaintiffs can establish loss causation
23   as to goodwill or internal controls, but exclude those allegations based on the assertion that the
     undisputed facts as to the remaining allegations demonstrate that loss causation cannot be
24   demonstrated. *See* Defs.' Mem. P & A at 1, n.3.

25   [46] Five Categories of Allegations include: REMEC Was Unable to Calculate Proper
     Inventory Reserves; REMEC Manipulated Revenue; REMEC Failed to Disclose Operational
26   Difficulties; REMEC Over-Valued Inventory; REMEC Further Manipulated Revenue by
     Selling "Zero Value Inventory."

27   [47] The Court notes as an initial matter that Plaintiffs challenge Defendants' categorization
     of the allegations in the FAC and assert that loss causation must be analyzed by looking at
28   Plaintiffs' claims as a whole. The Court agrees, and therefore shall disregard the categorical
     approach adopted by Defendants.

1  revelation of that truth must be statistically significant. *Id.* at 342-47; *Metzler*, 540 F.3d at

2  1063.  Simply put, "loss causation" is an "exotic name" for "the standard rule of tort law

3  that the plaintiff must allege and prove that, but for the defendant's wrongdoing, the

4  plaintiff would not have incurred the harm of which he complains." *Bastian v. Petren*

5  *Resources Corp.*, 892 F.2d 680, 685 (7th Cir. 1990).

6      In the context of a summary judgment motion, failure to establish that the disclosure

7  of the relevant wrongdoing played a significant role in a loss merits entry of summary

8  judgment for failure to show loss causation. *In re Mercury Interactive Corp. Sec. Litig.*,

9  2007 U.S. Dist. LEXIS 59171 (N.D. Cal. July 30, 2007) (citation omitted).  A plaintiff can

10  survive the motion if the defendant is unable "to establish that, as a matter of undisputed

11  fact, the depreciation in the value of the [stock] could not have resulted from the alleged

12  false statement or omission of the defendant." *In re Motorola Sec. Litig.*, 505 F. Supp. 2d

13  501, 550 (N.D. Ill. 2007) (citing *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645,

14  649-50 (7th Cir. Ill. 1997)).  In this regard, plaintiffs often hire experts to opine on loss

15  causation.  Generally, the starting point of an expert's analysis on this issue is the

16  identification of one or more corrective disclosures during the class period.  "A 'corrective

17  disclosure' is a disclosure that reveals the fraud, or at least some aspect of the fraud, to the

18  market.  It stands to reason then that "[a] disclosure that does not reveal anything new to

19  the market is, by definition, not corrective.'" *Teamsters Local 617 Pension & Funds v.*

20  *Apollo Group, Inc.*, 633 F. Supp. 2d 763, 818 (D. Ariz. 2009) (citations omitted).

21      Plaintiffs rely on the testimony and report of an expert witness, Dr. Blaine F. Nye,

22  who identifies December 8-9, 2003, February 10-11, 2004, and September 8-9, 2004, as

23  dates upon which corrective disclosures were made by REMEC.[48]  Relying on the efficient

24  capital market theory, Dr. Nye asserts that the market for REMEC stock was efficient

25  during the class period.  Based thereon, Dr. Nye concludes that each of these corrective

26  disclosures resulted in a decline in the stock price that cannot be attributed to general

27

28      [48]Keeping in mind that REMEC's fiscal year began on February 1st and ended on January 31st each year.

1  market trends, industry trends, or other external factors, but rather were caused by the

2  company's fraud and misrepresentations regarding REMEC's true financial condition.

3      As a threshold matter, pursuant to Federal Rule of Evidence 702, Defendants object

4  to and move to strike Dr. Nye's declaration in support of Plaintiffs' opposition to the

5  summary judgment motion.

6      **B.**    ***Daubert* Motion**

7          **1.**    **Legal Standard**

8      As previously stated, Federal Rule of Evidence 702 provides that expert testimony is

9  admissible if "scientific, technical, or other specialized knowledge will assist the trier of

10  fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Expert

11  testimony under Rule 702 must be both relevant and reliable. *Daubert*, 509 U.S. at 589.

12  When considering evidence proffered under Rule 702, the trial court must act as a

13  "gatekeeper" by making a preliminary determination that the expert's proposed testimony

14  is reliable. *Elsayed Mukhtar*, 299 F.3d at 1063. The Supreme Court has provided a list of

15  factors that courts may consider: (1) whether the theory or technique is generally accepted

16  within a relevant scientific community, (2) whether the theory or technique has been

17  subjected to peer review and publication, (3) the known or potential rate of error, and (4)

18  whether the theory or technique can be tested. *Daubert*, 509 U.S. at 593-94; *see also*

19  *Kumho*, 526 U.S. 137.

20          **2.**    **Analysis**

21      Defendants argue that Dr. Nye bases his conclusions on a "true financial condition"

22  theory, which Defendants assert has been rejected by the Ninth Circuit as a legitimate

23  framework for the analysis of loss causation. *See* Defs.' Mot. to Strike at 10 (citing

24  *Metzler,* 540 F.3d at 1064). Defendants also assert that the only corrective disclosure

25  referred to in Plaintiffs' FAC is REMEC's September 8, 2004 announcement regarding its

26  financial condition. Defendants direct the Court's attention to the loss causation portion of

27  the FAC, and point out that the only disclosure mentioned in that section of the FAC is the

28  one made on September 8, 2004. Based on this observation, Defendants argue that Dr.

Nye's identification of two additional corrective disclosures is adding new allegations not previously contained in the FAC that should therefore be rejected in considering the merits of his analysis.  The Court considers Defendants' argument below as to each disclosure at issue.

Defendants further assert that Dr. Nye's failure to determine whether specific pieces of information were material to investors, or to distinguish deviations in REMEC's stock price caused by factors or statements other than Defendants' alleged misrepresentations, renders his opinion wholly unreliable.  In this regard, Defendants cite *In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195 (N.D. Okla. 2007), wherein the district court rejected Dr. Nye as a competent expert witness, a finding which the Tenth Circuit Court of Appeals affirmed.  *In re Williams Sec. Litig. – WCG Subclass*, 558 F.3d 1130 (10th Cir. 2009).

In order to provide some background on Dr. Nye's work and his role as a plaintiff's expert in securities cases, the Court begins its analysis by reviewing the methods that he used and those which were rejected by the court in *Williams*.  Similar to this case, the plaintiffs in *Williams* relied upon Nye's expert opinion regarding loss causation, and the defendant moved to strike his testimony and report from the record based on his alleged failure to satisfy the requirements set forth in *Daubert*.

### a)     <u>Williams</u>

In *Williams*, Dr. Nye was retained on behalf of plaintiffs to provide his expert opinion on loss causation, among other issues.  Nye's expert report offered three scenarios as an analytical base for his estimation of compensable losses during the relevant class period.  The court, after a detailed summary of Nye's findings, applied the principles of loss causation as articulated in *Dura* to his three scenarios and ultimately rejected all three. *Williams*, 496 F. Supp. 2d at 1263-64.

The *Williams* court rejected Dr. Nye's conclusions based in large part on his "deficient" methodology, specifically his failure to consider any non-fraud company specific information or to identify any specific corrective disclosures for the class period, and as a necessary result, his failure to parse out the effect of the two categories of data on

the price of the defendant's stock. *Id*. at 1264 (the non-fraud company specific event being the filing of a lawsuit against the defendant company on the same day that certain fraud-related news was revealed to the public). The court found that under *Dura*, when a plaintiff proceeds on a "leakage" theory of corrective disclosure, as was the case there, the plaintiff must establish that the decline in stock price directly reflects the fraud-related inflation, *i.e.*, there must be a distinct causal connection between the two. The court faulted Dr. Nye for proceeding under the *assumption* of leakage of relevant truth, making his opinion unreliable and more or less irrelevant to the purpose of establishing *whether* leakage occurred in the first instance. *Id.*

In addition, the court rejected Dr. Nye's conclusions due to his failure to demonstrate an adequate factual basis for his assertion of loss causation, and his use of a "constant percentage inflation" approach. The court explained that "where, as in the case at bar, the value of a common share is driven down to the penny stock range by forces unrelated to revelation of the fraud (as must be assumed for purposes of Dr. Nye's Scenario 2), the application of the constant percentage inflation approach would give the equity investor the "partial downside insurance policy" which *Dura* counsels that securities law should not provide." *Id* at 1270. Finally, the court rejected Dr. Nye's conclusions because Nye did not perform any statistical analysis, *i.e.*, an "event study," to support his conclusions. *Id.* at 1272-73. The court excluded Dr. Nye's expert opinion on loss causation because of his unscientific methodology and his failure to distinguish between loss attributable to alleged fraud and loss attributable to non-fraud related news and events. The plaintiffs appealed, and the Tenth Circuit Court of Appeals affirmed the district court's holding. *See Williams Sec. Litig. – WCG Subclass*, 558 F.3d 1130.

###        b)        REMEC

For reasons similarly articulated in *Williams*, Defendants argue here that Dr. Nye's expert opinion must be rejected due to his reliance upon discredited methodology and his failure to consider non-fraud company specific information, as well as information not specific to REMEC, when drawing his conclusions. Defendants challenge his

identification of corrective disclosures, as noted above, and assert that Nye fails to show a sufficient causal connection between the one correctly identified corrective disclosure and the decline in REMEC's stock price.

As an initial point, Nye has altered his methods of analysis since the decision in *Williams*.  In this case, Dr. Nye identifies three corrective disclosures, performs an event study supported by the results of a multivariate regression, and rather than relying solely on a "constant percentage" approach to calculate losses, he also uses a "constant dollar" approach.

A review of Dr. Nye's declaration in support of Plaintiffs' opposition reveals the following.  First, Nye identifies five specific disclosures during the class period occurring on September 8-9, 2003, December 8-9, 2003, February 10-11, 2004, March 24-25, 2004, and September 8-9, 2004.  *See* Nye Decl. ¶ 19.  Of these, Dr. Nye opines that REMEC's announcements regarding its financial status on December 8, 2003, March 24, 2004, and September 8, 2004, corrected former misrepresentations and omissions by the company regarding its true financial status.  As noted above, Nye bases his conclusions on the results of an event study, utilizing regression analysis to determine statistically significant changes in REMEC's stock price and their relation to the disclosures.  *Id.* ¶ 22.  An event study is a "statistical method of measuring the effect of a particular event such as a press release . . . on the price of a company's stock."  *In re Enron Corp. Sec., Derivative, & ERISA Litig.*, 529 F. Supp. 2d 644, 720 (S.D.Tex. 2006).  This statistical method has been accepted by some courts as an appropriate method for determining loss causation.  *Williams*, 496 F. Supp. 2d at 1272-73.

Dr. Nye relies on the efficient capital market theory to presume that REMEC shares were being "traded on a well-developed, efficient, and information-hungry market" during the class period.  *Basic*, 485 U.S. at 249.  Efficient capital market theory

> is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business. . . .  Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements. . . .  The causal connection between the

> defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.

*See id.* 108 S. Ct. at 989.  Nye draws the following conclusions.

       1.        September 8-9, 2003:

Dr. Nye begins his analysis by looking at events occurring on September 8, 2003, the first day of the class period, and September 9, 2003.  On September 8, 2003, after market close, REMEC announced its financial results for the second quarter of 2004, which included an increase in sales, improved gross profits, narrowing losses, forecasts of increased net sales, profit margin increases, the benefits of low cost inventory, as well as increased operating expenses and a decrease in cash and short term investments.  Nye also notes that according to analysts commenting on the press release, these financial results exceeded Wall Street's expectations.  REMEC's stock price increased on September 9, 2003 by 10.3% to close at $11.78.  Dr. Nye concludes that the disclosure of the positive financial results caused an inflation of the stock price, which he includes in his analysis as "an increase in price inflation, which serves to reduce damages (for purchases made on September 8, 2003 only) because part of the price inflation measured by the drops upon subsequent corrective disclosures is taken back only to September 9, 2003."  Nye Decl. ¶ 27.

       2.        December 8-9, 2003:

Dr. Nye next turns to events occurring on December 8 and 9, 2003.  On December 8, 2003, after market close, REMEC announced its financial results for the third quarter of 2004, including an increase in net sales, the beneficial sale of low cost inventory, as well as a decrease in gross profit margin, an increase in operating expenses, an operating loss, and a decrease in cash and short term investments.  On December 9, 2003, REMEC's stock price decreased by 21.8% to close at $8.65, a drop which analysts attributed to the December 8, 2003 earnings report.

Nye classifies the December 8, 2003 press release as a partially corrective disclosure due to the announcement of declining gross profit margins.  Nye opines that this new,

negative, company-specific information "explains the company-specific stock price decline on December 9, 2003." *Id.* ¶ 31.  However, Dr. Nye's assertion contradicts Plaintiffs' actual allegations regarding the December 8, 2003 announcement.  The FAC alleges that REMEC based its announcement on artificially inflated gross profit margins, REMEC's manipulation of its results to state falsely that profits were growing, that REMEC knew that the overseas facilities were unprofitable, and that the strategy of reducing material costs to improve profitability was unsuccessful.  FAC ¶ 44.  Plaintiffs allege that this disclosure contained false and misleading information about the company's financial condition, and the FAC characterizes the statements regarding profitability as additional misrepresentations, not as statements that corrected previous misrepresentations by the company.  FAC ¶ 46.  As such, Dr. Nye wrongly identified the December 8, 2003 announcement as a corrective disclosure.  Plaintiffs' losses which allegedly were caused by this announcement may not be factored into Dr. Nye's loss causation analysis because the losses occurred *before* REMEC made any corrective disclosures and prior to the disclosure of REMEC's true financial condition.  *Metzler*, 540 F.3d at 1063 (citing *Daou*, 411 F.3d at 1027)).  Dr. Nye's inclusion of this announcement in his event study renders the study biased in Plaintiffs' favor.[49]

3.      February 10-11, 2004:

On February 10, 2004, after market close, REMEC confirmed that its financial results for the fourth quarter of 2004 would be lower than its previous "break-even net income goal," advised the public that its operating results would be "under pressure," and announced the unexpected retirement of then-CEO, founder, and Chairman of the Board Ronald Ragland.  The press release detailed that REMEC was experiencing higher costs than originally planned with respect to the transition of production to China, and that the company also was experiencing higher than expected start up costs on new products.  The press release further disclosed that the company expected to take a fourth quarter write-

_____

[49]The Court notes that for this reason alone, it might be reasonable to suggest that Dr. Nye's analysis could be rejected  as fatally flawed and classify Dr. Nye's results as unreliable and subject to exclusion under Rule 702.

down on existing inventory.  FAC ¶ 48.  On February 11, 2004, REMEC's stock price declined by 24.9% to close at $7.80 a share.

Plaintiffs allege in the FAC that the decline in stock price on February 11, 2004, was due to the February 10, 2004 announcement.  FAC ¶ 49.  Dr. Nye classifies the February 10, 2004 press release as a partially corrective disclosure due to the announcement of financial results below expectations, specifically the news regarding the higher than expected start up costs and related inventory actions, as well as Ragland's sudden retirement.  Nye opines that this new, negative company-specific information was a partial revelation of the truth regarding REMEC's true operating costs, failure to improve gross profit margins, and inability to achieve near-term profitability.  *See* FAC ¶ 48.  The inventory related information partially corrected the company's statements from the December 8, 2003 announcement that Plaintiffs allege overstated inventory to make REMEC's financial condition falsely appear stronger.  *Id.* ¶ 44.

4.      March 24-25, 2004:

On March 24, 2004, after market close, REMEC announced its financial results for the fourth quarter and fiscal year as a whole.  The company reported a net loss for the fourth quarter and the fiscal year, due in part to a larger than expected operating loss from its commercial wireless division, and in part to restructuring charges, transition costs, and inventory write-downs, all of which had been anticipated by the February press release. The company also announced that gross profits were down from the previous fiscal year and operating expenses had increased.  On March 25, 2004, REMEC's stock price increased by 13.4% to close at $7.51.  According to Dr. Nye's research, analysts responded mostly positively to the press release because the financial results were better than anticipated, causing the stock price to increase.  Dr. Nye therefore includes the increase in his analysis as an increase in price inflation.  Nye Decl. ¶ 41.

5.      September 8-9, 2004:

On September 8, 2004, after market close, REMEC announced its earning for the second quarter of 2005.  The company reported an increase in sales from the previous year

but below the "First Call consensus."  Also announced was a net loss of $1.23 per share

attributable in part to a goodwill write-down of $62.4 million associated with the

company's commercial wireless division.  The press release also informed the public that

gross profits were a much lower percentage of sales in comparison to the previous fiscal

year, a decrease in zero-value inventory sales, as well as several other pieces of financial,

company-specific information.  REMEC also announced that it would be delayed in filing

its Form 10-Q with the SEC due to unresolved deficiencies with its internal controls and

the need for a review of its tax filings by retained tax specialists.  On September 9, 2004,

REMEC's stock price decreased by 18.9% to close at $4.30 per share.  Dr. Nye classifies

the September 8, 2004 press release as a wholly corrective disclosure, revealing REMEC's

true financial condition to investors, and causing the decline in REMEC's stock price.  *Id.* ¶

46.

### c)     Statistical Analysis

Dr. Nye uses an event study to analyze the impact of the above-referenced corrective

disclosures, the "events," on REMEC's stock.  In order to do so, Nye compares actual

return on the company's shares with "predicted return," *i.e.*, the stock price that one would

anticipate in the absence of fraud.  Dr. Nye finds that on the next day following the date of

a corrective disclosure the actual stock return varies markedly from the predicted return,

resulting in a statistically significant negative residual return.[50]  As such, Dr. Nye concludes

that the corrective disclosures caused these declines in the value of REMEC stock,

confirming his hypothesis that REMEC stock was being traded in an efficient market where

new, negative, company-specific information was immediately absorbed and then reflected

by a decline in per-share value.

Appendix B to Dr. Nye's declaration details the results of his statistical analysis.  He

uses regression analysis to measure the relationship between the REMEC stock returns and

---

[50]Nye notes that he was instructed by counsel that no damages should be awarded for shares sold prior to the disclosure of the fraud, *i.e.*, no damages to shareholders who sold prior to the first partially corrective disclosure on December 8, 2003.

changes in market-wide factors and changes in industry-wide factors.[51]  Dr. Nye starts by

creating a market index and an industry index (independent variables) to reflect these

factors, and analyzes a control period of September 8, 2002 through September 7, 2003, to

calculate the daily predicted return (dependent variable) on REMEC stock in relation to the

two indices.  Dr. Nye chose this time period, hypothesizing that it would serve as a normal

representation of the movements in REMEC's stock prices absent any fraud.  The resulting

regression equation may be presented as:

$$Y_{PR} = \beta 0 + \beta 1(X_{mi}) + \beta 2(X_{ini})$$

wherein $Y_{PR}$ is predicted return, $X_{mi}$ is the market index and $X_{ini}$ is the industry index.  β0

represents the Y intercept, the height of the regression line as it crosses the Y axis; in other

words, the value of the dependent variable when all other variables equal zero.  β1 and β2

represent the coefficients, which indicate the magnitude of the effect that the market index

and industry index, respectively, have on predicted return during the control period.

As expected, the regression results indicate that both indices have an impact on the

predicted return, indicating that during the control period, market forces and industry forces

affected the daily return on REMEC's stock prices.  The coefficients for both variables are

statistically significant, as shown by the resulting t-statistics, their associated 2-tailed

p-values, and using a 95% confidence limit for the coefficients.[52]  The coefficient of the

market index variable is 1.61541, therefore for every unit increase in the market index, the

model predicts a 1.61541 unit increase in predicted return, holding all other variables

constant.  The coefficient of the industry index is .44985.  The model across all data points

demonstrates that approximately 24% of the variance in REMEC's return during the

---

[51]Multiple regression analysis is a commonly accepted statistical tool used to examine "the effect of independent variables on a dependent variable."  *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 448 (2d Cir. 1999).

[52]The confidence intervals are related to the p-values such that the coefficient will not be statistically significant if the confidence interval includes 0.  Confidence intervals assist in placing the coefficients into perspective by seeing how much each coefficient's value could vary.

04cv1948

1   control period can be predicted by the two indices.[53]

2       Using the results of this model, Dr. Nye calculates the residual return of REMEC's

3   stock for each date during the class period.  Dr. Nye weights the value of the two indices by

4   their coefficients to calculate the value of predicted return, where residual return, the

5   variable now of interest in the analysis, is a function of actual return and predicted return.

6   Employing event study methodology, Dr. Nye analyzes the individual observations for

7   each date during the class period and finds that on the next day after a date with a

8   corrective disclosure there is a statistically significant residual return.  Nye interprets these

9   results as demonstrating that significant changes in REMEC's daily stock price during the

10  class period are "associated with material, new, and unexpected information about the

11  company which supports" his conclusion that the market for REMEC stock was efficient

12  during the class period.

13                  **d)    *Daubert* Scrutiny**

14      Upon due consideration, the Court finds that Dr. Nye's statistical analysis and

15  results do not meet Rule 702's standards for admissibility as articulated in *Daubert*.  His

16  methodology is fatally flawed such that his results cannot be relied upon by a trier of fact.

17      Dr. Nye predetermines the results of his analysis.  Nye purports to test the

18  hypothesis that REMEC's corrective disclosures exerted a material negative influence on

19  the per-share price of REMEC stock during the class period.  Nye builds a multivariate

20  regression model which predicts the predicted return on REMEC stock as a function of a

21  weighted market index and a weighted industry index, and then defines residual return as a

22  function of actual return and predicted return.  Nye's model assumes that the difference

23  between actual return and predicted return is necessarily a result of company-specific

24  information.

25      Dr. Nye makes no attempt to account for other possible causes, i.e., industry-specific

26  news (for example, if an increase in global sales of defense products due to an increase in

27  _____

28      [53]Indicated by an adjusted R-Square equal to .2360.  Note that this is an overall measure
    of the strength of association, and does not reflect the extent to which any particular
    independent variable is associated with the dependent variable.

U.S. presence in Iraq was announced during the class period), market-specific news (for example, if a 5% decline in stock prices occurred across the market due to an announcement of an expected drop in consumer sales in December), or other measurable macroeconomic variables (for example, the inflation rate and GDP). *See e.g., In re Wireless Tel. Servs. Antitrust Litig.*, 385 F. Supp. 2d 403, 427 (S.D.N.Y. 2005) (regression analysis excluded as irrelevant because it failed to "incorporate major independent variables").

The failure to include a variable in a regression analysis affects the probative value of the analysis and not necessarily its admissibility. *Bazemore v. Friday*, 478 U.S. 385, 400 (1986). Where a study accounts for the "major factors" but not "all measurable variables," it is admissible. *Id.* (citation omitted). However, where significant variables that are quantifiable are omitted from a regression analysis, the study may become so incomplete that it is inadmissible as irrelevant and unreliable. *Bickerstaff*, 196 F.3d at 449. Because the burden of proving helpfulness and relevance rests on the proponent of a regression analysis, it is the proponent who must establish that other major factors have been accounted for in a regression analysis. Dr. Nye makes no attempt to do so here, aside from his assertion/assumption that company-specific information is the only major factor.

In addition, Dr. Nye's conclusion that residual return is the result of company-specific news has very little explanatory power because Nye's model does not account for categories of news. This is a key flaw in Nye's methodology, pointed out by the *Williams* court, that he has not corrected. Dr. Nye fails to separate the loss caused by the disclosure of corrective information (new, negative, company-specific, revealing a prior misrepresentation or omission) from loss caused by the disclosure of other company-specific information. Rather, Nye asserts that isolating the effects of multiple pieces of information is unnecessary in this case because "all of the new, material information [disclosed on any given date in his report] was related to REMEC's allegedly concealed earnings prospects. . . ." *See* Nye Rebuttal Decl. ¶ 9. Dr. Nye's own analysis clearly demonstrates that each of the five identified disclosures, including the three corrective

disclosures, contained multiple pieces of company specific information, some negative, some positive, some allegedly fraud related, and some not.

For instance, as the Court notes above, Nye states that the December 8, 2003 announcements included multiple pieces of information, including: (1) an increase in net sales (positive); (2) the beneficial sale of low cost inventory (positive); (3) a decrease in gross profit margin (negative); (4) an increase in operating expenses (negative); (5) an operating loss (negative); and, (6) a decrease in cash and short term investments (negative). Dr. Nye classifies the December 8, 2003 announcement of financial results as a partially corrective disclosure due to the information provided to the public regarding the company's earning results, including its declining gross profit margins. Nye opines that this particular piece of new, negative, company-specific information "explains the company-specific stock price decline on December 9, 2003." Nye goes on to state that "I have not identified any other new, negative, company specific news that would have materially contributed to the company specific stock price decline on December 9, 2003." *See* Nye Decl. ¶ 31.

The problem with this last statement is that Dr. Nye clearly identifies other new, negative, company-specific information in the press release, as noted above. Nye also identifies positive information, which he does not attempt to account for in his analysis. Nye himself notes that the analysts' responses to the company's announcement were mixed, and that most analysts reacted positively to the company's earnings results. *Id.* ¶ 30. The failure to consider this additional information demonstrates that his methodology is flawed to the point of being unreliable, and that his results reveal very little about REMEC's residual returns in relation to the public announcements made by the company during the class period.

Finally, the Court notes that Dr. Nye's regression model suffers from several deficiencies in addition to the omission of key independent variables. For example, Dr. Nye uses time-series data,[54] but does not account for any possible lag in the affect of his independent variables upon his dependent variable, even though he theorizes that one

---

[54]A time series is a sequence of observations which are ordered in time (or space).

exists.  A one-year control period to determine the affect of market-wide and industry-wide forces on value of REMEC's stock is arguably too short, particularly when additional data is readily accessible.  He does not appear to test his model for multicollinearity or for autocorrelation.[55]  As to multicollinearity, it would not be unreasonable to suspect that the market index and the industry index move together, which would skew the coefficients.  As to autocorrelation, a review of the individual data observations reveals that residual return increases and decreases in series, i.e., a negative residual return is often observed on multiple days in a row, indicating that an autoregressive moving average model may have been appropriate given that stock prices may be shocked by fundamental information as well as exhibiting technical trending and mean-reversion effects due to market participants.

Dr. Nye's expert opinion under Rule 702 must be both relevant and reliable. *Daubert*, 509 U.S. at 589.  Based on the above-stated reasons, the Court finds that it is not. Dr. Nye's declaration filed in support of Plaintiffs' opposition is the only evidence proffered by Plaintiffs as to the element of loss causation.  With no evidence upon which to base a decision, no rational trier of fact will be able to find that REMEC's alleged misrepresentations caused Plaintiffs' losses, and therefore summary judgment is appropriate.  *McCormick v. Fund Am. Co., Inc.*, 26 F.3d 869, 875 (9th Cir. 1994) (holding that summary judgment may be justified 'in appropriate cases.'") (citations omitted).

Accordingly, the Court **GRANTS** Defendants' objections to Dr. Nye's declaration, as well as the motion to strike him as an expert in this case.  Without Nye's report and testimony, Plaintiffs are left with only their allegations and cannot withstand Defendants' motion for summary judgment as to loss causation.  Because loss causation is an element Plaintiffs must prove to succeed on either of their two causes of action,[56] dismissal of both

---

[55]Autocorrelation is the correlation (relationship) between members of a time series of observations, such as weekly share prices or interest rates, and the same values at a fixed time interval later.  More technically, autocorrelation occurs when residual error terms from observations of the same variable at different times are correlated (related).

[56]In order to prove a claim for violation of Section § 20(a), a plaintiff must prove: "(1) a
(continued...)

1  claims is appropriate.

2  **VII.    PLAINTIFFS' MOTION *IN LIMINE***

3        Pursuant to the Court's Scheduling Order, in October 2008, Defendants designated

4  their expert witnesses.  In addition to the two retained experts who provided expert reports,

5  Defendants list approximately seventy percipient witnesses who may also give expert

6  testimony.  These include the key accountants at Ernst & Young, the individual Defendants

7  Ragland and Hickman, and other former REMEC employees.  Accounting is the main

8  subject matter (such as REMEC's procedures regarding goodwill and its internal controls),

9  but a few will testify about the telecommunications industry and its market.

10        Plaintiffs object because Defendants did not provide expert reports as required by

11  Federal Rule of Civil Procedure 26.  They argue that the witnesses are not qualified and

12  their testimony would duplicate that given by the retained experts.  Fed. R. Evid.. 403, 702,

13  703, & 705.  The Court **DENIES** the motion for the reasons set forth in Defendants'

14  opposition brief.

15  **IX.    COSTS**

16        As prevailing parties, Defendants are presumed to be entitled to recover court costs.

17  Fed. R. Civ. P. 54(d)(1); *Association of Mexican-Am. Educators v. Calif.*, 231 F.3d 572,

18  591-93 (9th Cir. 2000) (en banc).  Although there may be other issues relative to costs, the

19  Court *sua sponte* eliminates one issue in order to simplify, somewhat, that laborious

20  project.  The Court **DENIES** Defendants ***any and all costs related to their unfounded***

21  ***motion for sanctions***.  Order Denying Defendants' Motion for Sanctions at 5

22  ("Defendants' motion was based entirely on speculation and allegations of wrongdoing,

23  devoid of evidentiary support.") [Doc. No. 379].  The conclusory motion derailed the

24  pretrial proceedings; wrongfully accused Plaintiffs' counsel of criminal conduct, serious

25  _____

26       [56](...continued)
primary violation of federal securities laws and (2) that the defendants exercised actual power or

27  control over the primary violator." *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp*., 320 F.3d 920, 945 (9th Cir. 2003) (internal quotations and citation

28  omitted).  As discussed above, however, Plaintiffs cannot establish the first predicate element – a primary violation of the federal securities laws under Rule 10b-5.  As such, Plaintiffs cannot prevail on their Section 20(a) claim.

ethical violations, and professional impropriety based wholly on suspicion; and consumed significant resources in a court carrying a significant criminal case load.  *See e.g.*, *id.* at 11, 16-17, 20-21 & n.4, & 24-25.  The exclusion of costs "related" to that motion shall be broadly construed.

**CONCLUSION**

Upon due consideration of the parties' memoranda and exhibits, a comprehensive review of the record, and for the reasons set forth above,

**IT IS HEREBY ORDERED THAT**:

(1) The Court **DENIES** Defendants' motion to strike the declaration of Plaintiffs' expert witnesses Regan [Doc. No. 263]; and **GRANTS IN PART AND DENIES IN PART** Defendants' motion to strike portions of Minstein's expert report;

(2) The Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' and Defendants' motions for summary judgment as to falsity [Doc. Nos. 336 & 308];

(3) The Court **GRANTS** Defendants' motion for summary judgment on scienter, but **DENIES** that part of the motion concerning internal controls [Doc. No. 173];

(4) The Court **GRANTS** Defendants' objections to and motion to strike Blaine F. Nye as an expert witness;

(5) The Court **GRANTS** Defendants' motion for summary judgment as to loss causation, but **DENIES** it as to reliance [Doc. No. 194]; and,

(6) The Court **DENIES** Plaintiffs' motion *in limine* [Doc. No. 310].

Based on the foregoing, the Court **DISMISSES** this civil action **WITH PREJUDICE**.  The Clerk of Court shall enter judgment in favor of Defendants and close the case.

**IT IS SO ORDERED**.

DATED:  April 21, 2010

Hon. Michael M. Anello
United States District Judge